**14-1085**

In The

# United States Court of Appeals

### For The Federal Circuit

## NYKO TECHNOLOGIES, INC., a California corporation,

*Plaintiff – Appellant*,

**v.**

## ENERGIZER HOLDINGS, INC., a Missouri corporation, EVEREADY BATTERY COMPANY, INC., a Delaware corporation, PERFORMANCE DESIGNED PRODUCTS LLC, a California limited liability company,

*Defendants – Appellees.*

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA IN CASE NO. 2:12-CV-03001-GAF-VBK, JUDGE GARY FEESS.**

———————

### NON-CONFIDENTIAL BRIEF OF APPELLANT

———————

**Art Hasan**
**G. Warren Bleeker**
**Katherine L. Quigley**
CHRISTIE, PARKER & HALE, LLP
**655 North Central Avenue, Suite 2300**
**Glendale, California  91203**
**(626) 795-9900 (Telephone)**
**(626) 577-8800 (Facsimile)**
**art.hasan@cph.com**
**warren.bleeker@cph.com**
**katherine.quigley@cph.com**

*Counsel for Appellant*

## CERTIFICATE OF INTEREST

Counsel for the Plaintiff and Appellant, Nyko Technologies, Inc., certifies as follows in accordance with Federal Circuit Rule 47.4 and Federal Rule of Appellate Procedure 26.1:

1.     The full names of every party or amicus represented in the case by me are: Nyko Technologies, Inc.

2.     The name of the real party in interest if the party named in the caption is not the real party in interest: Not applicable.  (Nyko Technologies, Inc., is the real party in interest.)

3.     All parent corporations and any publicly held corporations that own 10% or more of the stock of either of Defendants and Appellees: None.

4.     The names of all law firms and the partners and associates that have appeared for the Plaintiff and Appellant in the lower tribunal or are expected to appear for the party in this court are: CHRISTIE, PARKER & HALE, LLP,  Art Hasan, G. Warren Bleeker, Katherine L. Quigley, and John D. Carpenter.

Dated:  February 12, 2014.

Respectfully submitted,

/s/ Art Hasan
Art Hasan
*Attorney for Plaintiff-Appellant,*
*NYKO Technologies, Inc.*

i

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ....................................................................i

TABLE OF CONTENTS........................................................................ ii

TABLE OF AUTHORITIES ....................................................................v

STATEMENT OF RELATED CASES ....................................................1

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES..............................................................1

STATEMENT OF THE CASE..................................................................3

     A.    Nyko Technologies.......................................................................3

     B.    Nyko's Patented Invention ........................................................3

     C.    Nyko's Provisional Application and Patent .........................7

     D.    The Defendants' Infringement .................................................10

     E.    The Asserted Claims of the '848 Patent...............................12

     F.    Proceedings in District Court .................................................14

SUMMARY OF ARGUMENT ...............................................................17

ARGUMENT ............................................................................................21

     I.    Summary Judgment Is Reviewed *De Novo* on Appeal .......................21

     II.    The District Court's Summary Judgment of No Written Description Was Fundamentally Misconceived ..................................22

A.    Written Description Depends on Whether the Description in the Provisional Application Supported the Claim of the Issued Patent ........................................................................23

B.    The District Court Based Its Decision on the Claims of the Provisional Application Instead of on Its Disclosure .........25

C.    The District Court Was Confused About "Teaching Away" ....................................................................................27

III.    Nyko's Patent Is Entitled to the Priority of the Provisional Application ........................................................................29

A.    The Provisional Application Disclosed Every Feature of the Asserted Claims .................................................29

1.    The Provisional Application Disclosed "Male Mini-USB Connectors Supported by the Base" as Set Forth in Claim 13......................................................30

B.    The Provisional Application Disclosed Claim 1's "DC Ports on the Base" as Properly Construed ................................34

C.    The Claims Do Not Require that the Ports or Connectors Be "On" or "Supported by" the Base at All Times ..................40

D.    The "Omitted Element" Rule Does Not Apply Here................42

1.    The Provisional Application Does Not Exclude Adapters that Remain on the Base...................................43

2.    The Provisional Application Discloses Multiple Embodiments, Including Connectors that Can Remain on the Base ......................................................47

E.    There Is No Unpredictability Requiring Further Disclosure of Embodiments......................................................48

F.    At the Very Least, There Are Genuine Factual Disputes About the Adequacy of the Written Description .....................50

IV.    Since Nyko Is Entitled to Priority of the Provisional Application, the Summary Judgment Was Unfounded, and the Public Use and On-Sale Issues Are Moot ........................................... 52

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ............................... 53

ADDENDUM

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

## STATEMENT REGARDING CONFIDENTIAL MATERIAL OMITTED

This Appeal is subject to a Protective Order issued by Judge Victor B. Kenton of the United States District Court for the Central District of California in *NYKO Technologies, Inc. v. Energizer Holdings, Inc.*, 2:12-CV-03001-GAF-VBK, Dkt. No. 66 (filed October 5, 2012).  In compliance with that Order, confidential information has been omitted from the following page of this brief: 5.  All omitted material is Protected Material, as defined by the Protective Order, and is to be disclosed only in accordance with the October 5th Protective Order.

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. Liberty Lobby*, *Inc.*,
  477 U.S. 242 (1986)..................................................................21

*Ariad Pharms.*, *Inc. v. Eli Lilly & Co.*,
  598 F.3d 1336 (Fed. Cir. 2010) (*en banc*)....................................52

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
  365 U.S. 336 (1961).................................................................43

*Bell Commc'ns Research*, *Inc. v. Vitalink Commc'ns Corp.*,
  55 F.3d 615 (Fed. Cir. 1995) .........................................................41

*Bilstad v. Wakalopulos*,
  386 F.3d 1116 (Fed. Cir. 2004) ............................................50, 52

*C.R. Bard*, *Inc. v. U.S. Surgical Corp.*,
  388 F.3d 858 (Fed. Cir. 2004) .....................................................47

*Clintec Nutrition Co. v. Baxa Corp.*,
  988 F. Supp. 1109 (N.D. Ill. 1997)..............................................40

*Cordis Corp. v. Medtronic AVE, Inc.*,
  339 F.3d 1352 (Fed. Cir. 2003)........................................22, 45, 49

*Crown Packaging Tech.*, *Inc. v. Ball Metal Beverage Container Corp.*,
  635 F.3d 1373 (Fed. Cir. 2011) ..........................................*passim*

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*,
  438 F.3d 1374 (Fed. Cir. 2006) ...................................................40

*Cybor Corp. v. FAS Techs., Inc.*,
  138 F.3d 1448 (Fed. Cir. 1998) ...................................................21

*DePuy Spine*, *Inc. v. Medtronic Sofamor Danek*, *Inc.*,
    567 F.3d 1314 (Fed. Cir. 2009) ...................................................27

*Eiselstein v. Frank*,
    52 F.3d 1035 (Fed. Cir. 1995) ...................................................24

*Epistar Corp. v. ITC*,
    566 F.3d 1321 (Fed. Cir. 2009) ...................................................45

*Exxon Chemical Patents*, *Inc. v. Lubrizol Corp.*,
    64 F.3d 1553 (Fed. Cir. 1995) ...................................................41

*Fuji Photo Film Co. v. U.S. Int'l Trade Comm'n*,
    386 F.3d 1095 (Fed. Cir. 2004) ...................................................49

*Gentry Gallery*, *Inc. v. Berkline Corp.*,
    134 F.3d 1473 (Fed. Cir. 1998) ...............................................42, 43

*Genzyme Corp. v. Transkaryotic Therapies*, *Inc.*,
    346 F.3d 1094 (Fed. Cir. 2003) ...................................................47

*Hormone Research Found. v. Genentech*, Inc.,
    904 F.2d 1558 (Fed. Cir. 1990) ...................................................40

*In re Wertheim*,
    541 F.2d 257 (C.C.P.A. 1976).....................................................24

*Johnson Worldwide Assos.*, *Inc. v. Zebco Corp.*,
    175 F.3d 985 (Fed. Cir. 1999) ...............................................43, 44

*Koito Mfg. Co. v. Turn-Key-Tech*, *LLC*,
    381 F.3d 1142 (Fed. Cir. 2004) ...................................................25

*Lampi Corp. v. Am. Power Prods.*, *Inc.*,
    228 F.3d 1365 (Fed. Cir. 2000) ...................................................46

*Laryngeal Mask Co. Ltd. v. Ambu A/S*,
    618 F.3d 1367 (Fed. Cir. 2010) ...................................................46

*Lockwood v. Am. Airlines, Inc.*,
  107 F.3d 1565 (Fed. Cir. 1997) ............................................................25, 30

*MBO Labs., Inc. v. Becton, Dickinson & Co.*,
  474 F.3d 1323 (Fed. Cir. 2007), *aff'd*,
  467 Fed. Appx. 892 (Fed. Cir. 2012) ........................................................38

*New Railhead Mfg., LLC v. Vermeer Mfg. Co.*,
  298 F.3d 1290 (Fed. Cir. 2002) ........................................................18, 23, 26

*Renishaw PLC v. Marposs Societa' per Azioni*,
  158 F.3d 1243 (Fed. Cir. 1998) ..................................................................41

*Rexnord Corp. v. Laitram Corp.*,
  274 F.3d 1336 (Fed. Cir. 2001) ............................................................47, 49

*Spine Solutions v. Medtronic Sofamor Danek USA*,
  620 F.3d 1305 (Fed. Cir. 2010) ............................................................45, 46

*Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*,
  655 F.3d 1364 (Fed. Cir. 2011), *cert. dismissed*,
  133 S. Ct. 97 (2012).....................................................................................21

*Synthes USA, LLC v. Spinal Kinetics, Inc.*,
  2013-1047, 2013 WL 5788675 (Fed. Cir. Oct. 29, 2013) ...........................50

*Tandon Corp. v. U.S. Int'l Trade Comm'n*,
  831 F.2d 1017 (Fed. Cir. 1987) ..................................................................40

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
  299 F.3d 1313 (Fed. Cir. 2002) ..................................................................21

*Thermal Techs., Inc. v. Dade Serv. Corp.*,
  No. 6:03-cv-1414-Orl-31JGG,
  2004 U.S. Dist. LEXIS 27885 (M.D. Fla. Jun. 14, 2004) ...........................40

*Utter v. Hiraga*,
  845 F.2d 993 (Fed. Cir. 1988) ....................................................................49

*Vas-Cath Inc. v. Mahurkar*,
    935 F.2d 1555 (Fed. Cir. 1991) ....................................................24, 25, 30, 43

*Vectra Fitness*, *Inc. v. ICON Health & Fitness*, *Inc.*,
    246 F. Supp. 2d 1111 (W.D. Wash. 2003) ............................................ 37-38

*Vitronics Corp. v. Conceptronic*, *Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ................................................................38, 41

## STATUTES

28 U.S.C. § 1295(a)(1) ...............................................................................1

28 U.S.C. § 1331 .........................................................................................1

28 U.S.C. § 1338(a) ....................................................................................1

28 U.S.C. § 2107(a) ....................................................................................1

35 U.S.C. § 102 .........................................................................................53

35 U.S.C. § 102(b) ..............................................................................*passim*

35 U.S.C. § 111(b)(2) ...............................................................................24

35 U.S.C. § 112 ...........................................................................24, 30, 49

## RULE

Fed. R. App. P. 4 .......................................................................................1

## OTHER AUTHORITY

Leahy-Smith America Invents Act of 2011, Pub. L. No. 112-29, 125 Stat.
284 § 3 (2011) ..........................................................................................53

## STATEMENT OF RELATED CASES

No other appeal involving this civil action was previously before this or any other appellate court. There are no pending cases known to counsel that would directly affect or be directly affected by this Court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) and entered a final judgment on November 4, 2013. Appellant filed notice of this appeal on November 8, 2013. This appeal is therefore timely under 28 U.S.C. § 2107(a) and Fed. R. App. P. 4. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1. On *de novo* review, are the defendants entitled to summary judgment of invalidity under 35 U.S.C. section 102(b), even though Plaintiff Nyko's asserted '848 Patent claims the priority of a provisional application filed within section 102(b)'s one-year grace period?

   a. Is there at least a triable issue of fact as to whether the defendants proved by clear and convincing evidence that the provisional application did not provide a "written description" supporting the

asserted patent claims, even after all reasonable inferences are drawn in favor of Nyko?

b.    Is at least a triable issue created by Nyko's submission of detailed, competent expert testimony that every element of the asserted claims was present in the provisional application?

c.    In view of the defendants' failure to rebut the facts presented by Nyko's expert, should this Court determine as a matter of law that the asserted claims *are* entitled to the priority of the provisional application?

2.    Is the adequacy of the provisional application's written description to be determined based only on what the provisional application *claimed*—as the district court believed—or on the complete description and drawings contained in the provisional application?

## STATEMENT OF THE CASE

### A.    Nyko Technologies

The plaintiff and appellant, Nyko Technologies, Inc., is one of the United States' top-selling manufacturers of video game accessories.  (A511.)  Nyko is known in the industry for technical innovation and leadership in bringing unique gaming accessories and advanced technologies to market.  (*Id*.)  Its products include charging systems for hand-held controllers used with various gaming consoles.  (A584-85 at ¶ 5.)  For example, Nyko sells a line of charging systems for the controllers used with Microsoft's Xbox® 360 video game consoles and another line of charging systems for the controllers used with Sony's PlayStation® 3 video game consoles.  (*Id*.)  Nyko's charging systems are very popular, because they enable users to charge multiple hand-held video game controllers simultaneously, without having to remove the battery packs from the controllers, and without dangling cords and connectors.  (A585 at ¶ 6.)

### B.    Nyko's Patented Invention

Nyko's Vice President of Research and Development, Amir Navid, successfully solved the problem of conveniently and simultaneously charging multiple game controllers having fragile charging receptacles.  Previous efforts had been unsatisfactory and unsuccessful.  For example, Randall C. Cole had patented

3

a storage rack for game controllers, but it did not hold them securely and required use of wires for charging.  (A1457.)



**U.S. Patent No. 7,942,747 to Cole, Entitled "Video Game Controller Rack" (A1457.)**

Mr. Navid invented a novel video game controller charging system with a docking structure configured to align, support and concurrently charge multiple controllers.  This novel charging system is exemplified in multiple embodiments described in detail in the '848 Patent.  For example:

**CONFIDENTIAL MATERIAL OMITTED**



**Figures 11 and 18 of '848 Patent**
**(Figure 18 is the same as Figure 3 of Navid Provisional Application.)**
**(A113, A119)**

The charging system includes a base with multiple docking bays, each docking bay defined by a pair of opposing parallel walls and a protruding DC port (or connector) between the walls.   Each docking bay accepts a video game controller from one direction and guides and aligns it so as to safely and securely couple the small and fragile charging receptacle on the controller to the protruding DC port on the base.  (A126 at Col. 1:54-62; A130 at Col. 9:35-39 & 51-55.)[1]

---

[1]    CONFIDENTIAL    [█████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████]

Figure 21 illustrates controllers in place on a charging station of the '848

Patent:



**Figure 21 of '848 Patent**
**(Same as Figure 6 of Navid Provisional Application)**
**(A122, A93)**

Mr. Navid's invention eliminates the need for long messy charging cables

and at the same time avoids damage to fragile plugs or ports.  (A511 at ¶ 7; A76-77

at ¶¶ 0003-4.)  The invention eliminates the need for the video game console to be

powered on in order to charge the controllers.  (A511.)  Additionally, the invention

eliminates the need to remove battery packs and charge them separated from the

controllers.  Having multiple ports on the charger allows more than one player to

charge controllers at the same time, and also allows a single player to have a

backup controller available to use immediately should the primary controller run

out of charge. (*Id.*) Still further, the configuration of the docking bays allows the controllers to be suspended in a position in which a user may readily grasp the handles of the controllers for game play. (*Id.*)

## C.    Nyko's Provisional Application and Patent

In January 2007, Nyko began promoting charging stations designed by Amir Navid. (*See*, *e.g.*, A721 ¶ 15.)[2] Less than a year later, on October 24, 2007, Mr. Navid filed a provisional patent application on his charging station invention. (A71-A100.)  The '848 Patent in suit claims priority of the provisional application. (A101, A126.)  The patent was issued on March 27, 2012. (A101.)

The '848 Patent discloses and claims multiple embodiments.  Some embodiments facilitate connection of the controller to the charging system by using detachable adapters with DC ports (connectors) that can either remain attached to a controller when it is removed from the charging base or can stay attached to the charging base. (*See*, *e.g.*, A118-19; A131 at col. 11, lines 64-67, A132 at col. 13, lines 7-14.)  For example, Figure 17 of the patent shows an embodiment in which "adapters 561 can be dropped vertically into the docking bays 512, 514 and into the recesses 530." (A131 at Col. 12:14-16.)

---

[2] In order to simplify this appeal, Nyko will not contest here the defendants' contention that these activities constituted public use or offers for sale of the subject matter of the asserted claims.



**Figure 17 of '848 Patent**
**(Same as Figure 2 of Navid Provisional Application)**
**(A118, A89)**

In other embodiments, the DC ports are attached directly to the charging stations and become attached to the controllers only when the controllers are being charged. (*See*, *e.g.*, A113.) All charging station embodiments disclosed in the '848 Patent and the provisional include docking bays with opposing parallel sidewalls dimensioned to receive the controllers and to guide and align them onto the charging station. (A71-134.)

Like the '848 Patent, the Navid provisional application disclosed multiple embodiments and configurations. One drawing of the provisional shows an adapter with DC ports that has been removed from a charge base (A89); another shows DC ports on a charge base without any controllers in place (A90); and

others show controllers in place on a charge base (*see*, *e.g.*, A93). As in the '848 Patent, all the embodiments disclosed in the provisional application include docking bays with opposing parallel sidewalls dimensioned to receive controllers and to guide and align them onto the charging station. (A71-100.) These docking bays protect the fragile connectors from torque that might bend or break them by preventing the controllers from twisting or turning as they are placed in the docking bays to mate with the DC ports. (*See* A2180 ¶ 86; *see also* A2174-75 ¶¶ 76-78.) Figure 3 of the provisional application (which is the same as Figure 18 in the '848 Patent) shows DC ports (mini-USB connectors) on and supported by the charge base, as claimed in the asserted claims of the '848 Patent:



(A90.)

**D.    The Defendants' Infringement**

The defendants, Energizer Holdings, Inc., and Performance Designed Products LLC, directly compete with Nyko in selling charging systems for game controllers.  (A585-586 at ¶ 8-9; A727 at ¶ 5.)  Before issuance of the '848 Patent, the defendants had already begun selling charging systems for Xbox® 360 and PlayStation® 3 controllers, using Mr. Navid's invention without any license from Nyko.  (A586-87 at ¶ 12.)  For example, the defendants' Energizer Charging Systems have a base, structures on the base for providing physical support to multiple video game controllers, docking bays including opposing parallel sidewalls for guiding and aligning the controllers, and multiple DC ports (male mini-USB connectors) on the base for directly coupling to the controllers without the use of wires or cables.  (A513, 562.)



**Example of an Accused Energizer Charging
System**

The defendants' DC ports are attached to a transparent plastic piece (the transparent plastic insertion guides), shown below. Each plastic piece attaches to the arc of the accused charge station via a plastic prong which fits into a matching hole on the plastic piece. (A3977-A3978.) The defendants have taken the position that the DC ports are indirectly attached to the base via the plastic piece. (A3977 at ¶ 60-61.) The DC ports in the accused device are on the plastic piece attached to the arc and are not detachable. (*Id*.)



(A3977-A3978.)

The defendants' infringing charging stations displaced Nyko's charging stations in about 1,000 Target stores and then began to take over the shelves at Walmart stores around the country. (A585-88 at ¶¶ 9-14.) Following issuance of the '848 Patent, defendants continued selling their unlicensed controllers. (A586-87 at ¶ 12.) Nyko therefore sued the defendants for infringement. (A434-439.)

**E.**    **The Asserted Claims of the '848 Patent**

In the district court, Nyko accused the defendants of infringing independent Claims 1 and 13 and dependent Claims 2-5, 7, 8, 10-12 and 14-17 of the '848 Patent.  (A25, fn. 4.)  Among other limitations, Claim 1 calls for "a plurality of DC ports on the base," while Claim 13 calls for "a plurality or male mini-USB connectors supported by the base."   (A133.)   Both independent claims recite a combination of mechanical features including features of the docking bays:

> 1. A video game controller charging system for charging a plurality of video game controllers using externally supplied power, the video game controller charging system comprising:
>
> a base;
>
> at least one structure on the base for providing physical support to the plurality of video game controllers while the plurality of video game controllers are being charged; and
>
> a plurality of ***DC ports on the base***, each of the DC ports configured to couple to and provide DC power to a power input port of a respective one of the plurality of video game controllers,
>
> wherein the at least one structure on the base comprises a plurality of docking bays open in a first direction and configured to receive respective ones of the plurality of video game controllers from the first direction, and
>
> wherein the at least one structure on the base further comprises a plurality of pairs of opposite surfaces, each pair of surfaces defining a respective docking bay of the plurality of docking bays each of the DC ports being on the base between a respective one of the pairs of surfaces.

13. A charging system for charging a plurality of video game controllers, each having a power input port, the charging system comprising:

a base;

a plurality of ***male mini-USB connectors supported by the base*** and each adapted to provide DC power to a respective one of the plurality of video game controllers;

at least one docking structure defining a plurality of docking bays open in a first direction and configured to receive from the first direction and align respective ones of the plurality of video game controllers to couple to respective ones of the plurality of male mini-USB connectors; and

a power input for connecting to a power supply, the power input electrically coupled to the plurality of male mini-USB connectors,

wherein the at least one docking structure comprises a plurality of pairs of substantially parallel opposite planar surfaces, each pair of surfaces defining a respective docking bay of the plurality of docking bays, each of the docking bays being open on opposite sides between the respective pair of surfaces.

(A133 (emphasis added to indicate the features at issue in this appeal).)

The claimed features, including the interrelationship between the recited components, are exemplified in Figure 18 of the '848 Patent, which is the same as Figure 3 of the provisional.  (A2195-211.)



**Figure 18 of '848 Patent**
**(Same as Figure 3 of Navid Provisional Application)**
**(A119, A90)**

## F.    Proceedings in District Court

After briefing and a *Markman* hearing, the district court issued a claim construction order construing "supported by the base" and other claim terms. (A46-70.)  The district court construed "supported by the base" which appears in claim 13 as "physically supported by, but not necessarily directly on the base." (A70.)  The district court did not construe "on the base," which appears in claim 1, since neither side requested any construction of that term.  (*See* A888-93.)  The district court construed the term "base" as "the body of the Charging System." (A56.)

After discovery and the exchange of expert reports, the defendants moved for summary judgment that Nyko's asserted claims were invalid under 35 U.S.C. section 102(b) based on alleged Nyko product demonstrations, offers, and sales beginning in January 2007. (*See* A1685-702.) The defendants argued that these activities constituted prior art because, according to the defendants, Nyko's October 2007 provisional application did not provide a sufficient written description to support the asserted claims. (*See* A1703-11.)

Opposing summary judgment, Nyko submitted multiple declarations, including detailed declarations from expert witness Garry Kitchen, an engineer with in-depth experience in the field of video game hardware, video game accessories, and video game controllers. (*See* A2151-54.) Mr. Kitchen provided an element-by-element analysis, showing that the provisional application disclosed each and every element in the asserted claims of Nyko's '848 Patent. (A2159, A2195-211.) In response to Nyko's showing, the defendants contested only whether the provisional application provided an adequate written description to support two features in the asserted claims: the DC ports "on the base" in Claim 1 and the male mini-USB connectors "supported by the base" in Claim 13. (A1703-11.)

In its summary judgment order, the district court stated that "the only question at issue is whether the '364 Provisional adequately supports the claims of

the '848 Patent."    (A35.)    But in deciding this dispositive issue of written description, the district court believed that the written description of the provisional application should be limited to what was set forth in the **claims of the provisional application** (which the district court considered the only "relevant manifestation" in the provisional application).    The district court articulated this mistaken belief during the summary judgment hearing:

> THE COURT: ***What do I look to in the provisional as to what's disclosed if I don't look at the claims?*** I mean, that's—the claims are ultimately the heart of the patent. It is what you're entitled to have your monopoly on. Your monopoly is on the invention which is described by the claims, and so, you know, we look to the provisional and try to figure out well, what does this provisional patent application show.

(A3230:16-22 (emphasis added).)

Although Nyko attempted to dissuade the court (*see* A3231:1-16), the court's summary judgment order maintained the position that, "[t]hough the '364 Provisional describes multiple embodiments of the Provisional System, ***the claims indicate one relevant manifestation***." (A27 (emphasis added).)  The district court rejected Nyko's evidence that the drawings of the provisional application disclosed a controller "on the base" and "supported by the base" as "miss[ing] the point" because "the '364 Provisional ***requires*** an external adapter . . . ." (A36 (emphasis in original).)  In a later order, the district court confirmed that its decision that the provisional application did not provide an adequate written description for the '848

Patent had been based on comparing "the inventions *claimed* in each." (A3882 (emphasis added).)

It was by looking only at what the provisional application "require[d]" (that is, claimed)—and not what its overall specification and drawing described—that the district court decided that "the invention was not described in the . . . '364 Provisional and therefore [is] not entitled to the earlier priority date." (A24.) Nyko appeals from the resulting summary judgment. (A3429-33.)

## SUMMARY OF ARGUMENT

This Court should reverse the district court's summary judgment of invalidity of the asserted claims of Nyko Technologies' '848 Patent. The summary judgment was based entirely on using Nyko's own product demonstrations, offers, and sales as prior art against Nyko's patent. But to qualify as prior art on the asserted basis—35 U.S.C. section 102(b)—these demonstrations, offers, and sales would have had to occur more than a year before the priority date of Nyko's patent. That requirement was not met, because Nyko's patent claims priority of a provisional application filed in October 2007. The earliest of the Nyko product demonstrations, offers, and sales that Defendants assert as "prior art" did not occur until January 2007—less than a year before the provisional application and therefore too late to qualify under section 102(b). (*See infra*, Argument parts I, III, IV.)

The district court denied the asserted claims the priority of the provisional application solely because the court became confused about the law of written description.  Misunderstanding the law, the district court wrongly concluded that the provisional application had not disclosed elements of the asserted claims. But Nyko's evidence showed that it did.  (*See infra*, Argument part II.)

A provisional application provides a sufficient "written description" to support priority of a later patent claim if, from the point of view of a person of ordinary skill in the relevant field, the provisional application disclosed the features in that claim.  *See*, *e.g.*, *New Railhead Mfg.*, *LLC v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1294 (Fed. Cir. 2002).  Nyko's provisional application *did* disclose all of the features recited in the claims asserted by Nyko against the defendants. This is shown by a detailed declaration from Nyko's expert Garry Kitchen (A2149-2211) and indeed is clear on the face of the application itself.  (*See*, *e.g.*, A90.) Nyko's detailed showing that the claimed features were disclosed in the provisional application raised genuine issues of material fact that made summary judgment improper.  (*See infra*, Argument part III.)

There are only two features of the asserted claims whose disclosure in the provisional application has been questioned.  With regard to Claim 1 (and its dependent Claims 4-5, 7-8, and 10-12), the defendants asserted that the provisional application did not disclose "DC ports on the base" of the charging system.

(A1703-11.)   With regard to Claim 13 (and its dependent Claims 15-17), the defendants asserted that the provisional application did not disclose "male mini-USB connectors supported by the base."  (A1699.)  The defendants were wrong on both points.

For example, with respect to Claim 13, the provisional application plainly illustrated and described male mini-USB connectors "supported by the base":



(A90; *infra*, Argument part III A.)

There can be no legitimate question that the base supports the male mini-USB connectors under both the district court's claim construction and the ordinary meaning of the word "support."  Anyone of ordinary skill in the art (or of common sense) would understand that the base is holding up the male mini-USB connectors

in Figure 3.  If the base were suddenly removed, the male mini-USB connectors would fall down.  (A2173 at ¶ 70; *infra*, Argument part III B.)

Claim 1 is also entitled to priority of the provisional application, under a correct construction of the claim's limitation requiring "DC ports on the base." While the district court never clearly construed the term "on," there is nothing about the use of "on" in Claim 1 that requires direct contact between the ports and the base.  Such contact is not required by most definitions of "on," nor by its ordinary meaning—such as "the food is on the table."  (A2159-64.)  Both sides' experts agreed that "on" is not used as a term of art in the '848 Patent (A2159-2164 at ¶¶ 40-47; A2213 at ¶ 7, A2291:12 – A2292:15), so its ordinary meaning should prevail.  (*See infra*, Argument part III C.)

There is nothing in the '848 Patent that disclaims detachable ports or connectors, nor is there anything in the provisional application that disclaimed non-detachable ports or connectors.  The asserted claims cover both, and the provisional application amply supported those claims.  (*See infra*, Argument part III.)  At a minimum, the evidence put forward by Nyko raises genuine factual issues about whether the asserted claims are entitled to priority of the provisional application.  As a result, the summary judgment motion should be vacated.

## ARGUMENT

### I. Summary Judgment Is Reviewed *De Novo* on Appeal.

This Court "review[s] the grant of summary judgment de novo, drawing all reasonable inferences in favor of the non-moving party." *Teleflex*, *Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1323 (Fed. Cir. 2002) (citing *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 255 (1986)). Whether a patent is entitled to its priority date is also reviewed *de novo*. *Star Sci.*, *Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1371 (Fed. Cir. 2011), *cert. dismissed*, 133 S. Ct. 97 (2012) ("This court reviews both the district court's grant of summary judgment and determination of priority date without deference."). Similarly, "[c]laim interpretation is a question of law, which [this Court] review[s] de novo." *Teleflex*, 299 F.3d at 1323 (citing *Cybor Corp. v. FAS Techs.*, *Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc)).

On *de novo* review, this Court should reverse the district court's summary judgment in favor of the defendants. Nyko presented detailed, competent evidence that its provisional application provided a written description supporting the asserted claims of Nyko's patent and therefore defeating the defendants' defense of invalidity under 35 U.S.C. section 102(b). (*See infra* parts III A-C.) The defendants failed to rebut Nyko's showing that every element in those claims was disclosed in the provisional application. (*See infra* part III A.) Therefore, Nyko should prevail, as a matter of law, against the defendants' section 102(b) defense.

Certainly, the defendants did not show by clear, convincing, and unrebutted evidence that they had established every single element of their invalidity defenses, even after all reasonable inferences were drawn in favor of Nyko. *See*, *e.g*., *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1364 (Fed. Cir. 2003) ("The burden at trial was on [accused infringer] AVE to establish by clear and convincing evidence that the written description requirement was not met, in light of the presumption of validity . . . ."). At a minimum, the district court should have held that there were triable issues of fact concerning the adequacy of Nyko's provisional application to support Nyko's asserted patent claims. (*See infra* part III F.)

## II.  **The District Court's Summary Judgment of No Written Description Was Fundamentally Misconceived.**

The summary judgment resulted solely from the district court's misunderstanding of "written description." The defendants sought summary judgment solely based on asserted "prior art" activities that occurred less than a year after Nyko filed its provisional patent application. (*See* A1685-1711.) The district court's summary judgment depended entirely on its mistaken conclusion that, as a matter of law, the provisional application did not provide a written description supporting Nyko's patent claims and that the claims were therefore not entitled to the priority of the provisional application. (*See* A24 (district court's holding that "the invention was not described in the . . . '364 Provisional and

therefore [is] not entitled to the earlier priority date").)  In ordering summary judgment, the district court stated that "the only question at issue is whether the '364 Provisional adequately supports the claims of the '848 Patent." (A35.)

Unfortunately, the district court misunderstood the applicable standard and therefore wrongly decided this sole dispositive issue.  Even though Nyko offered uncontroverted evidence that the provisional application disclosed every element in the asserted claims of the '848 Patent, the district court wrongly believed that this was not enough.  Instead, the district court thought that the provisional application must not only have disclosed the features claimed in the later patent but must have itself *claimed* them.  The district court believed that embodiments described in the provisional application were not "relevant" to its written description unless those embodiments had been claimed in the application.  (A27; *see also* A36, A3230:16-22, A3882.)  The court was utterly mistaken.

A.  **Written Description Depends on Whether the Description in the Provisional Application Supported the Claim of the Issued Patent.**

A provisional application provides a sufficient "written description" to support priority of a later patent claim if, from the point of view of a person of ordinary skill in the relevant field, the provisional application disclosed the features in that claim.  *See*, *e.g.*, *New Railhead Mfg.*, 298 F.3d at 1294 ("[F]or the non-provisional utility application to be afforded the priority date of the provisional application, . . . the written description of the provisional must

23

adequately support the claims of the non-provisional application . . . .").  To provide an adequate written description, "the prior application need not describe the claimed subject matter in exactly the same terms as used in the claims; it must simply indicate to persons skilled in the art that as of the earlier date the applicant had invented what is now claimed." *Eiselstein v. Frank*, 52 F.3d 1035, 1038 (Fed. Cir. 1995).

Contrary to the belief of the district court, the scope of priority document's written description is not determined merely by its claims.  The provisional application was not even required to have claims.  *See* 35 U.S.C. § 111(b)(2) ("A claim, as required by subsections (b) through (e) of section 112, shall not be required in a provisional application.").  And, during prosecution, an inventor can amend the claims or add new claims that are different in scope from the original claims but still satisfy the written description requirement of 35 U.S.C. section 112.  *See*, *e.g.*, *In re Wertheim*, 541 F.2d 257, 263 (C.C.P.A. 1976).  Instead of depending on the claims of the priority document, the written description determination "requires an objective inquiry into **the four corners of the specification** from the perspective of a person of ordinary skill in the art.  *Crown Packaging Tech.*, *Inc. v. Ball Metal Beverage Container Corp.*, 635 F.3d 1373, 1380 (Fed. Cir. 2011) (emphasis added). Indeed, "drawings alone may provide a 'written description' of an invention as required by § 112." *Vas-Cath Inc. v.*

*Mahurkar*, 935 F.2d 1555, 1565 (Fed. Cir. 1991); *see Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997) (The written description requirement can be satisfied by "words, structures, figures, diagrams, formulas, etc.").  In *Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1155 (Fed. Cir. 2004), the Court held that "Figure 1 . . . demonstrates that the inventor was 'in possession' of the patent claims . . . and thus that the written description requirement was satisfied." And in *Vas-Cath*, the Court held that the drawings of a design patent can provide a "written description" sufficient to support a utility patent.  *Vas-Cath*, 935 F.2d at 1565.

In opposing summary judgment, Nyko showed that its provisional application disclosed every element of the asserted patent claims.  (*See infra* part III A.)  The district court should have denied summary judgment.

### B.    The District Court Based Its Decision on the Claims of the Provisional Application Instead of on Its Disclosure.

In ordering summary judgment, the district court mistook the relevant question and focused on the ***claims*** of the provisional application instead of its disclosure.  The optional claims contained in Nyko's provisional application did not limit the disclosures that preceded them.  (*See supra* part II A.)  The relevant question was, not whether the provisional application ***claimed*** what Nyko's patent-in-suit claims, but rather what but whether the provisional application ***described*** what the patent claims—for example, whether the provisional application provided

examples of the limitations in the asserted claims. *See*, *e.g.*, *New Railhead*, 298 F.3d at 1294. The provisional application did in fact provide such a disclosure. (*See infra* part III A.) As a result, the provisional application fulfilled the written description requirement, and the asserted claims are entitled to the priority of the provisional application. The district court erred in concluding otherwise.

Mistaking the relevant question, the district court never clearly found whether the provisional application disclosed examples of the disputed claim limitations. Instead of directly addressing Nyko's well-supported contentions that the provisional application disclosed a controller "on the base" and "supported by the base" as those claim terms are properly construed, the district court wrongly stated that Nyko's contentions "misse[d] the point." (*See* A36.) The reason that the district court gave for this is "that the '364 Provisional ***requires*** an external adapter while the '848 Patent makes no mention of it." (*Id*. (emphasis in original).) In this reasoning, the district court got the question backwards and granted summary judgment because it believed the provisional application's claims excluded features of the '848 Patent, instead of focusing on whether the application disclosed the features in the patent's claims. (*See infra* part II A.)

In addition, although it was not required to do so, the provisional application actually ***did*** claim the subject matter of the present asserted claim. Claim 11 of the provisional application recites "Apparatus as shown and described herein." (A86.)

Therefore, for example, the device configured as shown in the provisional application's Figure 3 was claimed in the provisional. Figure 3 shows a device as claimed in asserted Claims 1 and 13 of the '848 Patent. (*See* A90.)

## C.    The District Court Was Confused About "Teaching Away."

The district court was also misled by a belief that "the '364 Provisional . . . teaches away from the claims at issue in the '848 Patent by discussing the failings of a system without an external adapter." (A35.) This belief was both irrelevant and factually mistaken.

The concept of "teaching away" properly applies to the obviousness of combinations or modifications of prior art—not to the scope of a written description. *See*, *e.g.*, *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1326-27 (Fed. Cir. 2009). Expressing a preference for a particular feature does not limit the disclosure to embodiments that include that feature. Instead, as this Court held in *Crown Packaging*, the written description of a patent application should be limited to the specific embodiment or species described in its specification only when the application "unambiguously limited the scope of the invention" to that specific embodiment or species. *Crown Packaging*, 635 F.3d at 1382. Because the specification in *Crown Packaging* did not teach that 'metal savings [could] ***only*** be achieved by increasing the chuck wall angle along with narrowing the reinforcing

bead," the specification adequately supported claims that did not require **both** of these features. *Id.* at 1381 (emphasis added).

Nyko's provisional application does not contain anything like the "unambiguous limit[ation]" required by *Crown Packaging*. The supposed "teaching away" in Nyko's provisional application consisted merely of a general comment that "plugs can be small and/or fragile [and] [t]hese small plugs can be easily bent or broken, rendering the charging station inoperable." (A76-77 at ¶¶ 0003-4.) The provisional application does not say that the use of external adapters is the only way to address this problem. On the contrary, the provisional application describes a variety of beneficial features, including "docking bays . . . dimensioned to accept a handheld controller." (A78 at ¶ 0017; A2174-75 at ¶ 76.) These bays include partitions and sidewalls that help guide and align the controllers as they are mounted on the base and accomplish the purposes of the inventions, as exemplified in Figure 3. (A90; A2166 at ¶ 55; A2175 at ¶ 77.) These features address the problem of broken or bent plugs—and improve on prior art such as Cole's—regardless of whether they are combined with a detachable adapter—as the docking bays prevent a torque from being applied to the connectors. (*See* A1457; A2174-81 ¶¶ 75-88.) The provisional application certainly contained no "unambiguous limitation" that could negate its disclosure of these features. Therefore, the district court erred factually as well as legally in granting summary

judgment on the belief that "the '364 Provisional actually teaches away from the claims at issue in the '848 Patent by discussing the failings of a system without an external adapter." (A35; *see also* A37.)

Further, there is no requirement that a patent claim include every feature disclosed as helping to solve a problem in the prior art. *Crown Packaging*, 635 F.3d at 1381. It is enough that the claims at issue recite docking bay features disclosed in the provisional application, without also claiming the detachability of the DC ports or connectors. *Id.*

### III. Nyko's Patent Is Entitled to the Priority of the Provisional Application.

#### A. The Provisional Application Disclosed Every Feature of the Asserted Claims.

The provisional application disclosed every feature in the asserted claims of Nyko's '848 Patent. This was established by the expert declaration of Garry Kitchen, an engineer with in-depth experience in the field of video game hardware, video game accessories, and video game controllers. (A2151-54 at ¶¶ 2-19; A2190-94.) Mr. Kitchen provided an element by-element analysis identifying every claim element in the disclosures of the provisional application. (A2170-73 at ¶¶ 64-72, A2195-211.)

In seeking summary judgment, the defendants contested the written description of only two claim elements: Claim 1's requirement for "DC ports on the base" of the charging system and Claim 13's requirement for "male mini-USB

connectors supported by the base." (*See*, *e.g.*, A1703-11.) The provisional application disclosed both these features.

**1.    The Provisional Application Disclosed "Male Mini-USB Connectors Supported by the Base" as Set Forth in Claim 13.**

Starting with Claim 13, the provisional application refers verbatim to the "male mini-USB . . . connector[s]." (A2170-73 at ¶¶ 64-72; A2206-07.)  While the provisional application does not say in so many words that these connectors are "supported by" the base, Figure 3 shows such support, which is enough to satisfy the written description requirement.  *See Vas-Cath*, 935 F. 2d at 1565 ("drawings alone may provide a 'written description' of an invention as required by § 112"); *Lockwood*, 107 F.3d at 1572 (The written description requirement can be satisfied by "words, structures, figures, diagrams, formulas, etc.").

For example, "male mini-USB connectors supported by the base" are illustrated in Figure 3 of the provisional application.  (A90.)



Connectors 42
(Can be "male mini-USB … connector[s].")

FIG. 3

Base 24
Supports the connectors.

The entire premise for the defendants' summary judgment motion as to Claim 13 was that the disclosure of a detachable adapter between the controller and the base in the provisional application necessarily prevented the controller from being "supported by the base." But this assumption is incorrect, whether under the district court's construction of "supported by the base" or any appropriate construction.

The district court construed "supported by the base" as meaning "physically supported by *but not necessarily directly on the base*." (A70 (emphasis added).) The district court's comments during claim construction provide clear context for this claim construction:

> THE COURT: Okay. I mean, I'll think about it. I hear your argument. It just seems to me that you've got a claim that deals with DC ports that are on the base and you've got another claim that has them supported by the base.
>
> I understand what "supported" means; and it seems to me certainly clear that they don't have to be, *when you use "supported by the base," they clearly don't have to be directly on the base*; right? You'd agree with that part?
>
> MR. HASAN: I completely agree with that.
>
> THE COURT: Right.

[A1619:11-21 (emphasis added); *see also* A1661:3-11, A1662:19-A1664:16.]

The district court's conclusion that direct contact with the base is not required is consistent with the plain meaning of "support." To "support" is to

"hold up." (A2213 at ¶ 8, 2314 ("to hold up or serve as a foundation or prop for"); A2213 at ¶ 9, A2316 ("to bear or hold up . . ."), A2214 at ¶ 10, A2318-19 ("to hold the weight of someone or of something such as a building or structure so that they do not move or fall").)  Meanwhile, "physical" means "having material existence: perceptible esp[ecially] through the senses and subject to the laws of nature" or "characterized or produced by the forces and operations of physics."  (A2214 at ¶ 11, A2321-23.)

The base of the charging station in Figure 3 of the provisional application plainly supports the USB connectors under both the district court's construction and under the ordinary meaning of the words "physical" and "support."  The base (Item 24) underlies and fits around the adapters (Items 16) and thereby physically supports both them and the connectors.  (A2170-73.)  As Nyko's expert pointed out, "If the body of the charging system were not under the mini-USB connectors, the connectors would fall down onto whatever surface is below."  (A2173 at ¶ 70.)

The base's physical support for the connectors is plain in Figure 3, but is also inescapably disclosed by the provisional application's description of embodiments in which the adapter with the connectors "is placed into the docking bay by a push-fit, press-fit, or snap-fit, rather than simply a drop-fit."  (A81 at ¶ 0024.)  A "press-fit," for example, is "really tight."  (A2213 at ¶ 7, A2295:10-14 (testimony of the defendants' expert).)  A base with the adapter mounted so tightly

within it is obviously "supporting" the adapter (as well as the connector that is part of it). Further, in yet another embodiment, "the charging station includes prongs that hold the . . . adapter into place . . . ." (A81 at ¶ 0024.) In other words, the base physically supports the adapter and its connector. A snap-fit is another form of mechanical attachment in which the adapter and the connector are secured to the base. (A2165-66 at ¶ 51-53.)

The defendants did not submit—and cannot justify—a construction of "supported by" that requires direct contact. There is no justification for such a constrained construction in the '848 Patent's specification or prosecution history. Trying to import such an unjustified constraint forced the defendants into absurd and contradictory positions, which illustrate the weakness of their attempt. For example, at his deposition, the defendants' expert, Stephen Bristow, at first admitted that he was "physically supported" by his chair. But later, realizing the fatal implications of this common-sense admission, he claimed that "the chair is supporting the slacks which is supporting my thighs, to be precise." (A2213 at ¶ 7, A2293:13-24.) Defying logic, he admitted that in Figure 3 the base is physically supporting the adapter (A2213 at ¶ 7, A2307:15-18), and he admitted that the connectors are "part of the adapter" (A2213 at ¶ 7, A2294:8-10; A2306:20-24), but he nonetheless denied that the base is supporting the male mini-USB connector that is part of the adapter. (A2213 at ¶ 7, A2304:22-2305:11.)

At one point, Mr. Bristow even said that, if the base were removed from Figure 3 "the adapter would be floating in air . . . ."  (A2213 at ¶ 7, A2311:13-20.) But later, he admitted the adapter and DC port "would fall to whatever surface was below where the disappeared charging base was . . . ."  (A2213 at ¶ 7, A2312:6-16.)  In other words, even the defendants' own expert admitted that the base holds up (physically supports) the male mini-USB connectors in Figure 3.[3]

### B.    The Provisional Application Disclosed Claim 1's "DC Ports on the Base" as Properly Construed.

The defendants' position as to Claim 1 parallels their position as to Claim 13.  The defendants sought summary judgment as to Claim 1 on the premise that disclosure of a detachable adapter prevented the provisional application from disclosing a controller DC port "on the base."

During claim construction, both sides evidently agreed that "on the base" should be given its plain and ordinary meaning.  Neither side designated the phrase for construction by the Court.  (*See* A888-93.)

In seeking summary judgment, the defendants never proposed any specific construction of "on the base."  The defendants and their expert merely assumed

---

[3] Further, defendants' same expert, Mr. Bristow, opined that the DC ports are indirectly attached to the base in the accused device, because they are attached to the base via a piece of plastic, where the DC ports are on the plastic piece. (A3977-78; *see also supra*, Statement of the Case part D.)  To the extent the adaptors disclosed in the provisional application may be construed to disclose an indirect connection between the DC port and the base because the DC ports are part of an adapter, that is no different than what is found in the accused device.

that the word "on" excludes any intermediate structures, without ever saying how they would define "on." (*See*, *e.g.*, A1707:14-22.)

In granting summary judgment, the district court did not expressly construe "on the base." (*See*, *e.g.*, A36.) The most the court said about the construction was that its claim construction order had "implie[d] that the word 'on' requires direct contact . . . ." (*Id*. at n. 12.) But the court never gave a reason for any such implied construction, and such a construction is not correct. Properly construed, the phrase "on the base" does not require direct contact between the DC ports and the base and does not exclude DC ports that are part of adapters that fit into the base, like the ones in the provisional application.

Both sides' experts agree that the word "on" has no specialized technical meaning in the context of the '848 Patent and that a person of ordinary skill in the art would understand it according to its plain English meaning. (A2159-2164 at ¶¶ 40-47; A2213 at ¶ 7, A2291:12-2292:15.)

While there are many possible definitions of "on," most definitions permit an object to be "on" an underlying object even if there are other objects between the two. For example, no direct contact is required by the dictionary definition of "on" as "supported by or resting at the top of another thing." (A2160 at ¶ 41; A2214 at ¶ 12, A2325.) No direct contact is required by the definition of "on" as "so as to be or remain supported by or suspended from." (A2160 at ¶ 42; A2214 at

¶ 14, A2330-31.)   And no direct contact is required by the definition of "on" as "[u]sed to indicate position above and supported by *or* in contact with."   (A2160-61 at ¶ 43; A2214 at ¶ 13, A2326-28 (emphasis added).)

Using the word "on" to refer to support without direct contact is also normal, everyday English usage.  (A2213 at ¶ 7, A2291:12-2292:15; A2159-64 at ¶¶ 40-47 ("The food is on the table"; "The boy [riding a skateboard] is on the sidewalk"; "The couple [on a towel] is sitting on the beach").)  For example, a statement that "the food is on the table" would be considered accurate even if the food was on a plate, which in turn was on a placemat or tablecloth, rather than directly touching the table.  (A2161-63 at ¶ 45.)



**"The food is on the table."**





**"The boy is on the sidewalk."**

**"The couple is on the beach."**

Even the defendants' expert, Stephen Bristow, had to admit that he was sitting "[o]n a chair" at his deposition, even though he was wearing slacks between his body and the chair.  (A2213 at ¶ 7, A2285:16-A2286:1, A2286:11-12.)  Under this same admitted "common understanding," (*id.*), the DC ports in Figure 3 of the provisional application are "on the body" of the charging station:



Trying to evade this compelling conclusion, Mr. Bristow shifted gears when he realized the implications of his testimony, and denied that a can of Diet Coke is "on" a table if there is a napkin between the can and the table.  (A2213 at ¶ 7, A2287:9-A2290:10.)  His self-contradictions and abuse of the English language merely highlight the defendants' misinterpretation of the word "on."

Courts have also recognized that the word "on" does not ordinarily require direct contact.  *See*, *e.g.*, *Vectra Fitness*, *Inc. v. ICON Health & Fitness*, *Inc.*, 246

F. Supp. 2d 1111, 1118 (W.D. Wash. 2003) (holding that claim limitation calling for "stops on said three cables" covered "stops [that] do not come into ***direct*** contact with the cable" (emphasis in original)).

Construing "on the base" to require direct contact would violate a well-established rule of claim construction. The preferred embodiments in the specification of the '848 Patent include the same designs with external adapters that were included in the provisional application. (A117-125, A131-133 at Col. 11:49-15:11; A117-25.) Adopting a narrow interpretation of "on" that requires direct contact would exclude such preferred embodiments from the scope of the claims, which "is rarely, if ever, correct." *MBO Labs.*, *Inc. v. Becton*, *Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007), *aff'd*, 467 Fed. Appx. 892 (Fed. Cir. 2012); *see Vitronics Corp. v. Conceptronic*, *Inc*., 90 F.3d 1576, 1583 (Fed. Cir. 1996) (holding that constructions are "rarely, if ever, correct and would require highly persuasive evidentiary support").

Moreover, the provisional application disclosed the DC port bearing adapters being joined to the base in multiple ways, including "snap-fits," "push-fits," and "press-fits" as well as by "prongs." (A81 at ¶ 0023; A2165-66 at ¶¶ 51-53; A2176 at ¶ 80; A2197-99.) Each of these constitutes a mechanical attachment to the base. (A2165-A2165 at ¶51-53.) As the defendants' expert testified, "A press-fit is typically a much firmer version of a push-fit. [I]t's really tight . . . ."

(A2213 at ¶ 7, A2295:10-14.)  It would be particularly inappropriate to conclude that the DC ports cannot be "on" the base even when the adapter is attached within the base in this manner.  In that position, the adapter is functionally part of the base (construed as the body of the charging system), and the DC ports, being part of the adapter, are "on" the base in any practical sense of the word.

There is nothing about the use of "supported by" in Claim 13 that compels adoption of a particularly narrow construction of "on" in Claim 1. The terms "on" and "supported by" may not have identical scope, but their meanings at least overlap–and so too do the scopes of Claims 1 and 13.  There is nothing about the use of alternative claim terms that compels construction of the alternative terms as opposites or mutually exclusive.  On the contrary, alternative claim terms usually reflect an attempt by the drafter to write claims that cover the same preferred embodiment.  Thus, in Figure 3 of the provisional application, the DC ports are both "supported by" the base and "on" the base as the word "on" is conventionally and properly understood.

Alternative claim terms may differ in the breadth of other designs that they cover.  Or, alternative claim terms may provide an insurance policy against an unfavorable future construction of one of the terms.  "[C]laim drafters can . . . use different terms to define the exact same subject matter.  Indeed this court has acknowledged that two claims with different terminology can define the exact

same subject matter." *Curtiss-Wright Flow Control Corp. v. Velan*, *Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006). "[P]ractice has long recognized that claims may be multiplied . . . to define the metes and bounds of the invention in a variety of different ways. . . . Thus two claims which read differently can cover the same subject matter." *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987) (internal quotations and citations omitted). "It is not unusual that separate claims may define the invention using different terminology, especially where (as here) independent claims are involved." *Hormone Research Found. v. Genentech*, Inc., 904 F.2d 1558, 1567 n. 15 (Fed. Cir. 1990), *quoted in Curtis-Wright*, 438 F.3d at 1380-81; *Clintec Nutrition Co. v. Baxa Corp*., 988 F. Supp. 1109, 1119 (N.D. Ill. 1997) ("sorting" and "selecting" are "synonymous"). In *Thermal Techs.*, *Inc. v. Dade Serv. Corp.*, No. 6:03-cv-1414-Orl-31JGG, 2004 U.S. Dist. LEXIS 27885 at *16-19 (M.D. Fla. Jun. 14, 2004), the court equated "on" and "supported by." But at a minimum, those terms should be viewed as overlapping even if their scopes are not exactly the same.

## C. The Claims Do Not Require that the Ports or Connectors Be "On" or "Supported by" the Base at All Times.

The provisional application's disclosure of detachable ports or connectors does not prevent it from supporting the asserted claims of the '848 Patent. Claims 1 and 13 cover detachable as well as non-detachable ports and connectors. While the claims require that the DC ports or connectors be "on" or "supported by" the

base, there is nothing in the claims that requires the ports or connectors to be on or supported by the base at all times.

First, Claims 1 and 13 do not say that the DC ports are ***always*** present on the base or that the mini-USB connectors are ***always*** supported by the base.  (A133.) Second, it would be improper to read such a limitation into the claims.  *See*, *e.g.*, *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998).   All the more so because such a limitation would cause a preferred embodiment to be read out of the claim.  *See Vitronics Corp.*, 90 F.3d at 1583 (holding that a claim construction that excludes a preferred embodiment "is rarely, if ever, correct.")  Adding a limitation that the ports are ***always*** on or supported by the base would read out the adapter embodiments of the '848 Patent.  (*See*, *e.g*., A117-118, A128 at Col. 6:15-21, A131-132 at Col. 11:49-13:38.)

The claims' requirements for "DC ports on the base" or "male mini-USB connectors supported by the base" are satisfied whenever the claimed ports or connectors are present on or supported by the base, even if at other times they are removed from the base.  "[A]n accused product that sometimes, but not always, embodies a claimed method nonetheless infringes."  *Bell Commc'ns Research*, *Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 622-23 (Fed. Cir. 1995); *see also Exxon Chemical Patents*, *Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1558 (Fed. Cir. 1995) (finding infringement of a chemical patent if the claimed combination of chemicals

existed at any time in the process of making their product, regardless of whether that combination was there at the beginning or end of the manufacturing process).

It would be especially inappropriate to read-in a requirement for permanent attachment in the context of the patented invention, which relates to an assembly that is in place and in use only some of the time. At other times, for example, a controller is detached from the charge base for game play—and no charging is taking place at such times. (*See*, *e.g*., A80 at ¶ 22, A88, A90.) However, both the controller and the DC port (*e.g*., a male mini-USB connector) must be on or supported by the base during charging, or the claimed devices cannot work for their intended purpose of charging controllers. (*See*, *e.g*., A80 at ¶ 22, A92-A93.)

### D.     The "Omitted Element" Rule Does Not Apply Here.

Neither the defendants nor the district court cited or relied upon the "omitted element" rule enunciated in *Gentry Gallery*, *Inc. v. Berkline Corp*., 134 F.3d 1473 (Fed. Cir. 1998). (*See*, *e.g*., A1685-711, A23-45.) That was appropriate, because *Gentry Gallery* manifestly does not apply here. As this Court's later decisions have emphasized, the omitted element rule is limited to very narrow circumstances—which are not present here. "[T]his court's determination [in *Gentry Gallery*] that the patent disclosure did not support a broad meaning for the disputed claim terms was ***premised on clear statements in the written description*** that described the location of a claim element—the 'control means'—as '***the only***

*possible location*' and that variations were '*outside the stated purpose of the invention*.'" *Johnson Worldwide Assos., Inc. v. Zebco Corp.*, 175 F.3d 985, 993 (Fed. Cir. 1999) (emphasis added) (quoting *Gentry Gallery*, 134 F.3d at 1479). This Court declines to apply the omitted element rule where the disclosure "does not 'unambiguously limit[]' the meaning of [a claim term]." *Id.* at 993 (quoting *Gentry Gallery*, 134 F.3d at 1480); *see also Vas-Cath*, 935 F.2d at 1565 ("There is 'no legally recognizable or protected "essential" element, "gist" or "heart" of the invention in a combination patent.'" . . . . 'The invention' is defined by the claims on appeal." (*quoting Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 345 (1961)).

## 1.  The Provisional Application Does Not Exclude Adapters that Remain on the Base.

Claims 1 and 13 recite structural elements that interact in a manner that guides and protects delicate connectors so as to reduce the risk of bending or breakage. (A133.)  Those identical structures were disclosed in the provisional application, such as docking bays open in a first direction, pairs of opposite surfaces defining the docking bays, the docking bays being configured to receive and align video game controllers, and DC ports or connectors on or supported by the base. (*See*, *e.g.*, A90; A2174-75 at ¶ 76.)

There was nothing in the provisional application—let alone "clear statements"—that described detachable adapters as the "only possible" approach or

said that DC ports (or USB connectors) were "outside the stated purpose of the invention" unless they were detachable. *Johnson*, 175 F.3d at 993. To the contrary, Nyko's expert explained why one of ordinary skill would not find the provisional application to be limited in any such manner. (A2174-81 ¶¶ 75-88.) While the provision application described detachable adapters as beneficial, it never described them as mandatory. (*See*, *e.g.*, A78 at ¶ 0016 ("In one embodiment, the adapters 16 drop-fit easily into the docking bays 12, 14, thus providing a fast and easy connection of the hand-held controllers to the charging station 10.").) One of ordinary skill would have understood the use of such adapters as one way of practicing the invention of the provisional application (a preferred embodiment), but not as the only way of doing so. (A2175 at ¶¶ 77-78; A2186-87 at ¶ 99.) Further supporting this understanding, the provisional application shows DC ports that remained in place when the controllers were removed, instead of remaining with the controllers (A90); and the provisional application says only that the "adapter [with a DC port] *can* remain with the handheld controller," not that it "must" do so (A80 at ¶ 0022. (emphasis added).) At a minimum, the testimony of Nyko's expert about how a person of skill in the art would have understood the provisional application's disclosure raised a genuine issue of fact, precluding summary judgment. (*See also infra* at part III F.)

Although the provisional application did not criticize non-detachable ports or connectors, even such criticism would not have turned detachability into a mandatory feature that had to be included in every claim. *See*, *e.g.*, *Spine Solutions v. Medtronic Sofamor Danek USA*, 620 F.3d 1305, 1315 (Fed. Cir. 2010). In *Spine Solutions*, the specification of the earlier patent "disparage[d]" the two-piece design in the later patent, saying that such a design would make it "'particularly difficult' to achieve a minimum structural height for the implant." This Court held that "this does not rise to the level of an express disclaimer sufficient to limit the scope of the claims; '[d]isavowal requires expressions of ***manifest exclusion or restriction***, representing ***a clear disavowal of claim scope***.'" *Id.* (quoting *Epistar Corp. v. ITC*, 566 F.3d 1321, 1335 (Fed. Cir. 2009)) (emphasis added). Despite the earlier patent's criticism of the later two-piece design, the court affirmed the denial of summary judgment of invalidity for failure to comply with the written description requirement. *Id.* at 1320; *see also Cordis*, 339 F.3d at 1361-65 (holding no restriction on claim scope absent a "clear and unmistakable" disclaimer that "unambiguously limit[s]" the meaning of a claim term). The result should have been the same here, because there were no such "expressions of manifest exclusion or restriction" or "clear disavowal of claim scope" in the provisional application.

While the provisional application does explain advantages of an external adapter, *Spine Solutions* establishes that this falls far short of anything that could be deemed to limit the scope of the disclosure.  As another example, in *Lampi Corp. v. Am. Power Prods., Inc.*, 228 F.3d 1365, 1378-79 (Fed. Cir. 2000), this Court held that the asserted patent was entitled to the priority of an earlier-filed patent, rejecting a written description argument similar to the one made by the defendants here.  The evidence supporting their argument was, if anything, stronger than in this case.  The earlier application showed only identical half-shells, and it emphasized the advantages of identical half-shells to "enable particularly easy and cost effective manufacture of these two half-shells and to ensure especially easy assembly . . . ."  *Id*. at 1378.  But the Court held that this was still consistent with interpreting identical half-shells as "only a preferred embodiment of the invention."  *Id*.

Similarly, in *Laryngeal Mask Co. Ltd. v. Ambu A/S*, 618 F.3d 1367, 1375 (Fed. Cir. 2010), this Court held that there was no requirement for connecting cuff reinforcements to breastplates, even though the "Summary of the Invention" said that this was a "preferred aspect" of the invention.  Here again, the facts here are even stronger, because the Summary[4] in Nyko's provisional application describes "the present invention" in very general terms that include "charging stations" either

---

[4]  In the Provisional Application, there is no "Summary of the Invention," only a section titled "Summary."  (A77.)

46

with or without external adapters.  (*See* A77 at ¶ 5 ("The present invention relates to a charging station for a consumer electronics device, and more particularly, to a charging station for one or more hand-held controllers for a video game console.").)  The Summary's only references to external adapters are expressly described as relating to "one embodiment"—not the invention as a whole.  (*Id.*)  Such references to embodiments do not limit the scope of the invention.  *See Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1345 (Fed. Cir. 2001) (holding that references to "one embodiment,"  "a preferred embodiment," etc., did not limit the written description); *cf. Genzyme Corp. v. Transkaryotic Therapies*, *Inc.*, 346 F.3d 1094, 1099 (Fed. Cir. 2003) (holding that the Summary of the Invention limited a claim term because it explicitly described the "present invention" and "not merely a preferred embodiment"); *see C.R. Bard*, *Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004) (holding that "[s]tatements that describe the invention as a whole, rather than statements that describe only preferred embodiments, are more likely to support a limiting definition of a claim term").

## 2. The Provisional Application Discloses Multiple Embodiments, Including Connectors that Can Remain on the Base.

While not required to do so, the provisional application illustrates use of the invention in a way that does not take advantage of external adapters.  Figure 3 shows DC ports (male mini-USB connectors) in place on the base and not

connected to controllers.  (A90; A2174-75 at ¶ 76.)  One of ordinary skill would have understood that, in this configuration, the operation of the charging station of the invention would be exactly the same whether or not the ports were detachable from the base.  (A2186-87 at ¶ 99.)

Trying to avoid the teaching of Figure 3, the defendants' expert was driven to question whether it is part of the invention. He said that Figure 3 showed "a bad idea," that "[i]t's not a recommendation," that "it looks similar in concept to the prior art," and that "the patent teaches that's not what you want to do."  (A2213 at ¶ 7, A2296:23-2297:22, A2300:21-2302:8, A2310:12-24.)  These efforts to read Figure 3 out of the provisional application highlight the lack of merit of the position.  The provisional application expressly identifies Figure 3 as showing "a charging station . . . according to an exemplary embodiment of the invention." (A77.)  The defendants' inability to reconcile their position with Figure 3 shows that their position is fallacious.  Certainly, their self-serving, revisionist interpretation of the provisional application is not sufficient to support summary judgment.

### E. There Is No Unpredictability Requiring Further Disclosure of Embodiments.

The "critical question" regarding written description is "whether the specification . . . demonstrates that the applicant[] had possession of an embodiment" fulfilling the later patent claims.  *Crown Packaging*, 635 F.3d at

1380.  The provisional application shows that the inventor *did* have possession of such an embodiment.  Such an embodiment was depicted, for example, in Figure 3 of the provisional application.  (*See supra* part III A.)

The Federal Circuit has repeatedly held that a specification need not describe every possible claimed embodiment to satisfy the written description requirement. *See*, *e.g.*, *Cordis*, 339 F.3d at 1365 ("As our case law makes clear . . . 'an applicant is not required to describe in the specification every conceivable and possible future embodiment of his invention.'"  (quoting *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001))).  "A specification may, within the meaning of 35 U.S.C. § 112 para. 1, contain a written description of a broadly claimed invention without describing all species that [the] claim encompasses."  *Utter v. Hiraga*, 845 F.2d 993, 998 (Fed. Cir. 1988).

Among other things, this understanding of the written description requirement maintains consistency with other basic rules of patent law.  "It is a familiar axiom of patent law . . . that the scope of the claims is not limited to the preferred embodiments described in the specification."  *Fuji Photo Film Co. v. U.S. Int'l Trade Comm'n*, 386 F.3d 1095, 1106 (Fed. Cir. 2004).  To require that every possible embodiment be included in the specification would not only be impossible as a practical matter but would also limit the claims to the embodiments disclosed in the specification, contrary to established Federal Circuit case law.  *Id.*

49

Thus, as long as the features of an asserted claim were disclosed in the provisional application, the claim was supported. It was not necessary for all possible ways of implementing those features to be disclosed. It is only in fields of technology that are unpredictable that disclosure of more species may be necessary to adequately show possession of the entire genus. *Synthes USA*, *LLC v. Spinal Kinetics*, *Inc.*, 2013-1047, 2013-1059, 2013 WL 5788675 (Fed. Cir. Oct. 29, 2013). This case does not involve such a complex and unpredictable field. *See Bilstad v. Wakalopulos*, 386 F.3d 1116, 1126 (Fed. Cir. 2004). The provisional application disclosed ports attached to both a controller and the base, ports attached to the base but not a controller, and ports attached to a controller but not the base. (*See*, *e.g.*, A88-90, A92-93.) There was nothing unpredictable about how the ports or other components would perform in any of these modes.

## F.    At the Very Least, There Are Genuine Factual Disputes About the Adequacy of the Written Description.

Nyko's position is supported by a detailed expert declaration from Garry Kitchen, an engineer with in-depth experience in the field of video game hardware, video game accessories, and video game controllers. (A2151-54 at ¶¶ 2-19; A2190-94.) Mr. Kitchen provided detailed analyses concluding that the claims of the '848 Patent were supported by the disclosure of the provisional application, were valid, and were infringed by the Defendants. (*See* A2149-A2211, A3884-3962.) Mr. Kitchen did not just opine that the provisional application disclosed

every feature in the asserted claims; he demonstrated that disclosure element-by-element, providing supporting evidence from the provisional to support the disclosure of each claim element.  (A2159-73 at ¶¶ 39-72; A2195-211.)

Mr. Kitchen went into especial detail with regard to the two claim elements that the defendants contend are missing from the provisional application.  Mr. Kitchen explained how and why the provisional application did disclose "DC ports on the base," as recited in Claim 1, and "male mini-USB connectors supported by the base," as recited in Claim 13. For example, he explained in detail why one of ordinary skill in the art would understand that the connectors in Figure 3 of the provisional application (labeled as Items 42) are physically supported by the base. (A2170-73 at ¶¶ 64-72; A2206-09.)  The base (Item 24) of the charging system depicted in Figure 3 of the provisional application underlies and fits around the adapters (Items 16) and thereby physically supports both them and the connectors. (A2170-74 at ¶¶ 64-72.)  "If the body of the charging system were not under the mini-USB connectors, the connector would fall down onto whatever surface is below."  (A2173 at ¶ 70.)

Nyko thus provided specific reasons and supporting evidence that the claim elements were disclosed.  The defendants' unsupported denials are insufficient to even raise a triable issue in their favor, let alone to preclude Nyko from claiming priority.

Further, the evidence submitted by Nyko raised genuine, material issues of fact about the amount of detail required to provide an adequate written description in the context of the technology and claim limitations at issue in this case. The "level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *Ariad Pharms.*, *Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (*en banc*). The relevant factors are questions of fact, such as "the existing knowledge in the particular field," "the maturity of the science or technology," and "the predictability of the aspect at issue." *Id.*; *see Bilstad*, 386 F.3d at 1126. In this respect too, Nyko has raised at least a genuine, triable issue of fact concerning its right to priority of the provisional application.

## IV.    <u>Since Nyko Is Entitled to Priority of the Provisional Application, the Summary Judgment Was Unfounded, and the Public Use and On-Sale Issues Are Moot.</u>

The defendants' invalidity arguments depended entirely on asserted "prior art" that does not actually qualify as prior art under the applicable statute. The defendants' summary judgment motion was premised upon according prior art status to Nyko's own demonstration, offering, and sale of a certain charge base starting in January 2007. (*See*, *e.g.*, A721 ¶ 15, A1685-702.) But it is undisputed that Nyko filed its provisional patent application on October 24, 2007—less than a

year after the events put forward by the defendants as constituting prior art. (*See* A71.)

The sole basis on which the defendants asserted that Nyko's disclosures, offers, and sales qualified as prior art was 35 U.S.C. section 102(b), which provides, "A person shall be entitled to a patent unless . . . the invention was . . . in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." (*See* A1689:2-4 (quoting § 102(b)).)[5] But a patent claim falls within the one-year grace period of section 102(b) —and cannot be invalidated—if it is entitled to priority of the provisional application. To qualify as prior art, the asserted demonstrations, offers, and sales by Nyko would have to predate the patent's priority date by at least a year, but they all occurred less than a year before Nyko filed its provisional application in October 2007. According the asserted claims the priority of the provisional application is fatal to the defendants' 102(b) defense and mandates reversal of the district court's summary judgment.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

Abundant—indeed, uncontested—facts show that Nyko's provisional application disclosed all the features of Nyko's asserted patent claims. Because the

---

[5] Nyko's patent is not affected by the amendment of § 102 that applies to patent applications filed starting March 16, 2013. *See* Leahy-Smith America Invents Act of 2011, Pub. L. No. 112-29, 125 Stat. 284 § 3 (2011).

asserted claims are entitled to the priority of the provisional application, this Court should reverse the summary judgment of invalidity and reject the defendants' section 102(b) defense as a matter of law.

In the alternative, and at the very least, the Court should vacate the summary judgment and remand this case for trial on the adequacy of the provisional application's written description and all other contested issues.

DATED:  February 12, 2014                    Respectfully submitted,

By:    /s/ Art Hasan
        Art Hasan
        G. Warren Bleeker
        Katherine L. Quigley

**CHRISTIE, PARKER & HALE, LLP**
**655 N. Central Avenue, Suite 2300**
**Glendale, California  91203-1445**
**Telephone:  (626) 795-9900**
**Facsimile:  (626) 577-8800**
**E-mail:       art.hasan@cph.com**
                **warren.bleeker@cph.com**
                **katherine.quigley@cph.com**

*Attorneys for Plaintiff-Appellant,*
*NYKO Technologies, Inc.*

# <u>ADDENDUM</u>

# TABLE OF CONTENTS

**Addendum Page**

Protective Order of
The Honorable Victor B. Kenton,
With U.S. Patent No. 8,143,848 B2,
   entered October 5, 2012.................................................................A1

Judgment Pursuant to Fed. R. Civ. Proc. 54(b)
   entered November 4, 2013.........................................................A21

Order of
The Honorable Gary Allen Feess
Re:  Defendants' Motion for Summary Judgment
   entered October 22, 2013...........................................................A23

Order of
The Honorable Gary Allen Fees
Re:  Claim Construction
   entered June 12, 2013 ................................................................A46

Provisional Patent Application No. 60/982,364
   filed October 24, 2007 ..............................................................A71

U.S. Patent No. 8,143,848
   issued March 27, 2012 ('848 Patent-in-Suit) ..........................A101

1  S. ART HASAN, CA Bar No. 167323
   art.hasan@cph.com
2  G. WARREN BLEEKER, CA Bar No. 210834
   warren.bleeker@cph.com
3  KATHERINE L. QUIGLEY, CA Bar No. 258212
   katherine.quigley@cph.com
4  CHRISTIE, PARKER & HALE, LLP
5  655 N. Central Avenue, Suite 2300
   Glendale, California 91203-1445
6  Telephone: (626) 795-9900
   Facsimile: (626) 577-8800
7
   Attorneys for Plaintiff,
8  NYKO Technologies, Inc.

9  DANIEL N. YANNUZZI, Cal. Bar No. 196612
   dyannuzzi@sheppardmullin.com
10 GRAHAM (GRAY) M. BUCCIGROSS, Cal. Bar No. 234558
   gbuccigross@sheppardmullin.com
11 SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   12275 El Camino Real, Suite 200
12 San Diego, California 92130-2006
   Telephone:  858.720.8900
13 Facsimile:  858.509.3691

14 STEVEN M. HANLE, Cal. Bar No. 168876
   shanle@sheppardmullin.com
15 SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   650 Town Center Drive, 4th Fl.
16 Costa Mesa, CA  92626
   Telephone:  714.513.5100
17 Facsimile:  714.513.5130

18 Attorneys for Defendants, Performance
   Designed Products LLC and Energizer
19 Holdings, Inc.

20              UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
21

| 22 | NYKO TECHNOLOGIES, INC. a California Corporation, | Case No. CV12-03001-GAF-VBK |
|---|---|---|
| 23 | | **PROTECTIVE ORDER** |
| | Plaintiff, | |
| 24 | | The Hon. Victor B. Kenton |
| | v. | |
| 25 | | |
| 26 | ENERGIZER HOLDINGS, INC. a Missouri Corporation, and PERFORMANCE DESIGNED | [Complaint Filed:  April 5, 2012] |
| 27 | PRODUCTS LLC, a California Limited Liability Company, | NOTE: Changes Have Been Made by the Court |
| 28 | Defendants. | |

-1-

A1

**PROTECTIVE ORDER**

This Protective Order is issued to facilitate document disclosure and other information production under the Local Rules of this Court and the Federal Rules of Civil Procedure.  Unless modified pursuant to the terms contained in this Order, this Order shall remain in effect through the conclusion of this Litigation.

GOOD CAUSE STATEMENT

1.     This case involves the alleged infringement of a patent relating to charging systems for wireless video game controllers.  The parties are competitors with respect to the technology at issue.

2.     Documents or other tangible and non-tangible information containing confidential proprietary and business information and/or trade secrets as defined in California Civil Code § 3426.1 ("Confidential Information") that bear significantly on the parties' claims or defenses is likely to be disclosed or produced during the course of discovery in this Litigation.

3.     Public dissemination and/or disclosure of Confidential Information could severely injure or damage the party disclosing or producing the Confidential Information and could place that party at a competitive disadvantage.

4.     The parties have jointly drafted this proposed Protective Order, which the parties respectfully seek to be entered by the Court, in order to prevent harmful disclosure of their confidential and sensitive business and technical information, while balancing the public's right to acquire information that properly falls outside the scope of the parties' protectable, confidential interests.  The parties agree that adoption and adherence to this Protective Order will facilitate an orderly and cost-effective discovery process and preparation for trial or settlement, and that the Confidential information will not be used for any purpose that is not directly related to this litigation.

SMRH:406889132.1

PROTECTIVE ORDER
CV12-03001-GAF-VBK

**A2**

**IT IS HEREBY ORDERED:**

    **A.**    **DEFINITIONS**

1.    "Discovery Material" means all items or information, including from any non-party, regardless of the medium or manner generated, stored, or maintained (including, among other things, testimony, transcripts, or tangible things) that are produced, disclosed, or generated in connection with discovery in this matter.

2.    "Litigation" means the case styled *NYKO Technologies, Inc. v. Energizer Holdings, Inc. and Performance Designed Products LLC*, Case No. CV12-03001-GAF-VBK, filed in the United States District Court for the Central District of California.

3.    "Outside Counsel" means (i) outside counsel who appear on the pleadings as counsel for a Party; and (ii) partners, associates, employees, and staff of such counsel to whom it is reasonably necessary to disclose information for this litigation, including supporting personnel employed by the attorneys, such as paralegals, legal translators, legal secretaries, and legal clerks; or (iii) independent attorneys contracted to assist outside counsel in connection with this action. However, no Outside Counsel shall be a current or former officer, director or employee of a Party, nor anticipated at the time of disclosure to become an officer, director or employee of a Party.  In addition, no Outside Counsel shall be a family member of a current or former officer, director or employee of a Party nor a family member of anyone anticipated at the time of disclosure to become an officer, director or employee of a Party.

4.    "Party" means any party to this action, including all of its officers, directors, employees, consultants, and retained experts.

5.    "Producing Party" means any Party, Outside Counsel and any other third-party entity who discloses or produces any Discovery Material in this action.

6.    "Protected Material" means any Discovery Material that is designated as "Confidential – Attorneys' Eyes Only" as provided in this Order.

-3-

PROTECTIVE ORDER
CV12-03001-GAF-VBK

**A3**

7.    "Receiving Party" means any Party and Outside Counsel who receives Discovery Material.

**B.    SCOPE**

1.    Protected Material designated under the terms of this Order shall be used by a Receiving Party solely for this Litigation, and shall be used only for purposes of litigating this case, and shall not be used directly or indirectly for any other purpose whatsoever.

2.    Unless specifically required by another provision of this Order, no Defendant is required to produce its Protected Material to any other Defendant(s), but nothing in this Order shall preclude such production.  Plaintiff may disclose one Defendant's Protected Material to any other Defendant through Court filings, oral argument, expert reports, deposition, discovery requests, discovery responses, or any other means, without the prior written consent of the Defendant that produced the Protected Material, provided that Plaintiff marks such disclosure with the same confidentiality designation as utilized by the disclosing party.

3.    The parties acknowledge that this Order does not confer blanket protections on all disclosures during discovery.  Designations under this Order shall be made with care and shall not be made absent a good faith belief that the designated material satisfies the criteria set forth in this Order.  The Producing Party may not unreasonably or improperly refuse to withdraw or change the designation when appropriate, whether for delay or otherwise.  Any new designation will become effective immediately, regardless of when the Receiving Party receives the replacement copy of the re-designated or de-designated material.  This paragraph applies regardless of whether the Producing Party discovers the incorrect designation on its own, becomes aware of the incorrect designation after being informed thereof by the Receiving Party, or if the Producing Party otherwise becomes aware of the incorrect designation by any means whatsoever.

4.    The computation of any period of time prescribed or allowed by this

-4-

**A4**

1  Order shall be governed by the provisions for computing time set forth in Federal
2  Rule of Civil Procedure 6, in its present form as of the date this Order is entered by
3  the Court.

4       5.    Nothing in this Order shall prevent or restrict a Producing Party's own
5  disclosure or use of its own Discovery Material for any purpose.

6       6.    Nothing in this Order shall be construed to prejudice any Party's right
7  to use any Protected Material in Court or in any Court filing, provided the Party
8  complies with the express requirements and provisions of this Order.

9       7.    Nothing in this Order shall be construed to prevent counsel from
10  advising their clients with respect to this case based in whole or in part upon
11  Protected Material, provided counsel does not disclose the Protected Material except
12  as provided in this Order.

13      **C.**    **DISCOVERY MATERIAL DESIGNATED AS "CONFIDENTIAL**
14      **– ATTORNEYS' EYES ONLY"**

15       1.    A Producing Party may designate Discovery Material as
16  "CONFIDENTIAL – ATTORNEYS' EYES ONLY" if it contains or reflects
17  information that is confidential and/or sensitive in nature and the Producing Party
18  reasonably believes that the disclosure of such Discovery Material is likely to cause
19  economic harm or significant competitive disadvantage to the Producing Party.  The
20  Parties agree that the following information, if non-public, shall be presumed to
21  merit the "CONFIDENTIAL – ATTORNEYS' EYES ONLY" designation: trade
22  secrets as defined in California Civil Code § 3426.1, pricing information, financial
23  data, sales information, sales or marketing forecasts or plans, licenses or licensing
24  agreements, business plans, sales or marketing strategy, product development
25  information, engineering documents, testing documents, employee information, and
26  other non-public information of similar competitive and business sensitivity.

27       2.    Written Discovery and Documents and Tangible Things.  Written
28  discovery, documents, and tangible things that meet the requirements for the

1    confidentiality designation listed in Paragraph C.1 may be so designated by placing

2    the appropriate designation on at least the cover page of the written material prior to

3    production.  Other tangible things not produced in documentary form may be

4    designated by affixing the appropriate designation on a cover page for such material

5    and in a prominent place on the exterior of the container or containers in which the

6    information or things are stored.  In the event that originals are provided for

7    inspection, the Producing Party may produce the documents for inspection under a

8    temporary designation communicated in writing by the Producing Party, provided

9    that the documents are re-designated as necessary by placing the appropriate legend

10   on the documents during the copying process.

11        3.    <u>Depositions and Testimony</u>.  Parties or testifying persons or entities

12   may designate confidential portions of depositions and other testimony with the

13   appropriate designation by indicating on the record at the time the testimony is

14   given or by sending written notice that the relevant portions of the testimony are so

15   designated within ten business (10) days of receipt of the transcript of the testimony.

16   All information disclosed during a deposition shall be deemed "CONFIDENTIAL –

17   ATTORNEYS' EYES ONLY" until the time within which it may be appropriately

18   designated as provided for herein has passed.  Any designated Discovery Material

19   that is used in the taking of a deposition shall remain subject to the provisions of this

20   Order, along with the transcript pages of the deposition testimony dealing with such

21   Discovery Material.  In such cases, the court reporter shall be informed of this Order

22   and shall be required to operate in a manner consistent with this Order.  In the event

23   the deposition is videotaped or recorded by other video means, the original and all

24   copies of the videotape or other video media shall be marked by the video technician

25   to indicate that the contents of the videotape or other video media are subject to this

26   Order (e.g., by including a label on the videotape or other video media which

27   contains the appropriate confidentiality designation).

28        4.    <u>Information Not Reduced to Any Physical Form</u>.  For information not

-6-

**A6**

1  reduced to any documentary, tangible, or physical form, or which cannot be

2  conveniently designated, the Producing Party must inform the Receiving Party of

3  the designation of such information in writing.

4       5.    Discovery Material designated as "CONFIDENTIAL – ATTORNEYS'

5  EYES ONLY" may be disclosed only to:

6       (a)    The Receiving Party's Outside Counsel;

7       (b)    Any expert or consultant, and their necessary support personnel,

8  retained by the Receiving Party to assist in this action, provided that disclosure is

9  only to the extent necessary to perform such work; and provided that: (i) such

10  person has signed the acknowledgement form annexed hereto as Exhibit A agreeing

11  to be bound by the terms of this Order; and (ii) no unresolved objections to such

12  disclosure exist after proper notice has been given to all parties to which such notice

13  is required to be given, as set forth in Paragraph E.2 below;

14       (c)    Court reporters, stenographers and videographers retained to

15  record testimony taken in this action, to whom disclosure is reasonably necessary

16  for this Litigation;

17       (d)    The Court, jury, and court personnel (under seal or with other

18  suitable precautions determined by the Court);

19       (e)    Graphics, translation, design, and/or trial consulting services, and

20  electronic discovery vendors, retained by a Party to whom disclosure is reasonably

21  necessary for this Litigation, provided that each such person, including their staff,

22  has signed the acknowledgement form annexed hereto as Exhibit A agreeing to be

23  bound by the terms of this Order;

24       (f)    Any mediator who is assigned to hear this matter, and his or her

25  staff, subject to their agreement to maintain confidentiality to the same degree as

26  required by this Protective Order; and

27       (g)    Any other person with the prior written consent of the Producing

28  Party.

-7-

**A7**

6.    Discovery Material designated as "CONFIDENTIAL – ATTORNEYS' EYES ONLY" may not be disclosed to any in-house counsel employed by any Party.

7.    A Receiving Party may disclose arguments and materials derived from a Producing Party's Discovery Material designated as "CONFIDENTIAL – ATTORNEYS' EYES ONLY" (e.g., summaries or abstractions) to mock jurors who have signed the acknowledgement form annexed hereto as Exhibit A agreeing to be bound by the terms and conditions of this Order (said signed acknowledgement for mock jurors need not be provided to counsel for any other party).  A Receiving Party may not disclose to mock jurors any original, as-produced materials or information (including, for example, originals or copies of as-produced documents, portions of deposition testimony that are designated as Protected Material, or interrogatory responses) produced by another Party designated as "CONFIDENTIAL – ATTORNEYS' EYES ONLY."  A Receiving Party making a disclosure to mock jurors under this sub-paragraph shall use all reasonable efforts to ensure that the identity of the Producing Party whose Discovery Material is being disclosed is not revealed.  No mock juror shall be a current or former officer, director or employee of a Party or of a competitor of a Party, nor anticipated at the time of disclosure to become an officer, director or employee of a Party or of a competitor of a Party.  No mock juror shall be a family member of a current or former officer, director or employee of a Party or of a competitor of a Party, nor a family member of anyone anticipated at the time of disclosure to become an officer, director or employee of a Party or of a competitor of a Party.

8.    These restrictions on the use or disclosure of Protected Material shall not apply to any information which:

(a)    Was known by the Receiving Party prior to disclosure, as evidenced by its business records;

SMRH:406889132.1

PROTECTIVE ORDER
CV12-03001-GAF-VBK

**A8**

1    (b)    Is lawfully received free of restriction from another source

2    having the right to so furnish such confidential information;

3    (c)    Is independently developed by or for the Receiving Party without

4    reference to or use of any Protected Material;

5    (d)    Is or becomes lawfully in the public domain other than through a

6    breach of this Protective Order;

7    (e)    The Disclosing Party agrees in writing that the Protected

8    Material is free of such restrictions; or

9    (f)    The information is disclosed by the Producing Party to a third

10    party without a duty of confidentiality on such third party.

11    **D.**    **"COMPETITIVE DECISION-MAKING" Designation**

12    1.    As to any Discovery Material designated by a Producing Party as

13    "CONFIDENTIAL – ATTORNEYS' EYES ONLY," a Producing Party may, in

14    addition, designate such Discovery Material as "COMPETITIVE DECISION

15    MAKING" if it contains or reflects information that is relevant to the preparation

16    and prosecution of patent applications in the field of charging systems for hand-held

17    video game controllers ("Relevant Field").  For example, financial data and other

18    sensitive business information, even if confidential, is not normally relevant to a

19    patent application.  On the other hand, information related to new inventions and

20    technology under development in the Relevant Field that are not already the subject

21    of pending published patent applications, may be relevant to a patent application in

22    the Relevant Field and may be designated as "COMPETITIVE DECISION

23    MAKING."

24    **E.**    **NOTICE OF DISCLOSURE**

25    1.    Experts or consultants receiving Protected Material shall not be a:  (i)

26    current or former officer, director or employee of a Party; (ii) current officer,

27    director, or employee of a competitor of a Party; (iii) anticipated at the time of

28

-9-

1   retention to become an officer, director or employee of a Party or of a competitor of

2   a Party; or (iv) a family member of a current or former officer, director, or employee

3   of a Party.

4         2.   Prior to disclosing any Protected Material to any person described in

5   Paragraph C.5(b) ("Person"), the party seeking to disclose such information shall

6   provide the Producing Party or Parties with written notice that includes: (i) the name

7   and contact address of the Person; (ii) the present employer and title of the Person;

8   (iii) any family or former employment connections with the party wishing to

9   disclose the information; and (iv) an up-to-date curriculum vitae of the Person.

10        3.   Within ten (10) calendar days of receipt of the disclosure of the Person,

11   the Producing Party or Parties may object in writing to the Person for good cause.

12   Any such objection must set forth in detail the grounds on which it is based.  The

13   objecting Party's consent to a Person shall not be unreasonably withheld.  In the

14   absence of an objection at the end of the ten (10) calendar day period, the person

15   shall be deemed approved under this Order.  There shall be no disclosure of

16   Protected Material to the Person prior to expiration of this ten (10) calendar day

17   period.  If the Producing Party objects to disclosure to the Person within such ten

18   (10) calendar day period, the parties shall meet and confer via telephone or in person

19   within three (3) business days following the objection and attempt in good faith to

20   resolve the dispute on an informal basis.  If the dispute is not resolved, the party

21   objecting to the disclosure will have five business (5) days from the date of the meet

22   and confer to serve its portion of a Joint Stipulation pursuant to Local Civil Rule 37-

23   2.  If the objecting party does not serve its portion of a Joint Stipulation within that

24   time, the objection shall be deemed withdrawn.  If the objecting party serves its

25   portion of a Joint Stipulation, Protected Materials of the objecting party shall not be

26   disclosed to the Person in question until the issue is fully resolved by the Court.

27        4.   For purposes of this section, "good cause" shall include an objectively

28   reasonable concern that the proposed Person will, advertently or inadvertently, use

SMRH:406889132.1

1  or disclose Protected Materials in a way or ways that are inconsistent with the

2  provisions contained in this Order.

3       5.    Prior to receiving any Protected Material under this Order, the Person

4  must execute a copy of the "Agreement to Be Bound by Protective Order" (Exhibit

5  A hereto).

6      **F.**    **<u>CHALLENGING DESIGNATIONS OF PROTECTED</u>**

7          **<u>MATERIAL</u>**

8      1.    A Party shall not be obligated to challenge the propriety of any

9  designation of Discovery Material under this Order at the time the designation is

10 made, and a failure to do so shall not preclude a subsequent challenge thereto.

11     2.    Any challenge to a designation of Discovery Material under this Order

12 shall be written, shall be served on Outside Counsel for the Producing Party, shall

13 particularly identify the documents or information that the Receiving Party contends

14 should be differently designated, and shall particularly identify the grounds for the

15 objection.  Thereafter, further protection of such material shall be resolved in

16 accordance with the following procedures:

17         (a)    The objecting Party shall have the burden of conferring with the

18 Producing Party claiming protection in compliance with Local Civil Rule 37-1 in a

19 good faith effort to resolve the dispute.  The Producing Party shall have the burden

20 of justifying the disputed designation;

21         (b)    Failing agreement, the objecting Party may ask the Court to rule

22 that the Discovery Material in question is not entitled to the status and protection of

23 the Producing Party's designation pursuant to the procedures set forth for discovery

24 motions in Local Civil Rule 37.  The Parties' entry into this Order shall not preclude

25 or prejudice any Party from arguing for or against any designation, establish any

26 presumption that a particular designation is valid, or alter the burden of proof that

27 would otherwise apply in a dispute over discovery or disclosure of information;

28         (c)    Notwithstanding any challenge to a designation, the Discovery

1  Material in question shall continue to be treated as designated under this Order until
2  one of the following occurs: (a) the Producing Party that designated the Discovery
3  Material in question withdraws such designation in writing; or (b) the Court rules
4  that the Discovery Material in question is not entitled to the designation.

5  **G.    FILING AND USE OF PROTECTED MATERIAL IN COURT**

6  1.    Absent written permission from the Producing Party or a Court order
7  secured after appropriate notice to all interested persons, a Receiving Party may not
8  file in the public record any Protected Material.

9  2.    Where Protected Material is used at a hearing on a dispositive motion
10  or at trial, it is the burden of the party seeking to use that information to make
11  arrangements with the Court to ensure that Protected Material remains confidential.
12  The Parties shall meet and confer prior to trial to discuss procedures for maintaining
13  the confidentiality of Protected Material during the course of trial.

14  **H.    INADVERTENT OR IMPROPER DISCLOSURE OF**
15  **PRIVILEGED OR PROTECTED MATERIAL**

16  1.    The inadvertent production by a party of Discovery Material subject to
17  the attorney-client privilege, work-product protection, or any other applicable
18  privilege or protection will not waive the applicable privilege and/or protection if a
19  request for return of such inadvertently produced Discovery Material is made
20  promptly after the Producing Party learns of its inadvertent production.

21  2.    Upon a request from any Producing Party who has inadvertently
22  produced Discovery Material that it believes is privileged and/or protected and/or
23  otherwise not subject to discovery in this matter, each Receiving Party shall
24  immediately return such Protected Material or Discovery Material and all copies to
25  the Producing Party.  The Producing Party shall provide the Receiving Party with a
26  privilege log of any such returned material that identifies the basis for it being
27  withheld from production.

28  3.    Nothing herein is intended to alter any attorney's obligation to abide by

-12-

**A12**

1   any applicable rules of professional responsibility relating to the inadvertent

2   disclosure of privileged information.

3       4.    If any Protected Material is disclosed to or accessed by any person

4   other than in a manner authorized by this Protective Order, the party responsible for

5   the disclosure or knowledgeable of such disclosure or access, upon discovery of the

6   disclosure or access, shall immediately inform the designating party of all facts

7   pertinent to the disclosure or access that, after due diligence and prompt

8   investigation, are known to the party responsible for the disclosure or

9   knowledgeable of the disclosure or access (including the name, address, and

10   employer of the person to whom the disclosure was made or who accessed the

11   information), and shall immediately make all reasonable efforts to retrieve any

12   Protected Material disclosed to or accessed by such unauthorized person and prevent

13   further disclosure, access, and any use by each unauthorized person who received

14   such information.

15       **I.**    **INADVERTENT FAILURE TO DESIGNATE**

16       1.    The inadvertent failure by a Producing Party to designate Discovery

17   Material as Protected Material with one of the designations provided for under this

18   Order shall not waive any such designation provided that the Producing Party

19   notifies all Receiving Parties that such Discovery Material is protected under one of

20   the categories of this Order promptly after the Producing Party learns of the

21   inadvertent failure to so designate.

22       2.    A Receiving Party shall not be in breach of this Order for any use of

23   such Discovery Material before the Receiving Party receives notice of the

24   inadvertent failure to designate.  Once a Receiving Party has received notice of the

25   inadvertent failure to designate pursuant to this provision, the Receiving Party shall

26   treat such Discovery Material (subject to the exception in Paragraph (3) below) at

27   the appropriately designated level pursuant to the terms of this Order.

28       3.    Protected Material produced without the designation of

-13-

1   "CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "COMPETITIVE

2   DECISION MAKING" may be so designated subsequent to production when the

3   Producing Party failed to make such designation at the time of production through

4   inadvertence or error.  If Discovery Material is designated subsequent to production,

5   the Receiving Party promptly shall collect any copies that have been provided to

6   individuals so that they can be re-labeled with the "CONFIDENTIAL –

7   ATTORNEYS' EYES ONLY" and/or "COMPETITIVE DECISION MAKING"

8   designation.  Notwithstanding the above, such subsequent designation of

9   "CONFIDENTIAL – ATTORNEYS' EYES ONLY" and/or "COMPETITIVE

10  DECISION MAKING" shall apply on a going-forward basis and shall not have any

11  retroactive effect on anyone who reviewed those "CONFIDENTIAL –

12  ATTORNEYS' EYES ONLY" and/or "COMPETITIVE DECISION MAKING"

13  materials prior to those materials being designated as such by the Producing Party.

14      **J.    <u>TERMINATION OF LITIGATION</u>**

15      1.    After termination of this litigation, the provisions of this Protective

16  Order shall continue to be binding, except with respect to those documents and

17  information that become a matter of public record and not due to any unauthorized

18  act or omission, or violation of this Order.

19      2.    This Court retains and shall have continuing jurisdiction over the

20  parties and recipients of the Protected Material for enforcement of the provisions of

21  this Protective Order following termination of this litigation.

22      3.    Within sixty (60) calendar days after termination of this litigation with

23  respect to a Producing Party, whether such termination arises from dismissal with

24  respect to the Producing Party, judgment for or against the Producing Party

25  (including exhaustion of all appeals or settlement), or otherwise, any Receiving

26  Party that has received Protected Material from the terminated Producing Party shall

27  destroy or return the same to the Producing Party.  If the Protected Material is

28  destroyed, the Receiving Party shall promptly notify the Producing Party of such

-14-

1  destruction in writing.  Nothing herein shall require Outside Counsel for any Party
2  to delete any electronic copies of materials from backup tapes or other electronic
3  backup storage that is overwritten in the ordinary course of business.

4      4.    Notwithstanding the provisions of Paragraph J.3 above, Outside
5  Counsel for a Receiving Party or Receiving Parties to this litigation may retain a
6  copy of any pleading, transcript (for each deposition, hearing, and trial), discovery
7  responses, and any exhibits thereto, and attorney work product, regardless of
8  whether it includes or details Protected Material.  Attorney work product may be
9  used in subsequent litigation provided that such use does not disclose Protected
10  Materials or any protectable information contained therein.  Any documents or
11  things retained by Outside Counsel pursuant to this provision shall remain subject to
12  this Order.

13      **K.**    **USE OF PROTECTED MATERIAL**

14      1.    Protected Material, and the substance or content thereof, including any
15  notes, memoranda, or other documents incorporating, reflecting, or summarizing
16  such information, or any other information that might reveal such protected
17  information, shall be used by a Receiving Party and its authorized representatives or
18  designees under this Protective Order solely for the purpose of this Action and any
19  appeals therefrom.  Such information may not be used for any other purpose,
20  including but not limited to use in other litigations, use for business purposes, or use
21  for patent prosecution or for providing strategic patent prosecution or patent
22  procurement or acquisition advice.  In particular, such information shall not be used
23  for drafting, filing, or prosecuting new or currently pending patent applications, or
24  for re-examination and/or reissues on behalf of a Party to this litigation.

25      2.    In the event any person subject to the terms of this Order is served with
26  a subpoena or request for production of Protected Material, it will give sufficient
27  notice in writing (by facsimile or e-mail) to the Producing Party to allow the
28  Producing Party a reasonable opportunity to intervene to oppose or limit such

1  production.  In no event shall the person receiving the subpoena or other process

2  produce Protected Material of any Producing Party in response to the subpoena or

3  other process unless and until such person or party has: (i) received written

4  authorization from counsel for the Producing Party to produce said Protected

5  Material; or (ii) been ordered to do so by a court of competent jurisdiction.  Nothing

6  in this Order shall be construed as authorizing a party to disobey a lawful subpoena

7  issued in another action.

8     **L.    <u>PROSECUTION LIMITATIONS</u>**

9     1.    Within seven days of the entry of this Protective Order, each Party shall

10 disclose in writing (e.g., by email) to the other Parties its list of at least one Outside

11 Counsel authorized to receive material designated both "CONFIDENTIAL –

12 ATTORNEYS' EYES ONLY" and "COMPETITIVE DECISION MAKING" from

13 another Party.

14     2.    The Parties shall only serve information with the designation of

15 "CONFIDENTIAL – ATTORNEYS' EYES ONLY" and "COMPETITIVE

16 DECISION MAKING" on Outside Counsel who, at the time of that service, have

17 been identified by the Receiving Party to have authority to receive that information.

18     3.    Any individual Outside Counsel for a Receiving Party who is

19 authorized to receive and in fact receives a Producing Party's material designated

20 both "CONFIDENTIAL – ATTORNEYS' EYES ONLY" and "COMPETITIVE

21 DECISION MAKING" shall not prosecute any of the Receiving Party's patents

22 relating to chargers for wireless video game console controllers for a period of 18

23 months after disclosure or one year after final termination of this action, whichever

24 is longer.

25     4.    If any Outside Counsel for a Receiving Party who is not authorized to

26 receive "CONFIDENTIAL – ATTORNEYS' EYES ONLY" and "COMPETITIVE

27 DECISION MAKING" receives such information from a Producing Party, the

28 Outside Counsel for a Receiving Party is not subject to the limitations of Paragraph

-16-

1  L.3 unless that unauthorized Outside Counsel actually views the information

2  designated as "CONFIDENTIAL – ATTORNEYS' EYES ONLY" and

3  "COMPETITIVE DECISION MAKING."

4       5.     A Party may amend its list of authorized Outside Counsel at any time

5  by providing written notice to the other Parties of any amendment, subject to the

6  limitation that at all times, each Party must list at least one Outside Counsel as

7  authorized to receive information designated as "CONFIDENTIAL –

8  ATTORNEYS' EYES ONLY" and "COMPETITIVE DECISION MAKING."

9       6.     If any Outside Counsel for a Receiving Party views information

10  designated as "CONFIDENTIAL – ATTORNEYS' EYES ONLY" and

11  "COMPETITIVE DECISION MAKING" produced by a Producing Party, that

12  Outside Counsel, if not already subject to the prosecution limitations as set forth in

13  Paragraph L.3, shall then be subject to those prosecution limitations.

14       7.     To the extent that Outside Counsel who views information designated

15  as "CONFIDENTIAL – ATTORNEYS' EYES ONLY" and "COMPETITIVE

16  DECISION MAKING" is not already a disclosed authorized Outside Counsel,

17  within seven days of such a viewing, that Outside Counsel shall provide written

18  notice to the other Parties of an amendment to that Receiving Party's list of

19  authorized Outside Counsel to include the name of the previously unauthorized

20  Outside Counsel who viewed the information designated as "CONFIDENTIAL –

21  ATTORNEYS' EYES ONLY" and "COMPETITIVE DECISION MAKING."

22      **M.**    **MISCELLANEOUS**

23       1.     <u>Right to Further Relief</u>.  Nothing in this Order abridges the right of any

24  person to seek modification of the Order by the Court in the future, to seek access to

25  a Producing Party's Protected Material, or to apply to the Court at any time for

26  additional protection.  Furthermore, without application to this Court, any Producing

27  Party may enter into a written agreement releasing any Receiving Party from one or

28  more requirements of this Order, even if the conduct subject to the release would

-17-

1   otherwise violate the terms herein.

2       2.   <u>Successors</u>.  This Order shall be binding upon the Parties hereto and

3   their attorneys, successors, executors, personal representatives, administrators, heirs,

4   legal representatives, assigns, subsidiaries, divisions, employees, agents, retained

5   consultants and experts, and any persons or organizations over which they have

6   direct control.

7       3.   <u>Nonparty Use of This Protective Order</u>.  A nonparty producing

8   information or material voluntarily or pursuant to a subpoena or a court order may

9   designate such material or information as Protected Material pursuant to the terms of

10  this Protective Order.  A nonparty's use of the Protective Order to protect its

11  Protected Material does not entitle that nonparty access to the Protected Material

12  produced by any Party in this case.

13      4.   <u>Right to Assert Other Objections</u>.  By stipulating to the entry of this

14  Order, no Party waives any right it otherwise would have to object to disclosing or

15  producing any information or item.  Similarly, no Party waives any right to object

16  on any ground to the use in evidence of any of the material covered by this Order.

17  This Order shall not constitute a waiver of the right of any party to claim in this

18  Litigation or otherwise that any Discovery Material, or any portion thereof, is

19  privileged or otherwise non-discoverable, or is not admissible in evidence in this

20  Litigation or any other proceeding.

21      5.   <u>Modification by Court</u>.  This Order is subject to further court order

22  based upon public policy or other considerations, and the Court may modify this

23  Order sua sponte in the interests of justice, or upon motion of a party for good cause

24  shown.

25  ///

26  ///

27  ///

28  ///

-18-

1  IT IS SO ORDERED.

2  Follow LR 79-5 re Under Seal Filings

3

4

5  Dated:__October 5, 2012___                _____/s/_____

6                                            Hon. Victor B. Kenton
                                             United States Magistrate Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-19-

**A19**

# EXHIBIT A

I, _____, acknowledge and declare that I have received a copy of the Protective Order ("Order") in *NYKO Technologies, Inc. v. Energizer Holdings, Inc. and Performance Designed Products LLC*, Case No. CV12-03001-GAF-VBK (C.D. Cal.).  Having read and understood the terms of the Order, I agree to be bound by the terms of the Order and consent to the jurisdiction of said Court for the purpose of any proceeding to enforce the terms of the Order, including any proceedings related to contempt.

In accordance with Section E of the Order (if applicable) I have attached my resume, curriculum vitae, and the other information required under Section E to this executed Confidentiality Agreement.

Name of Individual:_____

Present occupation/job description:_____

_____

_____

Name of Company or Firm: _____

Address: _____

_____

-20-

SMRH:406889132.1

PROTECTIVE ORDER
CV12-03001-GAF-VBK

**A20**

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations

JS-6

DANIEL N. YANNUZZI, Cal. Bar No. 196612
dyannuzzi@sheppardmullin.com
GRAHAM M. BUCCIGROSS, Cal. Bar No. 234558
gbuccigross@sheppardmullin.com
MATTHEW M. MUELLER, Cal. Bar No. 268486
mmueller@sheppardmullin.com
12275 El Camino Real, Suite 200
San Diego, California  92130-2006
Telephone:  858.720.8900
Facsimile:   858.509.3691

STEVEN M. HANLE, Cal. Bar No. 168876
shanle@sheppardmullin.com
650 Town Center Drive, 4th Floor
Costa Mesa, California  92626
Telephone:  714.513.5100
Facsimile:   714.513.5130

Attorneys for Performance Designed Products
LLC and Energizer Holdings, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NYKO TECHNOLOGIES, INC. a California Corporation,<br><br>                    Plaintiff,<br><br>          v.<br><br>ENERGIZER HOLDINGS, INC. a Missouri Corporation, and PERFORMANCE DESIGNED PRODUCTS LLC, a California Limited Liability Company,<br><br>                    Defendants. | Case No. CV12-03001<br><br>**JUDGMENT PURSUANT TO FED. R. CIV. PROC. 54(b)**<br><br>The Hon. Gary A. Feess<br><br>[Complaint Filed:  April 5, 2012] |

SMRH:411649000.5

-1-

Case No.: CV12-03001
Judgment

**A21**

1    The Court has granted the motion for summary judgment of Defendants

2  Energizer Holdings, Inc., Eveready Battery Co., Inc., and Performance Designed

3  Products, LLC (Dkt. Nos. 133) holding all of the claims of U.S. Patent No.

4  8,143,848 asserted against Defendants (claims 1-5, 7, 8, and 10-13, 15-17) invalid.

5  (Dkt. No. 205.)  Having determined that there is no just reason for delaying entry of

6  judgment in accordance with such order, the Court enters judgment as follows:

7    IT IS HEREBY ORDERED, ADJUDGED, DECLARED AND DECREED:

8    Judgment is entered pursuant to Federal Rule of Civil Procedure 54(b) in

9  favor of Defendants Energizer Holdings, Inc., Eveready Battery Co., Inc., and

10 Performance Designed Products, LLC and against Plaintiff Nyko Technologies, Inc.

11 on Plaintiff's Amended Complaint, Defendants' Third Additional Defense

12 (invalidity), and Count II of Defendants' Counterclaim (declaration of invalidity).

13

14    Dated:  November 4, 2013

15

16

17    JS-6                                     _____

18                                             GARY ALLEN FEESS
                                               UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26

27

28

**A22**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

| Present: The Honorable | **GARY ALLEN FEESS** | |
|---|---|---|
| Stephen Montes Kerr | Pam Batalo | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: | |
| Katherine L. Quigley
Syed A. Hasan | Steven M. Hanle | |

Proceedings:

**ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**I. INTRODUCTION**

Plaintiff NYKO Technologies, Inc. ("NYKO" or "Plaintiff") holds the patent on a video game controller charging system that contains multiple docking bays allowing for several game controllers to be charged at the same time. The charging system is described in United States Patent No. 8,143,848 (the "'848 Patent" or the "Patent"), entitled "Video Game Controller Charging System Having a Docking Structure." (Docket No. 135-3 [Ex. B ("'848 Patent")].) In the present lawsuit, NYKO contends that Energizer Holdings, Inc. ("Energizer"), Eveready Battery Co., Inc. ("Eveready"), and Performance Designed Products, LLC ("PDP") (collectively "Defendants"), have infringed the '848 Patent through the sale of a competing video game controller charging system having a docking structure. (Docket No. 85 [First Am. Compl. ("FAC")] ¶ 10.) Defendants now move for summary judgment on the ground that the '848 Patent is invalid. (Docket No. 133-1 [Mot. for Summ. Judgment ("Mem.")].)

In this motion, Defendants argue that the '848 Patent is invalid because "the device claimed . . . was in public use and on sale more than a year before the patent's filing date" in violation of 35 U.S.C. § 102(b).[1] (Mem. at 1.) They contend that the device was demonstrated to the public at the January 2007 Consumer Electronics Show in Las Vegas and that orders for

---

[1] Congress recently changed the language and structure of 35 U.S.C. § 102. See Leahy-Smith America Invents Act, Pub. L. No. 112-29. Because this case was filed before the effective date of the change, the Court refers to the old version of § 102(b).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|----------|------------------------|------|------------------|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

the sale of the charger were taken at that time. Because the application for the '848 Patent was not filed until March 7, 2008, Defendants argue that this public use and sale of the device undeniably invalidates the Patent. ('848 Patent at 1.)

Plaintiff contends that, even if the conduct in January 2007 constitutes a public use or sale, the one year ban does not invalidate the '848 Patent because the invention is allegedly described in a provisional patent application filed on October 24, 2007 -- Application No. 60/982,364 (the "'364 Provisional" or the "Provisional"). Plaintiff therefore contends that the '848 Patent is not invalid because it is entitled to the Provisional's earlier priority date. (See Docket No. 135, [Opp. to Mot. for Summ. Judgment. ("Opp.")] at 8–21; Docket No. 135-3 [Ex. A ("'364 Provisional")].)

The undisputed facts, and those that are without substantial controversy, establish that: (1) the invention described in the '848 Patent was in public use and offered for sale in January 2007; and (2) the invention was not described in the the '364 Provisional and therefore not entitled to the earlier priority date.[2] For these reasons, which are discussed in detail below, the '848 Patent is invalid and the motion for summary judgment is **GRANTED**.

### II. BACKGROUND

#### A. PROCEDURAL HISTORY

Plaintiff initiated this action on April 5, 2012, asserting one patent infringement claim based on Defendants Energizer's and PDP's alleged sale of competing "video game controller charging systems having a docking structure." (Docket No. 1, [Compl.] ¶ 8.) On December 14, 2012, Plaintiff filed a First Amended Complaint pursuant to a stipulation between the Parties. (FAC.) The FAC asserts one patent infringement claim, expands on the factual allegations, and adds Defendant Eveready. (Id.) Defendants answered on December 28, 2012, also asserting a counterclaim seeking declaratory judgment as to noninfringement, invalidity, and unenforceability. (Docket No. 88 [Answer]; Docket No. 93 [Counterclaim].) Plaintiff answered the Counterclaim on January 16, 2013. (Docket No. 96 [Counterclaim Answer].)

---

[2] Throughout this Order, the Court refers exclusively to the claims at issue; several claims of the '848 Patent are not the subject of this litigation, and this Order does not purport to determine the validity of those claims.

**LINK: 126**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

Before the Court now is Defendants' motion for summary judgment. In this motion, Defendants primarily argue that 35 U.S.C. § 102(b) invalidates the contested elements of the '848 Patent because the described device was "in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." (Mem. at 1) (quoting 35 U.S.C. § 102(b).)  Plaintiff responds that the device was not in public use or on sale prior to the March 7, 2007, critical date. (Opp. at 23–25.)  And even if it were, Plaintiff charges that the filing of the '364 Provisional on October 24, 2007, means that the actual critical date should be October 24, 2006, at which time no public use or sale had taken place. (Id. at 1–3.)

**B.  OVERVIEW OF THE '848 PATENT**

The '848 Patent describes a device (the "Charger" or "Charging System") for charging video game controllers. ('848 Patent at 1:16–19, 1:66–2:1.)[3]  Plaintiff's '848 Patent is a charging station capable of charging multiple video game controllers simultaneously. (Id. at 1:66–2:1, 15:30–31, 16:28–29.)

Though there are multiple variations of the Charging System, the relevant embodiments of the '848 Patent are described in the 15 claims at issue.[4]  The Charging System consists of a number of components. There is a base, on top of which sits at least one support structure, which comprises a plurality of docking bays configured to receive controllers and which physically supports the controllers. (Id. at 15:34–38; 16:31, 35–40.)  The Charging System also includes an AC-to-DC converter, which may be either internal or external to the base. (Id. at 16:13–20; 16:50–56.)  This converter, whether internal or external to the base, converts the externally supplied AC power into DC power, which is then ultimately provided to the power input port of the video game controllers. (Id. at 16:13–16; 16:57–59.)  DC ports on the base -- which may be mini-USB connectors[5] -- are configured to couple to and provide DC power to the input ports of the controllers. (Id. at 15:33–35, 39–42; 16:32–34.)  The video game controller

---

[3] While the specification notes that the '848 Patent is not limited to charging video game controllers, i.e. it is capable of charging other handheld electronics devices, ('848 Patent at 15:12–20), any other potential uses are not at issue here.

[4] The claims at issue are Independent Claims 1 and 13, and Dependent Claims 2–5, 7, 8, 10–12, and 14–17. While the claims at issue specify further elements of the '848 Patent, the Court will discuss only those details necessary to the determination of this motion.

[5] A mini-USB connector is a type of DC port.

**A25**

**LINK: 126**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

rests directly on the base or support structure. The '848 Patent provides a useful functional diagram of the system:



(Id., Figure 15.) The '848 Patent also provides a helpful visual rendering that illustrates the relationship between the DC ports and the rest of the device:



**A26**

**LINK: 126**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

(Id., Figure 11.)  Item No. 408 in Figure 11 is a mini-USB DC port incorporated into the base, and the video game controllers are placed directly onto each of those ports, as shown in Figure 14:

*FIG.14*



(Id., Figure 14.)  That is, a video game controller (Item No. 420 in Figure 14) fits between each of the partitions (Item No. 406 in Figure 11) and onto each of the DC ports (Item No. 408 in Figure 11), which in this case are mini-USB connectors.

## C.  OVERVIEW OF THE '364 PROVISIONAL

The '364 Provisional also describes a charging system (the "Provisional System"). ('364 Provisional at 1:6–8.)[6]  Plaintiff's Provisional System is a charging station capable of charging one or more hand-held controllers for a video game console.  (Id. at 2:8–9.)

Though the '364 Provisional describes multiple embodiments of the Provisional System, the claims indicate one relevant manifestation.  Like the Charging System, the Provisional

---

[6] As with the '848 Patent, the '364 Provisional is not limited to charging video game controllers, i.e. is capable of charging other handheld electronics devices ('364 Provisional at 3:15–17). However, any other potential uses are not at issue here.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|----------|------------------------|------|------------------|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

System consists of a number of inter-working parts. There is a base, which has recesses with electrical contacts dimensioned to receive external adapters.[7, 8] (Id. at 10:5–7, 10–11.) The base also has a power input for connection to a power supply. (Id. at 10:5–6.) The Provisional System includes an AC-to-DC converter, which is coupled between the power input and electrical contacts in the recesses. (Id. at 10:5, 11:3–6.) The electrical contacts in the recesses contact electrical leads on the external adapters. (Id. at 10:10–11.) The external adapters fit into the recesses on the base, and include a "connector configured to couple to the power input port" of the video game controllers. (Id. at 10:8–9.) The connector may be a male mini-USB connector. (Id. at 10:26–27.) The video game controller rests on the external adapters, which in turn fit into the recesses and rest on the base. Like the '848 Patent, the '364 Provisional provides a useful functional diagram of the system:



FIG. 7

(Id., Figure 7.) This diagram clearly shows an adapter that links the base to the device being charged as a critical element. (Id.) The '364 Provisional also provides a helpful visual rendering that illustrates the relationship between the external adapters and the rest of the device:

---

[7] Though the '364 Provisional only describes these recesses and adapters in the singular, it is clear from the attached figures and prior descriptions that it was intended to cover a plurality of both recesses and adapters.

[8] The Court notes that these adapters are simply structural adapters, not electrical converters.

**LINK: 126**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |



(Id., Figure 2.) Item No. 16 in Figure 2 is the external adapter. Item No. 42 is a mini-USB DC port attached to that adapter and Item No. 30 is the recess into which the adapter fits. The video game controllers would be connected to the external adapters, which would then fit into the recesses on the base, as shown in Figure 5:



(Id., Figure 5.) That is, a video game controller (Item No. 26 in Figure 5) fits onto an external adapter (Item No. 16 in Figure 2) by connecting to the adapter's DC ports (Item No. 42 in Figure 2), and the adapter then connects to the base by fitting into its recesses (Item No. 30 in Figure 2).

**A29**

**LINK: 126**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

## D. PUBLIC USE OF THE CHARGER

### 1. THE PUBLIC NATURE OF THE DISCLOSURE

On January 8, 2007, Plaintiff demonstrated a model of what became the '848 Charging System (the "Model") at the Consumer Electronics Show 2007 ("CES") in Nevada. (Docket No. 136, [Statement of Disputed Facts ("SDF")] ¶ 2.)[9]  The Model was displayed in a suite rented by NYKO for the occasion. (Id. ¶ 131.) While on display, members of the press were invited to photograph and videotape their interactions with it, and they were under no obligation of confidentiality. (Id. ¶ 3.) These disclosures led to widespread discussion and online dissemination of pictures of the Model in the following weeks and throughout January. (Id. ¶ 5.) Thus, while the suite may not have been open to anyone who wished to walk in, no one who entered was barred from reporting their observations, and the conduct of NYKO unambiguously indicates that it sought widespread publicity for its device. Indeed, as discussed below, these disclosures resulted in NYKO receiving a number of orders for the Charger from resalers like Amazon.

### 2. THE MODEL WAS FUNCTIONING

Because only a Model which had been reduced to practice would trigger the public use bar, NYKO seeks refuge in its recent contention that the Model shown at CES was not a functioning version of the Charger. (Id. ¶¶ 129, 130, 135.)[10]  But the record will not support such a contention.  Plaintiff has admitted that the Model "included all the elements" of the claims at issue, and therefore it must have been functional. (Id. ¶ 4.) In addition, Defendants presented evidence that Plaintiff ordered thousands of parts for making Charging Systems as early as December 2006. (Docket No. 133-26, [Hip Hing Order] at 1.) Those orders followed an email conversation with NYKO's supplier in which the Charger's inventor, Amir Navid,

---

[9] For the sake of narrative coherence, the Court cites to the Statement of Disputed Facts when providing background information.  The Court does not necessarily adopt these facts, and it addresses the different stories told by Plaintiff and Defendants, when necessary, below.

[10] One would have thought that NYKO could readily establish that the Model was merely a non-functioning replica simulating the Charger's appearance.  However all of the evidence suggests the contrary. Accordingly, NYKO has offered the convoluted argument that the Model must not have been working because all four lights on the Model's LED display lit up during the demonstration, whereas if it had been functioning only two would have been illuminated. (Id. ¶¶ 129, 130.) NYKO therefore asks the Court to ignore contrary evidence and draw the inference that it must have been only a mockup of the anticipated Charger.

**LINK: 126**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

sought "a working [model]" for use "as our main sales demonstration sample." (Docket No. 133-28 [Hip Hing Description] at 1.) Bizarrely, Plaintiff's own exhibits in opposition to the motion provide further clear evidence that the Model was operational. Plaintiff attaches a transcript of the Navid's deposition in support of its Opposition. In describing the Model's manufacturing, Navid stated that such constructions might "initially work, [then] they may not work later." (Docket No. 135-4, [Navid Dep.] at 127:8–9.) He then goes on to add that the very reason for making the Model would have been "to test how everything fits together *and how it will work*." (Id. at 127:19–20) (emphasis added.)

The Parties likewise dispute whether Plaintiff's CES suite was public for the purposes of § 102(b) "public use" analysis. (SDF ¶ 131.) Defendants claim that because the suite was open to members of the press and retailers of video game accessories, who were under no obligation of confidentiality, it was public. (Id. ¶ 2.) Plaintiff responds that, while retailers and members of the press had access to the suite, the suite was nevertheless not public because that access was restricted to invited guests with appointments. (Id. ¶ 131.)

### E. CLAIMED SALE OF THE CHARGER

Defendants also argue that, in addition to making public use of the Charger, Plaintiff began offering the Charger for sale on January 8, 2007, two months before the March 7, 2007, critical date. (Id. ¶ 6.) It released a price, part number, product name, and product description to customers on January 8, 2007, and customers almost immediately began placing orders for the Charger. (Id. ¶ 7.) Plaintiff accepted those orders as early as January 9, 2007, and further orders were received over the following months prior to the March 7, 2007, critical date. (Id. ¶¶ 8, 9.) Plaintiff eventually fulfilled the orders beginning July 11, 2007. (Id. ¶¶ 10, 11.)

Plaintiff's version of the story indicates that none of these "orders" constituted an actual sale. It contends that the design and price of the product had not been finalized when the orders were made, and that Plaintiff had not even determined whether it would be able to manufacture the product in a cost-effective manner. (Id. ¶¶ 137, 138, 140.) Plaintiff claims that the initial orders were in fact only requests made by vendors, conditioned on the premise that the product would actually be released, and that no binding contract was formed prior to the March 7, 2007, critical date. (Id. ¶¶ 140, 142.) Accordingly, Plaintiff argues, no sale took place within the meaning of § 102(b).

---

**A31**

**LINK: 126**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

### III. DISCUSSION

<u>A. LEGAL RULES</u>

#### 1. SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). Thus, when addressing a motion for summary judgment, the Court must decide whether there exist "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986).

The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial, which it can meet by presenting evidence establishing the absence of a genuine issue or by "pointing out to the district court . . . that there is an absence of evidence" supporting a fact for which the non-moving party bears the burden of proof. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). To defeat summary judgment, the non-moving party must put forth "affirmative evidence" that shows "that there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 256–57. This evidence must be admissible. <u>See</u> Fed. R. Civ. P. 56(c), (e). The non-moving party cannot prevail by "simply show[ing] that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). Rather, the non-moving party must show that evidence in the record could lead a rational trier of fact to find in its favor. <u>Id.</u> at 587. In reviewing the record, the Court must believe the non-moving party's evidence, and must draw all justifiable inferences in its favor. <u>Anderson</u>, 477 U.S. at 255.

#### 2. PROVISIONAL PATENT PRIORITY

Inventors may file a "provisional patent application that . . . will establish a priority filing date for a later complete Section 111(a) application . . . filed not more than 12 months later." 4 <u>Chisum on Patents</u> § 11.02[1][g] at 11–118 (citing 35 U.S.C. § 119(e) (1)). "Such a provisional application need only include a specification conforming to the requirements of 35 U.S.C. § 112 and at least one drawing filed under § 113; no claims are required." <u>New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.</u>, 298 F.3d 1290, 1294 (Fed. Cir. 2002) (citing 35 U.S.C. §§ 111(b) (1), (2)). But that is only the beginning of the applicant's obligation if he seeks priority based on the provisional application's filing date. "[T]he specification of the provisional must contain a

**A32**

**LINK: 126**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

written description of the invention and the manner and process of making and using it, in such full, clear, concise, and exact terms to enable an ordinarily skilled artisan to practice the invention claimed in the non-provisional application." Id. (internal quotations, citations omitted). The purpose of this description "is broader than to merely explain how to 'make and use'" the invention. Id. "[T]he applicant must also convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention." Id., citing Vas-Cath Inc. v. Mahurkar, 935 F.2d 1555, 1563–64 (Fed. Cir. 1991). In other words, "the disclosure must show he had invented each feature that is included as a claim limitation." Id. at 1295.[11]

### 3. SECTION 102(B) INVALIDITY

"A person shall be entitled to a patent unless . . . the invention was . . . in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). Courts have treated this language as providing two methods for invalidating a patent: the public use bar, and the on-sale bar.

#### a. The Public Use Bar

"Public use under 35 U.S.C. § 102(b) includes any use of the claimed invention by a person other than the inventor *who is under no limitation, restriction or obligation of secrecy to the inventor*." Minn. Mining & Mfg. v. Chemque, Inc., 303 F.3d 1294, 1301 (Fed. Cir. 2002) (emphasis added). "The statutory phrase 'public use' does not necessarily mean open and visible in the ordinary sense; it includes any use of the claimed invention by a person other than the

---

[11] Plaintiff argues that this standard is unduly restrictive and that it is entitled to priority if the '364 Provisional rendered the claims in the '848 Patent obvious to one skilled in the art. (Docket No. 203, [Hearing Tr.] at 40:4–7.) In support of this argument, it refers the Court to Utter v. Hiraga, 845 F.2d 993 (Fed. Cir. 1988), a review of a decision of the Board of Patent Appeals and Interferences. Hiraga, which pre-dates both Vas-Cath and New Railhead, involved a priority dispute between foreign and domestic patent applicants and addressed the significance of prior art citations in determining priority. Hiraga determined that, while the preferred embodiment of the invention contemplated an internal pivot and made no mention of an external pivot, disclosure of at least two prior art references utilizing external pivots revealed both that the inventor was in possession of the invention and expressly disclosed to one skilled in the art the potential for the use of the external pivot in that invention. Indeed, the Federal Circuit concluded that the Board did not err in concluding that he "had possession at [the time of his application] of the later claimed ['068 interference count] subject matter." Hiraga, 845 F.2d at 999. Thus, when carefully considered, Hiraga is consistent with the analysis in New Railhead. See also Anascape, Ltd. v. Nintendo of Am., Inc., 601 F.3d 1333, 1339 (Fed. Cir. 2010) (applicant must "recount his invention in such detail that his future claims can be determined to be encompassed within his original creation.")

**A33**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

inventor who is under no limitation, restriction, or obligation of secrecy to the inventor." New Railhead, 298 F.3d at 1297 (citing Lough v. Brunswick Corp., 86 F.3d 1113, 1119 (Fed. Cir. 1996)). In contrast, "[t]he use of an invention by the inventor himself, or of any other person under his direction, by way of experiment, and in order to bring the invention to perfection, has never been regarded as [a public] use." Petrolite Corp. v. Baker Hughes, Inc., 96 F.3d 1423, 1426 (Fed. Cir. 1996) (quoting City of Elizabeth v. American Nicholson Pavement Co., 97 U.S. 126, 134 (1877)).

Although these principles suggest a clear line of demarcation, no such bright line exits. An apparently "public use" of an invention, *prior to its reduction to practice*, may qualify as "experimental use." Under Federal Circuit jurisprudence, such "experimental use" does not constitute an invalidating public use. See Baxter Int'l, Inc. v. Cobe Labs., Inc., 88 F.3d 1054, 1059 (Fed. Cir. 1996) ("Experimental use negates public use; when proved, it may show that particular acts, even if apparently public in a colloquial sense, do not constitute a public use within the meaning of section 102."). Accordingly, the public use bar can only apply "where the inventions were used for their intended purpose." Motionless Keyboard Co. v. Microsoft Corp., 486 F.3d 1376, 1385 (Fed. Cir. 2007). But the experimental use exception "does not include market testing where the inventor is attempting to gauge consumer demand for his claimed invention. The purpose of such activities is commercial exploitation and not experimentation," and therefore not entitled to the protection of the "experimental use" doctrine. In re Smith, 714 F.2d 1127, 1135 (Fed. Cir. 1983).

### b. The On-Sale Bar

Under the on-sale bar, "an inventor may not patent an invention that has been 'on sale' more than one year before the patent application is filed." Link Treasure Ltd. v. Baby Trend, Inc., 809 F. Supp. 2d 1191, 1197 (C.D. Cal. 2011) (citing 35 U.S.C. § 102(b)). "A party challenging the validity of a patent on the basis of the on-sale bar 'must demonstrate by clear and convincing evidence that there was a definite sale or offer to sell' before the critical date." Id. (quoting Group One, Ltd. v. Hallmark Cards, Inc., 254 F.3d 1041, 1045–46 (Fed. Cir. 2001)). In applying the on-sale bar, the Court utilizes the test set forth in Pfaff v. Wells Electronics, Inc., which requires that "(1) the invention be the subject of a commercial sale or offer for sale and (2) the invention be 'ready for patenting' at the time of the offer or sale." 525 U.S. 55, 67 (1998).

To satisfy the first criteria of the on-sale bar, the product must be part of an actual sale or offer for sale. In re Kollar, 286 F.3d 1326, 1330 (Fed. Cir. 2002). For instance, "merely

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

granting a license to an invention, without more, does not trigger the on-sale bar of § 102(b). In re Kollar, 286 F.3d at 1330–1331 (citing Mas-Hamilton Group v. LaGard, Inc., 156 F.3d 1206, 1217 (Fed. Cir. 1998)). "Only an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming consideration), constitutes an offer for sale under § 102(b)." Lacks Indus. v. McKechnie Vehicle Components USA, Inc., 300 Fed. Appx. 904, 906–907 (Fed. Cir. 2008).

The second element of the on-sale bar asks whether "the inventor thought he had a product which could be . . . offered to customers, not whether he could prevail under the technicalities of reduction to practice . . .." Paragon Podiatry Labs., Inc. v. KLM Labs., Inc., 984 F.2d 1182, 1187 n.5, (Fed. Cir. 1993). However, whether an invention is "ready for patenting" is an objective determination. Petrolite Corp., 96 F.3d at 1427 (citing U.S. Envtl. Prods., Inc. v. Westall, 911 F.2d 713, 717 (Fed. Cir. 1990)).

**B. APPLICATION**

### 1. THE '364 PROVISIONAL DOES NOT DISCLOSE THE '848 PATENT

Plaintiff acknowledges that the '848 Patent may only be afforded the priority date of the '364 Provisional if the two applications "share at least one common inventor and the written description of the provisional . . . adequately support[s] the claims of the non-provisional application." (Opp. at 8) (citing New Railhead, 298 F.3d at 1294.) The Parties agree that the two applications "share at least one common inventor," so the only question at issue is whether the '364 Provisional adequately supports the claims of the '848 Patent.

The undisputed facts demonstrate that the claims at issue are not adequately disclosed by the '364 Provisional. First, the '364 Provisional "discloses only a charging system with an external adapter, where the DC ports are on the adapter, and not on the base or supported by the base" as required by the '848 Patent. (Mem. at 19.) Second, the '364 Provisional requires the controller to attach "directly to the external adapter, rather than directly to the base." (Id. at 19.) And third, the '364 Provisional actually teaches away from the claims at issue in the '848 Patent by discussing the failings of a system without an external adapter. (Id. at 20.)

In response Plaintiff relies substantially on the expert declaration of Gary Kitchen to demonstrate that the '364 Provisional disclosed every element of the claims at issue in the '848 Patent. (Opp. at 9, 11–16.) This argument attempts to demonstrate the likeness of a system *with* an external adapter (the '364 Provisional) to a system *without* an external adapter (the '848

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

Patent).  Plaintiff does this in two ways.  First, it argues that the language of the '848 Patent incorporates removable adapters.  (Id. at 11–18.)  Second, it argues that the '364 Provisional's external adapter could be "permanently affixed" to the base, in effect making it part of the base. (Id. at 18.)

Plaintiff's first argument relies on a close reading of Independent Claims 1 and 13 of the '848 Patent, which use two different phrases to describe the relationship of the DC ports to the base.  Claim 1 describes them as being "on the base," while Claim 13 describes them as "supported by the base."  ('848 Patent 15:35, 16:32–33.)  The Court's Claim Construction Order determined that the phrase "supported by the base" meant "physically supported by but not necessarily directly on the base."  (Docket No. 122, [June Order] at 25.)  The phrase "on the base" was not designated for construction by either Party.[12]  Because the DC ports in the '364 Provisional rest on an adapter, which in turn rests in a recess, which in turn is set into the base, Plaintiff argues that the DC ports are "supported by the base" as disclosed in the '848 Patent. (Opp. at 13.)  Arguing that "on the base" encompasses a similar meaning, Plaintiff suggests that the DC ports in the '364 Provisional are also "on the base" as disclosed in the '848 Patent.  (Id. at 15.)

However, focusing solely on the construction of the phrases "on the base" and "supported by the base" misses the point.  The '364 Provisional must "adequately support the claims" of the '848 Patent.  New Railhead, 298 F.3d at 1294.  And the fact remains that the '364 Provisional *requires* an external adapter while the '848 Patent makes no mention of it.[13]  One skilled in the

[12] However, it is plain from the Court's June Order that the phrase "on the base" means something other than "supported by the base."  At the time, the Court described the phrases as having a "rectangle-square relationship."  (June Order at 24.)  That is, something "on the base" would be "supported by the base," but the reverse is not necessarily true.  (Id.)  The subsequent language of the Court's definition of "supported by the base" -- "physically supported by but *not necessarily directly on the base*" -- implies that the word "on" requires direct contact while the words "supported by" do not.  (Id. at 25.)

Plaintiff now suggests a meaning of "on the base" that flies in the face of this rectangle-square relationship.  It argues that "on" can include either "above and supported by" or "in contact with."  (Opp. at 15.) Perhaps recognizing the distinction the Court drew previously, Plaintiff acknowledges that phrases "may not have identical scope," and suggests that "their meanings at least overlap."  (Id. at 17.)  But Plaintiff's overlap goes in the wrong direction by professing that "supported" is a subset of "on," rather than the other way around.

[13] Plaintiff appears to play fast and loose with this distinction on at least one occasion by referring to Figures in the '848 Patent that incorporate an external adapter.  (Docket No. 135-1, [Kitchen Declaration] at 14.) However, upon review of the '848 Patent, these Figures correspond solely to claims that are not at issue in this

**A36**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|----------|----------------------|------|------------------|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

art may have been able to conceive of a different invention by studying the '364 application, but that invention, one that did not require an external adapter, plainly was not disclosed in the '364 Provisional.

Plaintiff's second argument, that the '364 Provisional does not exclude a permanently affixed adapter, is an argument foreclosed in the case law. The question is not whether the provisional excludes a particular claim or claims, but whether it affirmatively discloses the pertinent claims of the later filed patent application. Here the '364 Provisional must affirmatively disclose the claims of the '848 Patent; the '848 Patent is not entitled to priority merely because the '364 Provisional fails to exclude its claims. New Railhead, 298 F.3d at 1294–1295; Anascape, 601 F.3d at 1339 (patentee is not presumed to claim variants that are not described). Moreover, Plaintiff's suggestion, that because the '364 Provisional permits permanently affixed external adapters it discloses a System without external adapters, is illogical. The argument implicitly relies on the '364 Provisional's disclosure of a so-called press-fit adapter, which forms a "really tight" connection between the external adapter and the base. (Opp. at 16.) Plaintiff suggests that a press-fit adapter is equivalent to disclosing an adapter-less Charger because it would be difficult to remove such an adapter. (Id.) Put simply, a "really tight" connection between adapter and base is not the same thing as eliminating the adapter altogether. Whether a user would have chosen to leave the adapter in the recess or not, the described invention contemplates adapters that could be removed, while the '848 Patent contemplates no adapters whatsoever. (See '848 Patent, Figure 15; '364 Provisional, Figure 7.)

The prior point supports Defendants argument that the '364 Provisional teaches away from the claims at issue. The '364 Provisional declares that placing a DC port directly on a charging station, as the '848 Patent does, risks having the DC port damaged, "rendering the charging station inoperable." ('364 Provisional 1:24–25.) "Thus, it is desirable to provide an improved charging station," presumably without the weakness included in the '848 Patent's claims. (Id. at 2:3–4.) In other words, the system described in the '364 Provisions is touted as desirable precisely because it does not describe or encompass the system described in the claims that are at issue in this litigation.

Because the '364 Provisional requires adapters while the pertinent claims of the '848 Patent excludes them, there can be no genuine dispute that the '364 Provisional fails to "convey to one of ordinary skill that [Plaintiff] was in possession of the . . . limitation of the invention claimed in the [Patent]." New Railhead, 298 F.3d at 1297. Accordingly, the '848 Patent is not

suit.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|----------|----------------------|------|------------------|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

entitled to the priority date of the '364 Provisional. The Court therefore evaluates the '848 Patent for invalidity under Section 102(b) using the March 7, 2007, critical date.

### 2. SECTION 102(B) RENDERS THE '848 PATENT INVALID

"A person shall be entitled to a patent unless . . . the invention was . . . in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). The Charger was both publicly used and on sale in this country more than one year prior to the March 7, 2007, critical date.

#### *a. The CES Display Constituted a Public Use*

Defendants essentially make four claims in support of their argument that Plaintiff's demonstration at CES qualifies as a public use. First, the Charger was displayed at CES. (Mem. at 12.) Second, it was shown to retailers and members of the press, who were not under the control of Plaintiff and were under no obligation of confidentiality. (Id. at 4, 12.) Third, those retailers and members of the press used the Charger, recorded that use, and made that use publicly available on the internet. (Id. at 12.) And finally, Plaintiff used that public demonstration for commercial purposes. (Id.)

The record before the Court establishes these facts beyond any reasonable dispute. Nevertheless, Plaintiff resists the "public use" claim on the principal ground that the Model on display at CES was not a Charger but was in fact nothing more than a stereolithograph ("SLA"), or plastic mockup, a dummy device made to look like the Charger.[14] (Opp. at 22–23.) Because, according to Plaintiff, the dummy device could not properly charge video game controllers, it was not used for the '848 Patent's intended purpose at CES, did not disclose or embody the claim elements at issue, and therefore had not been reduced to practice. (Id. at 22.) For that reason, Plaintiff argues that its display qualifies as an experimental use, and does not trigger the public use bar. See 35 U.S.C. § 102(b); Baxter Int'l, 88 F.3d at 1059; Hamilton Beach Brands, 2012 WL 6562220, aff'd, 2013 WL 4081872.

---

[14] Stereolithography is a method of three-dimensional printing, in which the entire object is "printed," typically as a single plastic construction. (Docket No. 135-4, [Ex. N, ("Navid Tr.")] at 126:21–25, 127:1–2.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

### i. The Charger Was Operable

In support of its argument that the Model was an inoperable dummy, NYKO has ignored the undisputed and incontrovertible facts now before the Court. When those facts, which come from NYKO's files and its own witnesses are considered, it is clear that Plaintiff has not created a genuine issue of fact for trial on the public use issue.

NYKO's suggestion that the Model was an inoperable dummy contradicts the inventor's earlier sworn declaration, the documentary record, and Plaintiff's interrogatory answers. In early December 2006, the inventor, Amir Navid, wrote in an email to one of his suppliers:

> The design looks good, please proceed.
>
> I need a ***working SLA*** made right away, and please make sure that the ~~outlook is attractive, as~~ *we will use this as our main sales demonstration sample*.

(Hip Hing Description at 1) (emphasis added.)  NYKO's interrogatory answers recognized that it was a working device, where NYKO acknowledged that Navid received a "prototype referred to as a stereolithographic apparatus ('SLA') which was completed on or about December 26, 2007. Mr. Navid then performed testing and made necessary modifications . . . ." (Docket No. 133-6, [Interrogatory Response] at 3–4.)[15]  Plainly, one cannot conduct tests and make necessary modifications on a non-operable dummy.

This evidence supports Navid's earlier admissions regarding the Model's functionality, made in an attempt to obtain interim injunctive relief during the pendency of this lawsuit. In a sworn declaration, Navid stated, "The product Nyko introduced in January 2007 includes each and every feature of the claimed invention." (Docket No. 44 [Decl. of Amir Navid ("Navid Decl.")] ¶ 17); (see Interrogatory Response at 5) (indicating that "the claimed invention was reduced to practice in asserted claims 1–5, 7, 8, and 10–13, and 15–17 on or after December 26,

---

[15] Navid and Christopher Arbogast, a marketing executive, suggested during their depositions that NYKO sometimes used dummy devices for display while designs were still being altered. (Id. at 54:4–11; Docket No. 135-4, [Ex. N ("Navid Tr.")] at 127:6–20.) Such statements do not create an issue of fact for trial even if they are absolutely true. What may occur on some occasions is one thing; evidence of what happened in the circumstances under discussion is another. The evidence here demonstrates that NYKO had a working model in use at the CES.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

2006.").)  Moreover, in that same declaration, Navid acknowledged that "NYKO introduced the
Charge Base product at the Consumer Electronics Show in Las Vegas to great fanfare in January
2007 (see Exhibit A attached hereto)." (Navid Decl. ¶ 15.)  The referenced "Exhibit A" shows a
January 10, 2007, report touting the advantages of the NYKO charge base with its suggested
retail pricing. (Id. at 10.)  In short, the record conclusively establishes that Navid: (1) ordered a
working SLA a month before the CES; (2) ordered it to use as a sales model; (3) used it at CES
to publicize the product and promote sales of the device; and (4) acknowledged that the device
demonstrated at the show included each and every feature of the claimed invention.  There can
be no dispute that it had been reduced to practice.

Plaintiff has not shown any evidence that would establish any conceivable ground for the
Court to ignore the admissions of NYKO and the inventor.  Rather, grasping at straws, Plaintiff
argues that the Model was non-operational based on video and photographs of the device's LED
display taken during CES. (Opp. at 23.)  The Model included four LEDs, each of which would
have been connected to a docking port in a genuine Charger. (Id.)  Because only two docking
ports were occupied by video game controllers during the CES demonstrations, Plaintiff
contends that only two lights should have been illuminated on a genuine Charger, and yet the
photographs and video show that all four LEDs were illuminated. (Docket No. 135-4, (Ex. L
[Wired Article] at 1); Docket No. 135-4 (Ex. M [Charger Picture].)  Moreover, Plaintiff
sometimes illuminated all LEDs for display purposes when making nonfunctioning models of
their devices. (Docket No. 135-4, [Ex. K ("Arbogast Tr.")] at 80:24–25, 81:1–2.)

While the lights may not have worked as intended, that is hardly evidence that the Model
was not functioning, particularly when the compelling evidence discussed above indicates
otherwise.  In reality, this evidence, even if viewed in isolation, tends to suggest that the Model
was more than a plastic dummy.  It clearly shows that it was wired and was drawing current,
which undermines the testimony of Christopher Arbogast, a marketing executive, who stated that
he did not "specifically recall if [the Model] was plugged in and working at [CES]." (Arbogast
Tr. at 55:7–8.)  And even Arbogast admits that he "wouldn't necessarily plug in a non-working
sample." (Id. at 55:23–24.)  As the pictures of Plaintiff's CES display show, the Model was in
fact plugged in. (Wired Article at 1; Charger Picture.)  And when pressed, Arbogast admitted
that -- even in light of the LED evidence upon which NYKO relies -- he simply did not know
whether the Model was functional. (Arbogast Tr. at 82:1–3.)

While the Arbogast testimony is at best neutral on the issue of the Model's functionality,
Navid's deposition testimony is more damning.  In his description of the Model's manufacture,
Navid said that such constructions might "initially work, [then] they may not work later."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

(Navid Tr. at 127:8–9.) He goes on to add that the very reason for making the Model would have been "to test how everything fits together *and how it will work.*" (Id. at 127:19–20) (emphasis added.) In other words, Plaintiff may not have commenced large scale manufacturing of the Charger prior to CES or reached a final decision on the exact appearance of the device, but Navid "would imagine that it [powered up]." (Id. at 127:6–7.)[16] Nothing in this testimony contradicts Navid's earlier admission that the CES Model in fact encompassed the '848 invention and worked as intended.

Documentation that Plaintiff had begun ordering thousands of parts for the Charger in December 2006 lends additional support to the proposition that a working model had been developed prior to CES. (Hip Hing Order at 1.) The supplier confirmed via email that it had received two purchase orders for Item 83017, which the record reflects is associated with the Charger at issue in this case, one order for 6,000 pieces and one for 30,000 pieces. (Id.) Although NYKO suggests that these orders are not significant because they were necessary merely to establish a price-point for products, (Opp. at 24–25), the supplier does not seem to view them that way. As to each, the supplier states that it will "confirm the delivery date of this order asap." (Id.) Such orders indicate that some version of the Charger had been reduced to practice prior to CES. To the extent that these orders are not considered large or substantial, that reflects concern over the level of interest in the marketplace and any final modifications in design elements rather than any indication that the invention had yet to be reduced to practice. (Arbogast Tr. 223:23–25, 224:1–14.)

In short, the invention had been reduced to practice by January 2007 and NYKO introduced a working version of the device at the January 2007 CES in Las Vegas.

### ii. The Use Was Public

Plaintiff offers a second argument in opposition to the motion -- that the use was not public. This argument merits only brief discussion.

Plaintiff contends that the CES display was not a public use for statutory purposes because the event was held in a private suite, and only people with invitations were allowed to attend. (Opp. at 23–24.) But whether a use is "public" within the meaning of statutory language

---

[16] The temporary form of construction Navid describes also suggests a possible reason for the discrepancy between the LED lights and the rest of the Model: nonessential elements such as lighting may not have been working, even while other parts of the Model were.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

"does not necessarily mean open and visible in the ordinary sense." New Railhead, 298 F.3d at 1297 (citing Lough, 86 F.3d at 1119).

Even if the device had been shown only to one person in a back alley in the dead of night, it would constitute a public use under Section 102(b) so long as that person (1) used the claimed invention and (2) was under no requirement of confidentiality or secrecy. Minn. Mining, 303 F.3d at 1301. Plaintiff notes that a formal agreement is not necessary if "an understanding of confidentiality can be implied." (Opp. at 23–24) (citing Am. Seating Co. v. USSC Group, Inc., 514 F.3d 1262, 1268 (Fed. Cir. 2008).) But Plaintiff admits that the members of the press photographed the Model, and may have even handled it. (Arbogast Tr. at 54:12–16.) At the very least, Plaintiff "demonstrated [the Model] at the suite" for members of the press. (Id. at 55:2–3.) And, as indicated by its press release and ensuing online publicization of the Charger, Plaintiff appears to have wanted the press to be as non-confidential in their discussion of the Charger as possible. (See e.g., Docket No. 133-16, [Press Release] at 1–2; Docket No 133-8, [IGN Article, Nyko Charge Base PS3] at 1.) No "understanding of confidentiality" could possibly be implied in this situation. Indeed, Navid's declaration testimony, cited above, indicates that the device was introduced at CES to "great fanfare," which was the obvious purpose of the demonstration. There was one reason and one reason only for inviting the press to view the device -- to generate publicity as widespread as possible for a device that NYKO immediately put on sale.[17]

The Model was a functioning version of the Charger. It was shown to retailers and members of the press, who were not under the control of Plaintiff and were under no obligation of confidentiality. Those retailers and members of the press publicized the Charger on the internet. Taken together, these facts establish the "use of the claimed invention by a person other than the inventor who is under no limitation, restriction, or obligation of secrecy to the inventor." New Railhead, 298 F.3d at 1297 (citing Lough, 86 F.3d at 1119). The CES display therefore constituted a public use more than one year before the '848 Patent was filed within the meaning of Section 102(b). Accordingly, the public use bar applies, and the '848 Patent must be deemed to be invalid.

---

[17] To the extent that NYKO has suggested that the use was an "experimental use," the Court considers the argument totally meritless. The entire purpose of the demonstration was to gauge and generate market interest in the product, neither of which constitutes "experimentation" within the meaning of Federal Circuit jurisprudence. Dippin' Dots, Inc. v. Mosey, 476 F.3d 1337, 1344 (Fed. Cir. 2007); In re Smith, 714 F.2d at 1135.

**A42**

**LINK: 126**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

#### b. Defendants Have Demonstrated that the On-Sale Bar Applies

The '848 Patent is also invalid because the on-sale bar applies. The record of sales during
and immediately after the CES belies NYKO's claim that its sales were mere market tests.
Beginning on January 8, 2007, in response to interest from vendors in the Charger, NYKO
communicated a price, part number, product name, and product description to customers. (Mem.
at 4, 14.) Between January 8, 2007, and March 7, 2007, customers, including Amazon.com, Inc.
("Amazon"), sent purchase orders for the Charger to Plaintiff. (Id.) Plaintiff generated sales
orders and invoices for each of those purchase orders. (Id.) Plaintiff eventually shipped
Chargers in compliance with nineteen such orders, beginning July 11, 2007. (Id. at 5, 14.) And
finally, the Charger involved in these sales embodied the claims at issue in the '848 Patent. (Id.
at 6.)

Plaintiff's defense essentially consists of one argument: the purported sales were actually
nothing more than pre-orders, or a way of signaling interest. (Opp. at 24–25.) No money or
Chargers changed hands, no contract was formed, and neither Plaintiff nor the customers were
obligated to act in any way based on the purported sales. (Id. at 25; Arbogast Tr. at 180:23–25,
181:1–4.) This is not clear from the face of either the purchase orders or the sales orders.
(Docket No. 133-23 [First Order]; Docket No. 133-22 [Second Order]; Docket No. 133-21
[Third Order]; and Docket No. 133-19 [Fourth Order].) Indeed, both the purchase and sales
orders quite clearly represent that they form contracts, with items and values set. And Plaintiff
has specifically acknowledged that the order forms themselves do not indicate that they are non-
binding. (Arbogast Tr. 200:19–23, 205:12–18.)

In spite of this, Plaintiff explains that NYKO's ordinary custom upon the release of a new
product, which it followed in this case, was to gauge interest with pre-orders prior to forming
binding contracts. (Opp. at 25; Arbogast Tr. at 180:5–13, 17–21.) The Court should infer that
the orders made in January were not binding contracts, Plaintiff argues, because the orders were
not fulfilled until July 2007, and when they were fulfilled, "re-invoices" for payment and
shipment were issued. (Opp. at 25; Docket No. 135-4, Ex. O [Interrogatory Responses] at 11.)
Moreover, Plaintiff asks the Court to interpret the initial orders as not setting a price. (Opp. at
25.) This argument fails upon examination of the undisputed documentary evidence. The Court
will analyze one set of orders and invoices, both as illustrative of the order process and aware
that even a single sale would be enough to impose the on-sale bar.

On January 8, 2007, Amazon submitted four purchase orders to Plaintiff. The fourth was
Purchase Order #L3470035 (the "Purchase Order"). (Fourth Order at 5.) The Purchase Order

**A43**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

requested 140 Chargers at a price of $22. (Id. at 6.) The following day, Plaintiff issued Sales
Order #97145 (the "Sales Order") in response. (Id. at 3.) The Sales Order refers to the Purchase
Order by number, and confirms the request for 140 Chargers. (Id. at 3.) The next day, on
January 10, 2007, Invoice #101146 (the "January Invoice") was prepared based on that Sales
Order. (Id. at 1.) The January Invoice included 140 Chargers at $22 each, and included a total
invoice amount to be billed. (Id. at 1–2.) At some point Amazon created a file (the "Vendor
Central Readout") that reflected these orders. (Docket No. 133-24 [Readout].) The Vendor
Central Readout again indicated, based on the Purchase Order, that 140 Chargers had been
ordered. (Readout at 1.) It also indicated that, while the Charger was on backorder, each of the
items requested in the Purchase Order had been accepted. (Id.) It is unclear exactly when
payment was delivered, but the Vendor Central Readout also reflects that payment did eventually
occur based on that Purchase Order.[18] (Id.) The final document in the sale process appears to be
missing from the record. This is the "re-invoice," which Plaintiff issued when it shipped the
Chargers in July 2007. However, a sales report (the "Sales Report") referring to that re-invoice
indicates its contents. (Docket No. 133-20, [Sales Report] at 2.) The Sales Report shows that
the second invoice, like the Purchase Order, Sales Order, January Invoice, and Vendor Central
Readout, was for 140 Chargers at $22 each. (Sales Report at 2.) So Plaintiff filled Amazon's
original request, made in January 2007, for 140 Chargers at $22 each. Nowhere in any of this is
there any support for Plaintiff's proposition that the Purchase Order was only a pre-order and
therefore non-binding.

    Plaintiff's response is therefore insufficient to raise a triable issue of fact as to whether a
sale took place. For the on-sale bar to apply two things must be true. First, the invention must
be the subject of a commercial sale or offer for sale. Pfaff, 525 U.S. at 67. And second, the
invention must be 'ready for patenting' at the time of the offer or sale. Id. Given the Court's
determination above that the device had been reduced to practice by the time it was displayed at
CES, the second half of this test has already been met. (See supra 17–19.) The only remaining
issue, then, is whether the invention was in fact the subject of a commercial sale or offer for sale.
The foregoing discussion shows that every single piece of evidence points to the conclusion that
the Purchase and Sales Orders reflect commercial sales within the meaning of Section 102(b).
See Lacks Indus., 300 Fed. Appx. at 906–907. Amazon and Plaintiff behaved as though they
had a contract: the price and quantity quoted in the Purchase Order remained consistent

---

[18] The Readout also apparently states that the Chargers were cancelled at some point. (Readout at 1.)
However, it is unclear whether this cancellation refers to the initial shipping window, which expired before the
Chargers were actually shipped, or whether it refers to something else. However, neither Plaintiff nor
Defendants ever suggest that the order itself was cancelled.

**LINK: 126**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 12-3001 GAF (VBKx) | Date | October 22, 2013 |
|---|---|---|---|
| Title | NYKO Technologies, Inc. v. Energizer Holdings Inc., et al | | |

throughout the various Orders and Invoices, and the Orders were eventually fulfilled.  The orders made prior to the March 7, 2007, critical date therefore constituted sales within the meaning of Section 102(b).  Accordingly, the on-sale bar applies, and the '848 Patent must be deemed to be invalid.

### IV.  CONCLUSION

The Charger was in public use and on sale more than one year before the '848 Patent was filed.  Accordingly, the '848 Patent is invalid under Section 102(b), and Defendants' motion for summary judgment is **GRANTED**.  Defendants are to prepare a judgment consistent with this order and to lodge the proposed judgment with the Court no later than the close of business on October 28, 2013.

**IT IS SO ORDERED.**

**A45**

LINKS: 98, 100, 104

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | June 12, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

| Present: The Honorable | **GARY ALLEN FEESS** | |
|---|---|---|
| Stephen Montes | None | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:**       (In Chambers)

**ORDER RE: CLAIM CONSTRUCTION**

**I.**
**INTRODUCTION**

Plaintiff NYKO Technologies, Inc. ("NYKO") holds the patent on a wireless game controller charging system that contains multiple docking bays allowing for several game controllers to be charged at the same time. The charging system is described in United States Patent No. 8,143,848 (the "'848 Patent" or the "Patent"), entitled "Video Game Controller Charging System Having a Docking Structure." (Docket No. 105, [First Declaration of Katherine L. Quigley ("First Quigley Decl.")], Ex. A ['848 Patent]; Docket No. 98, [Plaintiff's Opening Brief ("PB")] at 1; Docket Nos. 100, 104, [Defendants' Opening Brief ("DB") at 1.]) This case arises out of the alleged infringement of that patent by Energizer Holdings, Inc. ("Energizer"), Eveready Battery Co., Inc. ("Eveready"), and Performance Designed Products, LLC ("PDP") (collectively "Defendants") through the sale of a competing video game controller charging system having a docking structure purportedly covered by the '84 patent. (Docket No. 85, [First Am. Compl. ("FAC")] ¶ 10.)

Of the 27 claims in the '848 patent, Independent Claims 1 and 13, and Dependent Claims 2-5, 7, 8, 10-12, and 14-17 are at issue. The parties dispute the meaning of six terms or phrases found in those claims, although the primary dispute centers prominently on the construction of the term "base" and whether the invention contemplates a wired connection between the DC port and the respective video game controller.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | June 12, 2013 |
|----------|----------------------|------|---------------|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

     The Court has considered the written submissions of the parties regarding the disputed terms and conducted a hearing where the parties offered further argument. The following sets forth the Court's resolution of the issues presented.

**II.
BACKGROUND**

**A. PROCEDURAL HISTORY**

     Plaintiff initiated this action on April 5, 2012, asserting one patent infringement claim based on Defendants Energizer's and PDP's alleged sale of competing "video game controller charging systems having a docking structure". (Docket No. 1, [Compl.] ¶ 8.) Shortly thereafter, Plaintiff filed an ex parte application for a temporary restraining order, which the Court denied on June 1, 2012. (Docket No. 51, [06/01/12 Order].) On December 14, 2012, Plaintiff filed a First Amended Complaint pursuant to a stipulation between the Parties. (FAC.) The FAC asserts one patent infringement claim, expands upon the factual allegations, and adds Defendant Eveready. (Id.) Defendants answered on December 28, 2012, also asserting a counterclaim seeking declaratory judgment as to noninfringement, invalidity, and unenforceability. (Docket Nos. 88, 93 [Answer and Counterclaim].) Plaintiff answered the Counterclaim on January 16, 2013. (Docket No. 96.)

**B. OVERVIEW OF THE PATENT**

     The patent described a video game controller charger (the "Charger" or "Charging System") for wirelessly charging video game controllers. ('848 Patent at 1:16-19, 1:66-2:1; PB at 1.)[1] Wireless video game controllers are often used and require periodic recharging. ('848 Patent at 1:46-52.) The controllers and the charging device have matching plugs (a female end

---

[1] While the specification notes that the '848 Patent is not limited to charging video game controllers, i.e. is capable of charging other handheld electronics devices ('848 Patent at 15:12-20), any other potential uses are not at issue here.

     Additionally, though the Summary of the Invention frequently uses the phrase "at least one video game controller," the pertinent claims - independent Claims 1 and 13 - were amended during prosecution to substitute the phrase "plurality of video game controllers" so as to confirm that the device was not intended to be structured to charge a single controller. (Docket No. 104-1, [First Declaration of Graham M. Buccigross ("First Buccigross Decl.")], Ex. 5 [Prosecution History] at 159-161). While practically speaking the charging station could charge a single controller, the charging station must have a plurality of docking bays. This is discussed in detail infra at III.C.4.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | June 12, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

and a male end, respectively) that fit together to make a connection in order to charge. (Id. at 1:52-54.) These plugs are often small and fragile, so the user must use care in forming the connection. (Id. at 1:57-62.)

Plaintiff's '848 Patent is a charging station capable of charging a plurality of video game controllers simultaneously. (Id. at 1:66-2:1, 15:30-31, 16:28-29.) Though there are multiple embodiments of the Charging System, the claims at issue indicate the relevant embodiment. The Charging System consists of a number of inter-working parts. There is a base, on top of which sits at least one structure that provides physical support to the controllers while they are being charged. (Id. at 2:1-3.) DC ports on the base are configured to couple to and provide DC power to the input ports of the controllers. (Id. at 2:5-8.) The DC ports may be male mini-USB connectors. (Id. at 2:8-9.)[2] Additionally, a current detector may be electrically coupled to each DC port and also electrically coupled to an indicator; the indicator indicates the charging status of the Charging System. (Id. at 2:10-15.) The support structure physically supports the controllers and comprises a plurality of docking bays configured to receive the controller. (Id. at 2:16-18.) The support structure is configured such that opposite facing surfaces, which may include locating buttons, receive and align the controller so that the controller's power input port couples to the DC port on the base. (Id. at 2:19-23.) An AC-to-DC converter located either inside or outside the base converts externally supplied power to DC power. (Id. at 2:32-35.)[3]

**III.
DISCUSSION**

**A. LEGAL STANDARDS GOVERNING CLAIM CONSTRUCTION**

The construction of a patent is a matter of law for the Court. Markman v. Westview Instruments, Inc., 517 U.S. 370, 372 (1996). To determine the meaning of a patent claim, the Court primarily considers three sources: (1) the claims; (2) the specification; and (3) the prosecution history. Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir.1995) (en banc), aff'd, Markman, 517 U.S. 370. These sources constitute the "intrinsic" evidence from which the meaning of the patent terms is to be derived. Vitronics Corp. v. Conceptronic, Inc., 90

---

[2] A mini-USB connector is a type of DC port.

[3] Although not a relevant embodiment in this action, another exemplary embodiment involves an external adapter that couples to the controller and remains on the controller when in use. ('848 Patent at 3:15-29.) The external adapter has an electrical lead that matches to an electrical contact on the base of the Charger when the controller is being charged. (Id.)

**LINKS: 98, 100, 104**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | June 12, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

F.3d 1576, 1582 (Fed. Cir. 1996).

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005) (en banc) (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  Accordingly, in construing disputed terms, the Court first looks to the words of the claims. Vitronics Corp., 90 F.3d at 1582.  Generally, the Court ascribes the words of a claim their ordinary and customary meaning. Id.  "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." Phillips, 415 F.3d at 1313.

Other claims of the patent in question can also assist in determining the meaning of a claim term, Vitronics, 90 F.3d at 1582; terms used consistently throughout the claims should be construed consistently.  Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1342 (Fed. Cir. 2001).  Conversely, use of a term in a different way in another claim may also be useful in determining the particular meaning of the disputed term. Laitram Corp. v. Rexnord, Inc., 939 F.2d 1533, 1538 (Fed. Cir. 1991).   The existence of a dependent claim that adds a particular limitation creates a presumption that the limitation in question is not present in the independent claim. Liebel-Flarseim Co. v. Medrad, Inc., 358 F.3d 898, 910 (Fed. Cir. 2004); Tandon Corp. v. U.S. Int'l Trade Comm'n, 831 F.2d 1017, 1023 (Fed. Cir. 1987).  "[T]hat presumption can be overcome if the circumstances suggest a different explanation, or if the evidence favoring a different claim construction is strong . . . ." Liebel-Flarseim Co., 358 F.3d at 910.  However, "where the limitation that is sought to be 'read into' an independent claim already appears in a dependent claim, the doctrine of claim differentiation is at its strongest." Id. (citing Sunrace Roots Enter. Co. v. SRAM Corp., 336 F.3d 1298, 1302–03 (Fed.Cir. 2003)).  The Federal Circuit has also made clear that this presumption is "especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim . . . ." Sunrace Roots, 336 F.3d at 1302–03.  However, an en banc panel of the Federal Circuit recently addressed the claim differentiation doctrine in Retractable Technologies, Inc. v. Becton, Dickinson and Co., reiterating that "[c]laim language must always be read in view of the written description, and any presumption created by the doctrine of claim differentiation 'will be overcome by a contrary construction dictated by the written description or prosecution history.'" 653 F.3d 1296, 1305 (Fed. Cir. 2011) (citing Phillips, 415 F.3d at 1315; Seachange Int'l, Inc. v. C–COR, Inc., 413 F.3d 1361, 1369 (Fed.Cir. 2005)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | June 12, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

Because the claims are part of a fully integrated written instrument comprised principally of the specification, the Court must next review the specification. Markman, 52 F.3d at 978–79. Because the specification must contain a description of the invention that is clear and complete enough to enable those of ordinary skill in the art to make and use it, the specification is "always highly relevant" to the Court's claim construction analysis. Vitronics, 90 F.3d at 1582. Phillips re-established the primacy of the specification in construing patent claim terms. "Usually, [the specification] is dispositive; *it is the single best guide to the meaning of a disputed term.*" Id. (Emphasis added.) "In light of the statutory directive that the inventor provide a 'full' and 'exact' description of the claimed invention, the specification necessarily informs the proper construction of the claims." Phillips, 415 F.3d at 1316. In some cases, the specification may reveal that the patentee has given a special definition to a claim term that differs from its ordinary meaning. "In such cases, the inventor's lexicography controls." Id. at 1316. The specification also may reveal the patentee's intentional disclaimer or disavowal of claim scope. "In that instance, as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive." Id. Thus, the specification can act as a dictionary when it expressly or impliedly defines terms used in the claims. Id. "[A] claim term may be clearly redefined without an explicit statement of redefinition." Bell Atl. Network Servs. v. Covad Communs. Group, 262 F.3d 1258, 1268 (Fed. Cir. 2001).

Next, in addition to reviewing the specification, the Court should consider the patent's prosecution history, if it is in evidence. Markman, 52 F.3d at 980. The prosecution history is intrinsic evidence and consists of the complete record of the proceedings before the Patent and Trademark Office ("PTO") and includes the prior art cited during the examination of the patent. Phillips, 415 F.3d at 1317. "The prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower then it would otherwise be." Phillips, 415 F.3d 1317; see also Chimie v. PPG Indus., Inc., 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution.") (internal quotations omitted).

In addition to the foregoing intrinsic evidence, the Federal Circuit has also authorized district courts to rely on extrinsic evidence in claim construction, which consists of "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." Markman, 52 F.3d at 980. However, extrinsic evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language." C.R. Bard, Inc. v. U.S. Surgical Corp., 388 F.3d 858, 862 (Fed. Cir. 2004).

LINKS: 98, 100, 104

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | June 12, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

"Because dictionaries, and especially technical dictionaries, endeavor to collect the accepted meanings of terms used in various field of science and technology, those resources have been properly recognized as among the many tools that can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention." Phillips, 415 F.3d 1318. Accordingly, the Court may consider this evidence, if the Court deems it helpful in properly construing the claim terms. Id.

**B. DISPUTED CLAIM TERMS**

The parties dispute a number of claim terms:

1. "base"
2. "to couple to"
3. "electrically coupled to"
4. "at least one . . ."
5. "structure"; "docking structure"
6. "supported by the base"

(Docket No. 86, [Joint Claim Construction Chart ("JCC")].)

Claims 1 and 13 of the '848 Patent read as follows:

1. A video game controller charging system for charging a plurality of video game controllers using externally supplied power, the video game controller system comprising:
    a base;
    at least one structure on the base for providing physical support to the plurality of video game controllers while the plurality of video game controllers are being charged; and
    a plurality of DC ports on the base, each of the DC ports configured to couple to and provide DC power to a power input port of a respective one of the plurality of video game controllers,
        wherein the at least one structure on the base comprises a plurality of docking bays open in a first direction and configured to receive respective ones of the plurality of video game controllers from the first direction, and
        wherein the at least one structure on the base further comprises a plurality of pairs of opposite surfaces, each pair of surfaces defining a respective docking bay of the plurality of docking hays [sic] each of the DC ports being on the base between a

**LINKS: 98, 100, 104**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | June 12, 2013 |
|----------|------------------------|------|---------------|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

respective one of the pairs of surfaces.

. . .

13. A charging system for charging a plurality of video game controllers, each
having a power input port, the charging system comprising:
a <u>base</u>;
a plurality of male mini-USB connectors <u>supported</u> <u>by</u> <u>the</u> <u>base</u> and each
adapted to provide DC power to a respective one of the plurality of video game
controllers;
<u>at</u> <u>least</u> <u>one</u> <u>docking</u> <u>structure</u> defining a plurality of docking bays open in a first
direction and configured to receive from the first direction and align respective ones
of the plurality of video game controllers <u>to</u> <u>couple</u> to respective ones of the plurality
of male mini-USB connectors; and
a power input for connecting to a power supply, the power input <u>electrically</u>
<u>coupled</u> <u>to</u> the plurality of male mini-USB connectors,
wherein the <u>at</u> <u>least</u> <u>one</u> <u>docking</u> <u>structure</u> comprises a plurality of pairs of
substantially parallel opposite planar surfaces, each pair of surfaces defining a
respective docking bay of the plurality of docking bays, each of the docking bays
being open on opposite sides between the respective pair of surfaces.

('848 Patent at 15:30-52, 16:28-49) (emphasis added.)

/ / /

/ / /

LINKS: 98, 100, 104

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | June 12, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

C. CONSTRUCTION

    1. "BASE"

| Claim Term | Plaintiff's Construction | Defendants' Construction |
|---|---|---|
| "base" Claims 1 and 13 of '848 Patent | (in opening brief) the foundation or support upon which structures rest<br><br>(in rebuttal brief) the foundation or support upon which structures rest, i.e. the entire body of the charger upon which the video game controllers rest in the docking bays | the bottom part of the charging system that provides physical support for the system against an external adjacent surface |

    The Parties' disagreement over this term stems essentially from how broad the term "base" should be construed: Plaintiff contends Defendants' construction is overly narrow; Defendants contend Plaintiff's construction is overly broad. Specifically, Plaintiff asserts that "Defendants' proposed construction of the base . . . is vague as to 'bottom part' and does not capture the full entrée of features and functions that the base, as described in the '848 Patent, can provide." (PB at 6.) In contrast, Defendants assert that "Nyko's construction is an attempt to improperly broaden the claim to include an entire charging system as a 'base'." (DB at 10.)

    Defendants' raise valid concerns regarding the breadth of Plaintiff's proposed construction. For example, the inventor of the '848 Patent, Amir Navid, testified that "[i]n the context of this patent, what a base is, is the entire charging device. It's the charging system." (Docket No. 104-1, [First Declaration of Graham M. Buccigross ("First Buccigross Decl.")], Ex. 1, [Deposition of Amir Navid ("Navid Depo.")] at 239:24-240:1.) Additionally, in its opening brief, Plaintiff at various points alludes to the base as "the entire charger body." (PB at 7-8, 10-11.) Reading base as the entire charging device would clearly contravene the plain language of the Patent. The independent claims at issue, Claims 1 and 13, both state that "a charging system compris[es]" of "a base". ('848 Patent at 15:30-34, 16:28-31.) Claims 1 and 13 indicate that structures and DC ports are different pieces from the base. (Id. at 15:35-38; 16:32-33.) On the other hand, Claim 18, which is not at issue, claims "a base comprising at least one recess . . . , the base further comprising a power input," and "the base further comprises at least one structure defining at least one docking bay . . . ." (Id. at 17:1-16.) Accordingly, the Court must give

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | June 12, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

credence to "the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope . . . ." Karlin Tech., Inc. v. Surgical Dynamics, Inc., 177 F.3d 968, 971-72 (Fed. Cir. 1999). Plainly the relevant claims of the Patent envision a Charger System of which the base is simply a part. (See also '848 Patent at Figs. 11-18; id. at 9:44-48, 12:1-2 (indicating that Figs. 11-18 consistently describe "the video game controller charging system 400" and "the base 402", and a "charging station 510 includ[ing] a base 524 . . . .").)[4]

Even though Defendants provide useful criticism of Plaintiff's proposed construction, Defendants' construction also misses the mark. While Defendants argue that "the specification consistently and exclusively uses the term 'base' to describe only the bottom part of the charging system," (DB at 9), the Court is persuaded otherwise. The intrinsic evidence compels a construction of "base" that "takes into account that 'base' may include surfaces that are at the top portion of the charging system opposite the bottom portion, that those surfaces do not bear against any external surfaces . . . , and that the base must be capable of supporting the video game controllers as well as housing other physical components . . . ." (PR at 4-5.) Plaintiff, for example, points to the language of Claim 1 that states: "at least one structure **on the base** for providing physical support to the plurality of video game controllers"; "a plurality of DC ports **on the base** . . . configured to couple to . . ."; "the . . . structure **on the base** further compris[ing] a plurality of docking bays . . . configured to receive . . ."; and "the . . . structure **on the base** further compris[ing] a plurality of pairs of opposite surfaces . . .". (PB at 6-7 quoting '848 Patent at 15:35-48 (alterations and emphasis in brief).) Further, Claim 9 states that "the AC-DC converter is ***in the base***." (PB at 7; '848 Patent at 16:17-18.) (Emphasis added.) Various other parts of the specification also indicate the many functions the base serves. Figure 11 demonstrates that, in that particular embodiment, surfaces separate each bay in which a

---

[4] Prior art cited by the Parties reiterates that the base is not equated with the entire Charger System. Prior art that was cited in the patent is considered intrinsic evidence. See Phillips, 415 F.3d at 1317. Plaintiff cites to United States Patent Application Publication No. 2009/0072784 A1 by Craig Erickson ("Erickson"), which was cited in the '848 Patent. (Docket No. 109, [Second Declaration of Katherine L. Quigley ("Second Quigley Decl.")], Ex. S [Erickson].) Erickson, titled an Inductive Charger Battery Replacement System, Device & Method, refers to the body of the charger as the "base unit". However, the "base unit" is analogous to what in the '848 Patent is referred to as the "Charging System". (Compare Erickson at Claim 1 with '848 Patent at 15:34-52.) In Erickson, the base unit is stated as a "base unit comprising . . .", whereas here the Charging System comprises, among other things, a base. The Parties also address United States Patent No. 7,942,747 by Randall C. Cole ("Cole"). (Second Quigley Decl., Ex. R [Cole].) This was not cited in the '848 Patent and is therefore extrinsic evidence. Cole, titled a Video Game Controller Rack, is comprised of a vertical base and cantilever posts functioning to cradle each controller. (Cole at 3:46-60.) As in the '848 Patent, Cole describes the "base" as a part of the "video game controller rack" - they are not one and the same. (Cole at 3:30-41.)

**CIVIL MINUTES - GENERAL**

LINKS: 98, 100, 104

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 12-3001 GAF (VBKx) | Date | June 12, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

controller will rest, such that a controller rests between two opposite facing surfaces. ('848 Patent at Fig. 11.) On that figure, the specification clearly indicates that at the far ends of the Charger, the base itself will play the role as one of the surfaces, functioning essentially as bookends at either end of the base. (Id.; id. at 9:47-55.) Furthermore, Figures 11 and 12 depict that the top of the base may also serve to support the controllers while in the docking bays. (Id. at Figs. 11-12.) Figure 15 clearly indicates that the base houses certain internal components. (Id. at Fig. 15.)

In light of the multi-faceted functions that the base undoubtedly serves, Defendants' construction is plainly untenable. Defendants' construction limits the base to providing support against the ground, rather than also functioning as a foundation or housing for other components. At oral argument, Defendants were unable to clarify just what "bottom part" actually meant aside from stating, essentially, bottom part means bottom part. (Docket No. 119, [Transcript] at 25:21-23, 26:10-13.) Nothing in the intrinsic evidence supports such a narrow reading of the term. The specification clearly demonstrates that the base is more that the bottom surface or the bottom part of the invention. Implicitly acknowledging that their construction found little support in the record, Defendants proposed a new construction at oral argument: "the foundation of the charging system." (Id. at 28:5-6.)

Though Defendants' new proposed construction is certainly preferable to its previous one, the Court finds that defining "base" as "foundation", in the context of this invention, merely substitutes one undefined term for another, offering no greater insight into what the "base" means. On the other hand, the term "body" clearly implicates the multifaceted functions of the base in the context of the Patent.[5] Defendants contested the term "body" at oral argument under the impression that "body" encompassed the entire Charging System. However, the Court finds this concern misplaced and grounded in Defendants' effort to analogize the invention to a table and then to argue that "body" is too broad because "the body of the table is the whole table." (Id. at 28:10-15.) The Court is not entirely certain a table has a "body" or a "base" in any sense relevant to this invention, which contains a physical structure that houses a variety of other essential components.

---

[5] The Court is aware that common dictionary definitions essentially state that a "base" is a support or foundation. (PB at 10, DB at 9.) The dictionary definitions, however, are of little import when the claim language and specification evidence the meaning of a term. See ArcelorMittal France v. AK Steel Corp., 700 F.3d 1314, 1320 (Fed. Cir. 2012). A broad dictionary definition, divorced from the specification, may result in a failure "to fully appreciate how the specification implicitly limits that definition . . . ." Phillips, 415 F.3d at 1321.

LINKS: 98, 100, 104

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | June 12, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

Defendants' proposed constructions aside, the Court did find convincing Defendants' presentation at oral argument that to expand upon the term "base" by construing it to include the objects that rest upon it, are supported by it, or are included within it, would run contrary to Federal Circuit precedent cautioning against construing terms to render other claim language superfluous.  (Id. at 30:22-32:25.)  See Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc., 672 F.3d 1270, 1275 (Fed. Cir. 2012); Phillips, 415 F.3d at 1314.  That line of case law strongly militates in favor of a relatively simple construction of the term "base", given that the surrounding claim language defines what is on, supported by, or inside the base.

In short, while Plaintiff's proposed construction is overbroad, Defendants' proposed construction is untenably narrow and finds no grounding in the Patent.  The Patent clearly evidences the multifaceted functions of the base, and therefore the construction must encompass that breadth.  The Court therefore adopts the following construction:

**base**: the body of the Charging System.

### 2. "TO COUPLE TO"

| Claim Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "to couple to" Claims 1 and 13 of '848 Patent | to join, link or connect structures together without the use of external wires or cables | to connect directly or indirectly to |

The dispute here centers around whether "coupling" in the relevant claims includes indirect coupling - namely coupling by use of an intermediate wire.  While apparently acknowledging that the claim language does not so specify, Plaintiff argues that its construction "eliminates confusion by providing a definition for the phrase in the proper context in which it is used; here, the mechanical context."  (PB at 16.)  The claims in which this phrase appears, Plaintiff argues, "always present the act of coupling the protruding DC port on the base to the corresponding receptacle on the controller in the context of a direct mechanical insertion . . . without the use of wires or cables."  (PB at 16-17.)  Defendants argue that "there is nothing in the specification that excludes the use of a wire or cable as [sic] means of coupling."  (DB at 12.)  Defendants believe that because the Parties agree that "electrically coupled to" includes both direct and indirect connections, and because "[t]he use of the adverb 'electrically' does not

LINKS: 98, 100, 104

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | | Date | June 12, 2013 |
|---|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | | |

imply direct versus indirect connection, . . . there is no reason why 'couple to' should exclude an indirect connection." (DB at 12.)[6]

The Court finds controlling here the line of case law holding that a patentee can act as his own lexicographer, an "explicit definitional format" is not required. Irdeto Access, Inc. v. Echostar Satellite Corp., 383 F.3d 1295, 1300 (Fed. Cir. 2004). Defendants argued at oral argument that there are only two exceptions to the rule that claim language is given its ordinary and customary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." Thorner v. Sony Computer Entm't Am. LLC, 669 F.3d 1362, 1365 (Fed. Cir. 2012). However, Defendants' assertion that "an explicit redefinition" is required, (Transcript at 37:16-20), is too narrow an interpretation of the rule. This is especially so after the recent en banc ruling in Phillips. Phillips held that:

> [R]equiring that any definition of claim language in the specification be express[] is inconsistent with our rulings that the specification is the single best guide to the meaning of a disputed term, and that the specification acts as a dictionary when it expressly defines terms used in the claims *or when it defines terms by implication*.

415 F.3d at 1320-21 (internal quotations and citation omitted, emphasis added). Phillips openly embraced the notion that "a claim term may be clearly redefined without an explicit statement of redefinition." Bell Atl. Network Servs., 262 F.3d at 1268. It is clear to the Court that the Patent implicitly defines "to couple to" as a direct, mechanical connection.

When taken in conjunction with the specification and figures, Plaintiff argues that all relevant embodiments describe and depict "a direct connection between the DC ports on the base and the power input ports of the video game controllers." (PB at 18.) The Court agrees. The intrinsic evidence clearly demonstrates that the Patent implicitly defines "to couple to" as a direct mechanical connection. The claim language plainly indicates that the docking bays are configured to receive the controllers:

---

[6] Defendants rely initially upon a statement the Court made in its 06/01/12 Order addressing Plaintiff's request for a TRO. There the Court stated that "neither the direct coupling nor the positioning of the controller are aspects of the claim 1 limitations." (06/01/12 Order at 11.) Defendants acknowledged at oral argument that the 06/01/12 Order was not controlling. (Transcript at 36:17-25.) The Court reiterates the preliminary nature of that ruling here.

LINKS: 98, 100, 104

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | June 12, 2013 |
|----------|------------------------|------|---------------|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

> "wherein the pairs of opposite surfaces are configured to align respective ones of the plurality of video game controllers such that the power input ports of the respective ones of the video game controllers <u>couple to</u> the respective ones of the plurality of DC ports." (<u>Id.</u> at 15:66-16:3.)

> "at least one docking structure defining a plurality of docking bays open in a first direction and configured to receive from the first direction and align respective ones of the plurality of video game controllers <u>to couple to</u> respective ones of the male mini-USB connectors . . ."  (Id. at 16:35-40.)

Implicit in the docking bays is the notion that the controller must be received by the docking bay and couple directly to the DC port.  Indeed, as Plaintiff argues, "[i]f a wire or cable were inserted between the two devices, it is apparent from the figures and description that this would conflict with the ability of the docking bays to receive, align, and support the controllers."  (PR at 13.)  In other words, the presence of a wire would prevent the controller from "coupling to" the docking bay in the manner contemplated by the invention.  The relevant figures depict exactly that, with the controllers resting in the docking bays, directly connected to a DC port.  ('848 Patent at Figs. 14-15.)  Perhaps most instructively, the specification teaches that:

> In use, the DC ports are connected to the power input ports of the video game controllers to be charged . . . .  When one or more video game controllers need to be recharged, connecting the video game controllers to the charging system is as easy as inserting each of the video game controllers into one of the docking bays.  As described above, the locators aid in aligning the video game controller into the docking bay **such that the power input port of the video game controller slides down onto and connects to the DC port**.

(<u>Id.</u> at 9:65-10:7 (emphasis added, numbers removed).)

The Court finds persuasive the recent Federal Circuit case <u>In re Abbott Diabetes Care, Inc.</u>, 696 F.3d 1142 (Fed. Cir. 2012).  In that case, the relevant claim at issue stated:

> A sensor control unit comprising: a housing adapted for placement on skin and adapted to receive a portion of an electrochemical sensor extending out of the skin having a plurality of contact pads; a plurality of conductive contacts disposed on the housing and configured for coupling to the plurality of contact pads on the electrochemical sensor; and an rf transmitter disposed in the housing and coupled to the plurality of conductive contacts for transmitting data obtained using the electrochemical sensor.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | June 12, 2013 |
|----------|----------------------|------|---------------|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

Id. at 1144.  The Court took on the issue of "whether the broadest reasonable construction of 'electrochemical sensor' includes external cables and wires connecting the sensor to its control unit."  Id. at 1148.  Abbott, the inventor, argued "that all descriptions of the claimed electrochemical sensor in the specification are devoid of any mention of external cables or wires for connecting to the sensor control unit."  Id.  The Court noted that "every embodiment disclosed in the specification shows an electrochemical sensor without external cables or wires" and external cables were only mentioned when disparaging prior art.  Id. at 1149.  The Court found that a claim term like "coupled" is "entirely consistent with and even support[s] the specification's exclusive depiction of an electromechanical sensor without external cables or wires."  Id. at 1149-50.  The Court held that though Abbott did not specifically disclaim external cables or wires, the fact that "nothing suggests or even hints that the claimed electrochemical sensor can include external cables or wires" indicated as much.  Id. at 1150.  The Court held that while "[i]t is true that the specification does not contain an explicit statement disclaiming . . . external cables or wires . . . this is not an instance where the specification would necessarily have to disavow an embodiment that would otherwise be covered by the plain language of the claims . . . ."  Id. at 1149.  Rather, the specification could implicitly define the term.  Id. at 1150.

Additionally, reading "to couple to" as requiring a direct mechanical connection, without wires or cables, is not inconsistent with construing "electrically coupled to" to encompass indirect connections.  Nor does it create an instance wherein the phrase "to couple to" is read more narrowly than the narrower phrase "electrically coupled to".  Turning, for example, to Plaintiffs' expert, Mr. Kitchen notes that "the phrase 'electrically coupled to' is used in cases where the two objects are in the same circuit (i.e. electrically connected) but may or may not be directly connected in a mechanical way."  (Docket No. 99, [First Declaration of Garry Kitchen ("First Kitchen Decl.")] at 14.)  To construe "to couple to" as requiring a "direct mechanical connection" is simply to say that in light of the specification and overall purpose of this invention, "to couple to" is only used in a mechanical sense.  Defendants also argue that Plaintiff's continuation application regarding the '848 Patent (United States Patent No. 8,378,630) explicitly used the phrase "directly couple to" to connote a direct connection without an external cable, such that it is clear that where Plaintiff wanted to say a connection was direct, it did so.  (DB at 14-15; First Buccigross Decl., Ex. 4 ['630 Patent] at 15:46-56.)[7]  The Court attributes no weight to the language in the '630 Patent.  That Plaintiff later adopted more specific

---

[7] Defendants argue that this is intrinsic evidence, (see DB at 14 n.9), and it appears clear that it is.  The '848 and '630 Patents have a clear familial relationship, and accordingly the Federal Circuit permits using the '630 Patent as intrinsic evidence to construe terms in the '848 Patent.  See Goldenberg v. Cytogen, Inc., 373 F.3d 1158, 1167-68 (Fed. Cir. 2004); see also Microsoft Corp. v. Multi-Tech Sys., 357 F.3d 1340, 1349 (Fed. Cir. 2004); Elkay Mfg. Co. v. Ebco Mfg. Co., 192 F.3d 973, 980 (Fed. Cir. 1999).

LINKS: **98, 100, 104**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | June 12, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

language does not alter the fact that Plaintiff implicitly, but clearly defined "to couple to" in the '848 Patent.  Furthermore, that Plaintiff adopted more explicit language in a continuation application during the pendency of this litigation is hardly surprising.  Indeed, as Plaintiff states, it rephrased the '630 Patent after the Court's 06/01/12 Order, which explains the more specific claim language.  (PR at 13 n.6.)[8]

The Court also finds persuasive that the clear purpose of the '848 Patent was to steer away from cables and wires and make for a simple connection between fragile parts.  As Defendants acknowledged at oral argument, "the background of the patent does describe a desire to get away from cables."  (Transcript at 39:3-4.)  In this sense the record is like that before the In re Abbot which noted that external cables were mentioned only when "disparaging" prior art. Moreover, the '848 Patent is addressed, in part, to help avoid breaking or bending DC ports and help "mak[e] a proper connection without damaging the parts."  ('848 Patent at 1:51-62.)  That is done through the use of a docking bay, which, through the elimination of intermediate wire connections, allows for better alignment of the connecting parts in the controller and the charger.

The Court therefore adopts the following construction:

**to couple to:** to connect directly without the use of wires or cables

---

[8]  Additionally, Defendants' citation to one of Plaintiff's other patents, United States Patent Number 6,881,147, (Docket No. 112, [Defendants' Rebuttal Brief ("DR")] at 15; Docket No. 106-1, [Second Declaration of Graham M. Buccigross ("Second Buccigross Decl.")], Ex. 9), is not well taken.  That patent, while providing that coupling may be through wires, is wholly unrelated to the '848 Patent.

**A60**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | June 12, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

### 3. "ELECTRICALLY COUPLED TO"

| CLAIM TERM | PLAINTIFF'S CONSTRUCTION | DEFENDANT'S CONSTRUCTION |
|---|---|---|
| "electrically coupled to" Claims 1 and 13 of '848 Patent | directly or indirectly connected to for the purpose of energy transfer | directly or indirectly electrically connected to |

The only dispute in regards to this construction is, as Defendants note, Plaintiff's use of the phrase "for the purpose of energy transfer," as opposed to simply omitting any purpose at all. (DB at 16.) Defendants believe the phrase is unnecessarily limiting insofar as "[t]he term 'energy' carries with it narrower connotations of 'power' (rather than data) that could serve to confuse the jury into thinking the term is limited to electrical power." (Id.) More specifically, in Defendants' rebuttal brief they argue that Plaintiff's "construction will only confuse the jury because it implies that electrical coupling is limited to the transfer of energy for the purpose of charging the controllers." (DR at 16.) Plaintiff fails to elucidate in its opening or rebuttal briefs why it felt the additional phrase was warranted, and in fact its briefing indicated that there was no real dispute over the construction. (See PB at 23, PR at 11.)

At oral argument, both Parties submitted on the Court's tentative construction, construing "electrically coupled to" to mean "directly or indirectly connect to permit the flow of electrical current." (Transcript at 6:23-24, 42:22-24.) This construction adequately addresses Defendants' valid concerns and finds support in Federal Circuit precedent. See Mems Tech. Berhad v. ITC, 447 Fed. Appx. 142, 151-52 (Fed. Cir. 2011).

Accordingly, the Court will remain with its tentative and adopt the following construction:

**electrically coupled to:** directly or indirectly connected to permit the flow of electrical current.

/ / /

/ / /

LINKS: 98, 100, 104

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | June 12, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

**4. "AT LEAST ONE . . ."**

| Claim Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "at least one structure on the base for providing physical support to the plurality of video game controllers" Claim 1 of '848 patent | "at least one structure" = one or more structures | (In brief) at least one structure (but not necessarily all structures) provides physical support to two or more video game controllers<br><br>(In chart) one or more structures on the base each for providing physical support to a plurality of video game controllers while they are being charged |
| "at least one structure on the base comprises a plurality of docking bays" Claim 1 of '848 patent<br><br>"at least one docking structure defining a plurality of docking bays" Claim 13 of '848 patent | "at least one structure" = one or more structures<br><br>"at least one docking structure" = one or more docking structures | (In brief) at least one structure (but not necessarily all structures) comprises a plurality of docking bays;<br><br>(In brief) at least one docking structure (but not necessarily all structures) defines a plurality of docking bays<br><br>(In chart) one or more structures on the base each defines a plurality of docking bays<br><br>(In chart) one or more docking structures, each defining a plurality of docking bays |

LINKS: 98, 100, 104

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | June 12, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

| | | |
|---|---|---|
| "at least one structure on the base further comprises a plurality of pairs of opposite surfaces" Claim 1 of '848 patent<br><br>"at least one docking structure comprises a plurality of pairs of substantially parallel opposite surfaces" Claim 13 of '848 patent | "at least one structure" = one or more structures<br><br>"at least one docking structure" = one or more docking structures | (In brief)<br>at least one structure (but not necessarily all structures) comprises two or more pairs of opposite surfaces;<br><br>(In brief)<br>at least one structure (but not necessarily all structures) comprises two or more pairs of substantially parallel opposite surfaces<br><br>(In chart)<br>one or more structures on the base, each has a plurality of pairs of opposite surfaces<br><br>(In chart)<br>one or more docking structures on the base, each having a plurality of pairs of substantially parallel opposite surfaces |

Defendants contend that "these terms must be construed in context, and the entire phrases set forth above require construction." (DB at 19.) Plaintiff disagrees, contending that only "at least one structure" and "at least one docking structure" require construction. (PB at 11.) In context or not, the phrase "at least one" is clear. The Court finds that "at least one" is the only phrase requiring construction, and the complexity Defendants see in the remaining language stems from misreading the claim language.

Defendants' trouble with the phrase "at least one" and the language that follows it arises principally from the prosecution history. The '848 Patent, as originally structured, read, in part, "at least one structure on the base for providing physical support to the at least one video game controller while the at least one video game controller is being charged . . . ." (First Buccigross Decl., Ex. 5 [Prosecution History] at 159.) In other words, the '848 Patent as originally written provided for at least one structure or docking structure supporting at least one controller, or one-

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | June 12, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

to-one correspondence. However, the PTO rejected the relevant claims in light of prior art, which "disclose[d] and show[ed] . . . a video game controller charging system for charging at least one video game controller . . . ." (Id. at 112, 117.) The patent was amended to circumvent the problem identified in the prior art by requiring that the charging system be capable of charging at a minimum a plurality of controllers. (Id. at 169, 171.) The amendment makes clear that the charging system had to be able to charge two or more controllers, but could still have a single "structure" to support the two or more controllers. (Id.) After amendment, the charging system would have to have at least one structure supporting no fewer than two controllers.

Defendants contend that, after amendment, "there must be at least one structure on the base that provides support for two or more video game controllers." (DB at 20.) More specifically, Defendants believe that no matter how many structures there are, "at least one of them" alone must still "provide[] support for two or more video game controllers." (Id.) Defendants state that the phrase in parentheses in their proposed construction is "the only way to sort of make sense of this mismatch between the . . . at least one structure supporting a plurality of controllers." (Transcript at 52:10-13.) The Court views this as a misreading of the claim language. The language in Claim 1 reads: "at least one structure on the base for providing physical support . . . ." ('848 Patent at 15:35-36.) The correct reading of this language is, as Plaintiffs state: "the 'at least one' language of claim 1 . . . allows for both embodiments - a single structure which provides support to two or more controllers and a plurality of structures which provide support to two or more controllers." (PR at 19.) The claim language **does not** require that if there are two structures, one alone must still provide support to two or more controllers. Further, the remaining relevant claim language reads: "wherein **the at least one structure** on the base comprises a plurality of . . . ." ('848 Patent at 15:43-48.) The word "the" refers back to "at least one structure on the base for providing physical support," creating a uniformity throughout as to the number of structures practicing the claim elements. This means that if there is only one structure, that structure alone must practice all the claim elements, but if there are two, those two **in conjunction** will practice all the claim elements. A quick look at the relevant figures confirms this. Claim 13 reads, and should be treated, similarly. ('848 Patent at 16:35-36.)

While Plaintiff's phraseology in the '848 Patent is somewhat convoluted, "at least one" is the only phrase that needs construction. The Court therefore adopts the following construction:

**at least one**: one or more than one.

/ / /

/ / /

LINKS: 98, 100, 104

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | June 12, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

### 5. "Structure"; "Docking Structure"

| Claim Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "structure" Claim 1 of '848 patent | [requires no construction] | indefinite |
| "docking structure" Claim 13 of '848 patent | [requires no construction] | indefinite |

Defendants aver that these terms are indefinite because "[n]either the intrinsic nor the extrinsic evidence describes with clarity what a 'structure' is in the context of these claims." (DB at 17.)  At oral argument, the Court tentatively construed "structure" as "one or more physical components attached to the base" and "docking structure" as "one or more physical components for receiving and aligning controllers".  At oral argument, Defendants proffered the construction of structure as "one or more physical components," (Transcript at 54:4-5), apparently recognizing that "structure" is not indefinite.[9]  Plaintiff declined to offer any construction in their briefing or at oral argument.  (See id. at 18-23.)  Plaintiff did eventually indicate that it agreed with the Court's tentative constructions.  (Id. at 22:20-21:3.)

"Section 112 paragraph 2 of the Patent Act requires that a patent specification conclude with one or more claims 'particularly pointing out and distinctly claiming subject matter which the applicant regards as his invention.'" Exxon Research & Eng'g Co. v. United States, 265 F.3d 1371, 1375 (Fed. Cir. 2001) (quoting 35 U.S.C. § 112 para. 2.)  It is not enough that the claim is merely difficult to construe, the claim must be "insolubly ambiguous," such that "no narrowing construction can properly be adopted . . . ."  Id.  The Federal Circuit teaches that the first option in claim construction is not to find indefiniteness.  "If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds."  Id.  Claims are presumed valid.  Id.

---

[9] The proposed construction Defendants offered at oral argument is the Court's tentative construction without the language "attached to the base".  Defendants objected to that phrase under the Digital-Vending line of authority noted above.  As indicated at oral argument, the Court agrees.  (Transcript at 54:3-18.)  Defendants did not propose a construction of "docking structure", but presumably does not take issue with the Court's tentative construction, which did not run afoul of Digital-Vending.

**A65**

LINKS: 98, 100, 104

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | June 12, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

An instructive case on this issue is Praxair, Inc. v. ATMI, Inc., 543 F.3d 1306 (Fed. Cir. 2008).  In Praxair, the court had before it the following claim:

> An apparatus for controlling the discharge of pressurized fluids from the outlet of a pressurized tank, the apparatus comprising: a port body for communication with the outlet of a pressurized tank defining a fluid discharge path; a valve element fixed in or upstream of the port body and adapted for movement between a sealing position that blocks fluid flow through the fluid discharge path and an open position that permits fluid flow along the fluid discharge path; and a diaphragm defining an interior volume isolated from the pressure condition upstream of the valve element and engaged with the valve element to control the movement of the valve element in a manner that retains the valve element in the sealing position until a pressure differential between the interior volume of the diaphragm and the interior of the port body moves the valve element to the open position.

Id. at 1319.  Specifically, the district court construed "port body" as indefinite, stating that "the term 'is not described, labeled, or coherently discussed in the patent,' and its meaning 'is not discernable from the patent.'"  Id. at 1319-20.  The Circuit, turning to a discussion of the term "port body" in the summary of the invention, disagreed, noting that although the description was not "a model of clarity, the specification adequately explains that the port body is "a structure that connects to the outlet of a pressurized tank and includes a path for the discharge of fluid from the pressurized tank."  Id. at 1321.

Defendants place great weight on the argument that Mr. Navid and Mr. Kitchen disagreed in their respective deposition testimonies as to what structure actually meant.  (DR at 17-18.) The Court draws little from that dispute.  As the Praxair Court noted in a similar circumstance, "such extrinsic evidence would not prove the '895 patent invalid, since indefiniteness is a legal rather than a factual question."  Praxair, 543 F.3d at 1321.[10]  Defendants further argue that the only language in the specification attempting to define "structure" is hopelessly vague.  (DB at 17.) That language from the specification states: "[e]ach pair of opposite surfaces, a portion of the base, a corresponding docking bay, and/or the locators may comprise a structure for providing physical support to one of the video game controllers during charging."  ('848 Patent at 9:51-55 (internal numbers omitted).)  Defendants aver that the language "and/or" means that

---

[10] Plaintiff's failure to offer a proposed construction is, however, all the more questionable given that Mr. Navid and Mr. Kitchen seriously struggled at offering a coherent construction in their respective depositions. (See First Buccigross Decl., Ex. 1 [Deposition of Amir Navid ("Navid Depo.")] at 243:5-244:12; Second Buccigross Decl., Ex. 6 [Deposition of Garry Kitchen ("Kitchen Depo.")] at 156-178.)

LINKS: 98, 100, 104

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | June 12, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

any one of the aforementioned elements alone may comprise a structure, which Defendants find nonsensical. (DB at 17-18.)  Defendants also argue that "may comprise" indicates that other unknown components could comprise a structure, and this is insolubly ambiguous.  (Id. at 18.) The specification language Defendants quote, however, compels a different result.

      As the Praxair Court phrased it, the claims and specification are not "a model of clarity" regarding the terms "structure" and "docking structure".  However, despite the Parties' apparent problems deciphering the terms, the claim language is not insolubly ambiguous.  Looking to the language of Claim 1 and the specification language Defendants quoted above, it is evident that the structural components define the space that serves as the docking bay and "provid[e] physical support to the plurality of video game controllers while" they are being charged.  ('848 Patent at 9:51-55, 15:35-38.)  At its most distilled, a structure and a docking structure are the physical components in and against which the controllers rest.  As in Praxair, it seems useful here to adopt a "construction [that] describes the nature of the structure based on its critical structural attributes . . . ."  Praxair, 543 F.3d at 1321.  This eliminates the need to try to define a structure or docking structure by what they may look like or the elements that may comprise them.  While the critical structural attributes of the "structure" and "docking structure" are largely the same, there are some marginal differences, which the Court takes into account.  "In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings."  CAE Screenplates v. Heinrich Fiedler Gmbh & Co. Kg, 224 F.3d 1308, 1317 (Fed. Cir. 2000).

      Before the Court construes "structure" and "docking structure", it notes briefly the implication of the "at least one" language read in conjunction with "structure" and "docking structure".  The plain claim language provides that there may be one structure, or there may be more than one.  If there is only one structure, then that one structure must independently practice all the elements of Claim 1, namely that the single structure supports a plurality of controllers, comprises a plurality of docking bays, and comprises a plurality of pairs of opposite facing surfaces that define the docking bays.  (Id. at 15:35-52.)  If there are multiple structures, then the structures in conjunction must practice the aforementioned elements.  Accordingly, "structure" must be construed broadly enough to encompass a situation where there is only one, or where there is more than one.  The same holds true for docking structure.  The Court offers no opinion as to what a single structure capable of practicing all the elements of the relevant claims would look like, but acknowledges that the Patent encompasses such a thing.

      The Court's tentative constructions were largely accepted by the Parties.  The Court therefore adopts the following constructions:

LINKS: 98, 100, 104

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | June 12, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

**structure**: one or more physical components for receiving controllers.

**docking structure**: one or more physical components for receiving and aligning controllers.

### 6. "SUPPORTED BY THE BASE"

| CLAIM TERM | PLAINTIFF'S CONSTRUCTION | DEFENDANT'S CONSTRUCTION |
|---|---|---|
| "supported by the base" Claim 13 of '848 Patent | [requires no construction] | on the base |

The central issue here is that while in Claim 1 the '848 Patent refers repeatedly to "structure on the base" and "DC ports on the base," ('848 Patent at 15:35-39, 15:50-51), Claim 13 refers to "male mini-USB connectors supported by the base". (Id. at 16:32-33.) Defendants argue that Plaintiff "fails to offer any construction for the term," and therefore "'supported by the base' means 'on the base,' or it is indefinite." (DB at 22-23.) More specifically, Defendants take issue with the fact that the only pertinent disclosed embodiments show male mini-USB connectors on the base. (DR at 24.)[11] While Plaintiff believes that the phrase "supported by the base" does not need construction, it is apparent that it does. Plaintiff's alternating uses of "on the base" and "supported by the base" are not self-explanatory.

At oral argument, Plaintiff was satisfied with the Court's tentative construction - "physically supported by but not directly on the base" - if the word "necessarily" was inserted after "not". (Transcript at 11:16-23.) Defendants disputed the Court's tentative construction insofar as the phrase "physically supported" was used. (Id. at 57:21-24.) Defendants' dispute stems from their concern that "support" as used in the phrase "supported by" is neutral as to compression and tension forces, while "physically supported by" is not. (Id. at 57:21-58:13.) Defendants proffered the construction "held in position by the base". (Id. at 60:2-3.)

---

[11] Defendants further argue that "because the 'supported by the base' 'limitation is defined in purely functional terms,' its construction is 'highly dependent on context . . . .'" (DR at 24 (quoting Halliburton Energy Servs. v. M-I LLC, 514 F.3d 1244, 1255 (Fed. Cir. 2008)).) It is clear, however, that the concept Defendants are alluding to in Halliburton is inapplicable here. Halliburton applied that concept to the noun "fluid", and noted that it was defined "by what it does rather than what it is." 514 F.3d at 1255. As Plaintiff correctly points out "'supported by the base' is not an object, thing or noun that is defined in functional language . . . ." (PR at 21.)

**A68**

LINKS: 98, 100, 104

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | June 12, 2013 |
|---|---|---|---|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

The Court finds that Defendants' concern regarding tension and compression forces is without merit. Defendants' concern is that "if the DC port is hanging on a cable . . . is that supported by the base?" (Transcript at 57:21-58:1.) Defendants point to nothing in the Patent that suggests that the DC ports will be hanging from cables. Especially following the Court's construction of "to couple to", the clear import of the Patent is to steer away from the use of wires. The controllers have to *dock* in the docking bays, thus vitiating the idea of hanging wires. As the Court noted at oral argument, "supported by the base" as used in the Patent clearly implies compression and not tension forces. (Id. at 58:10-16.) In any event, there is nothing about the phrase "physically supported" that, in and of itself, would contemplate a DC port hanging from a cable.

The phrases "supported by the base" and "on the base" are clearly not synonymous phrases. As noted above, "[i]n the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings." CAE Screenplates, 224 F.3d at 1317 (Fed. Cir. 2000). The intrinsic evidence clearly indicates a difference. "On the base" connotes a direct connection between the object and the base. For example, Figure 11 depicts the DC ports "within each of the docking bays" and directly on the base. ('848 Patent at Fig. 11; id. at 9:29-30.) The phrase "supported by the base" connotes the possibility of an indirect connection between the object and the base. This is the case in Figures 17 and 18, which depict the mini-USB connectors on an adapter, the adapter resting upon connectors attached to the base. (Id. at Figs. 17, 18.)[12] Figure 17 depicts the adapter and base as separate pieces. (Id. at Fig. 17.) In that circumstance, it is the adapter that is on the base, while the mini-USB connector is at least one layer removed from the base. While it is certainly the case that the embodiments corresponding to Claims 1 and 13 depict a DC port "on the base", it is also evident that the '848 Patent contemplates embodiments wherein the mini-USB connector is other than directly on the base, i.e. where there is at least one intervening layer between the mini-USB connector and the base.

Plaintiff's proffered dictionary definitions are also helpful here in delineating the meanings of "on" and "supported". The common dictionary definitions of "on" are "[u]sed to indicate position above and supported by or in contact with," and "[u]sed to indicate contact with . . . ." (Second Quigley Decl., Ex. W.) The common dictionary definition of "support" is "[t]o bear the weight of, especially from below." (Id.) These definitions support the Court's construction, which indicates a rectangle-square relationship between "on" and "supported by." That is to say, "on" connotes direct contact, and therefore all components "on the base" are "supported by it," but not all components "supported by the base" are "on it".

---

[12] These figures, the Court is aware, embody independent Claims 18 and 24, which are not at issue here.

**LINKS: 98, 100, 104**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-3001 GAF (VBKx) | Date | June 12, 2013 |
|----------|------------------------|------|---------------|
| Title | NYKO Technologies Inc v. Energizer Holdings Inc et al | | |

The Court therefore adopts the following construction:

**supported by the base**: physically supported by but not necessarily directly on the base.

**IV.
CONCLUSION**

For the reasons set forth above, the Court adopts the foregoing constructions.

**IT IS SO ORDERED.**



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | FILING or 371(c) DATE | GRP ART UNIT | FIL FEE REC'D | ATTY.DOCKET.NO | TOT CLAIMS | IND CLAIMS |
|---|---|---|---|---|---|---|
| 60/982,364 | 10/24/2007 | | 105 | 60708/N220 | | |

**CONFIRMATION NO. 9640**

23363
CHRISTIE, PARKER & HALE, LLP
PO BOX 7068
PASADENA, CA 91109-7068

**FILING RECEIPT**

|||||||||| *OC000000027012026* ||||||||||

Date Mailed: 12/12/2007

Receipt is acknowledged of this provisional patent application. It will not be examined for patentability and will become abandoned not later than twelve months after its filing date. Any correspondence concerning the application must include the following identification information: the U.S. APPLICATION NUMBER, FILING DATE, NAME OF APPLICANT, and TITLE OF INVENTION. Fees transmitted by check or draft are subject to collection. Please verify the accuracy of the data presented on this receipt. **If an error is noted on this Filing Receipt, please write to the Office of Initial Patent Examination's Filing Receipt Corrections. Please provide a copy of this Filing Receipt with the changes noted thereon. If you received a "Notice to File Missing Parts" for this application, please submit any corrections to this Filing Receipt with your reply to the Notice. When the USPTO processes the reply to the Notice, the USPTO will generate another Filing Receipt incorporating the requested corrections**

**Applicant(s)**

     Amir Navid, Sherman Oaks, CA;

**Power of Attorney:**
Tiffany Parcher--58944

**If Required, Foreign Filing License Granted:** 11/30/2007

The country code and number of your priority application, to be used for filing abroad under the Paris Convention, is **US 60/982,364**

**Projected Publication Date:** None, application is not eligible for pre-grant publication

**Non-Publication Request:** No

**Early Publication Request:** No
**\*\* SMALL ENTITY \*\***
**Title**

     CHARGING STATION

## PROTECTING YOUR INVENTION OUTSIDE THE UNITED STATES

Since the rights granted by a U.S. patent extend only throughout the territory of the United States and have no effect in a foreign country, an inventor who wishes patent protection in another country must apply for a patent in a specific country or in regional patent offices. Applicants may wish to consider the filing of an international application under the Patent Cooperation Treaty (PCT). An international (PCT) application generally has the same effect as a regular national patent application in each PCT-member country. The PCT process **simplifies** the filing of patent applications on the same invention in member countries, but **does not result** in a grant of "an international

page 1 of 3

Exhibit    8
A. Navid
1-30-13
S. Clifford. CSR 10154

patent" and does not eliminate the need of applicants to file additional documents and fees in countries where patent protection is desired.

Almost every country has its own patent law, and a person desiring a patent in a particular country must make an application for patent in that country in accordance with its particular laws. Since the laws of many countries differ in various respects from the patent law of the United States, applicants are advised to seek guidance from specific foreign countries to ensure that patent rights are not lost prematurely.

Applicants also are advised that in the case of inventions made in the United States, the Director of the USPTO must issue a license before applicants can apply for a patent in a foreign country. The filing of a U.S. patent application serves as a request for a foreign filing license. The application's filing receipt contains further information and guidance as to the status of applicant's license for foreign filing.

Applicants may wish to consult the USPTO booklet, "General Information Concerning Patents" (specifically, the section entitled "Treaties and Foreign Patents") for more information on timeframes and deadlines for filing foreign patent applications. The guide is available either by contacting the USPTO Contact Center at 800-786-9199, or it can be viewed on the USPTO website at http://www.uspto.gov/web/offices/pac/doc/general/index.html.

For information on preventing theft of your intellectual property (patents, trademarks and copyrights), you may wish to consult the U.S. Government website, http://www.stopfakes.gov. Part of a Department of Commerce initiative, this website includes self-help "toolkits" giving innovators guidance on how to protect intellectual property in specific countries such as China, Korea and Mexico. For questions regarding patent enforcement issues, applicants may call the U.S. Government hotline at 1-866-999-HALT (1-866-999-4158).

## LICENSE FOR FOREIGN FILING UNDER

## Title 35, United States Code, Section 184

## Title 37, Code of Federal Regulations, 5.11 & 5.15

### GRANTED

The applicant has been granted a license under 35 U.S.C. 184, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" followed by a date appears on this form. Such licenses are issued in all applications where the conditions for issuance of a license have been met, regardless of whether or not a license may be required as set forth in 37 CFR 5.15. The scope and limitations of this license are set forth in 37 CFR 5.15(a) unless an earlier license has been issued under 37 CFR 5.15(b). The license is subject to revocation upon written notification. The date indicated is the effective date of the license, unless an earlier license of similar scope has been granted under 37 CFR 5.13 or 5.14.

This license is to be retained by the licensee and may be used at any time on or after the effective date thereof unless it is revoked. This license is automatically transferred to any related applications(s) filed under 37 CFR 1.53(d). This license is not retroactive.

The grant of a license does not in any way lessen the responsibility of a licensee for the security of the subject matter as imposed by any Government contract or the provisions of existing laws relating to espionage and the national security or the export of technical data. Licensees should apprise themselves of current regulations especially with respect to certain countries, of other agencies, particularly the Office of Defense Trade Controls, Department of State (with respect to Arms, Munitions and Implements of War (22 CFR 121-128)); the Bureau of Industry and

page 2 of 3

Security, Department of Commerce (15 CFR parts 730-774); the Office of Foreign AssetsControl, Department of Treasury (31 CFR Parts 500+) and the Department of Energy.

**NOT GRANTED**

No license under 35 U.S.C. 184 has been granted at this time, if the phrase "IF REQUIRED, FOREIGN FILING LICENSE GRANTED" DOES NOT appear on this form. Applicant may still petition for a license under 37 CFR 5.12, if a license is desired before the expiration of 6 months from the filing date of the application. If 6 months has lapsed from the filing date of this application and the licensee has not received any indication of a secrecy order under 35 U.S.C. 181, the licensee may foreign file the application pursuant to 37 CFR 5.15(b).

**PROVISIONAL APPLICATION COVER SHEET [37 CFR 1.53(c)]**
**This is a request for filing a PROVISIONAL APPLICATION under 35 U.S.C. §111(b) and 37 CFR 1.51(a)(2)**

*I hereby certify that this correspondence is being electronically filed with the United States Patent and Trademark Office on October 24, 2007 at or before 11:59 p.m. Eastern Standard Time under the Rules of 37 CFR § 1.10.*

Christina L. Vann

| | | |
|---|---|---|
| Date | : | October 24, 2007 |
| Docket No. | : | 60708/N220 |

**INVENTOR(S)/APPLICANT(S)** (LAST NAME, FIRST NAME, MIDDLE INITIAL, RESIDENCE (CITY AND EITHER STATE OR FOREIGN COUNTRY))

NAVID, Amir     Sherman Oaks, California

_____ Additional inventors are being named on separately numbered sheets attached hereto.

**TITLE OF THE INVENTION** (500 characters max)

CHARGING STATION

**APPLICANT(S) STATUS UNDER 37 CFR § 1.27**

___X___ Applicant(s) and any others associated with it/them under § 1.27(a) are a SMALL ENTITY

**ENCLOSED APPLICATION PARTS**

___12___ Specification (number of pages)
___8___ Drawings (number of sheets)
_____ Assignment
_____ Other (specify):

**FEE AND METHOD OF PAYMENT**

___X___ Please deduct the filing fee of $105 from our Deposit Account No. 03-1728.

___X___ No application size fee enclosed.

___X___ The Commissioner is hereby authorized to charge any fees under 37 CFR 1.16 and 1.17 which may be required during the entire pendency of the application to Deposit Account No. 03-1728. Please show our docket number with any charge or credit to our Deposit Account. A copy of this letter is enclosed.

The invention was made by an agency of the United States Government or under a contract with an agency of the United States Government.

___X___ No
_____ Yes, the name of the U.S. Government agency and the Government contract number are:

**CORRESPONDENCE ADDRESS**

Please address all correspondence to the address corresponding to **CUSTOMER NUMBER 23363,**

**PROVISIONAL APPLICATION COVER SHEET [37 CFR 1.53(c)]**
This is a request for filing a PROVISIONAL APPLICATION under 35 U.S.C. §111(b) and 37 CFR 1.51(a)(2)

**Docket No.** 60708/N220

the practitioners associated with the law firm of Christie, Parker & Hale, LLP, who are authorized to transact all business in the U.S. Patent and Trademark Office connected with this application.

Respectfully submitted,

CHRISTIE, PARKER & HALE, LLP

By _____

Tiffany N Parcher
Reg. No. 58,944
626/795-9900

-2 -

**A75**

1      60708/N220

# CHARGING STATION

5      FIELD OF THE INVENTION

[0001]    The present invention relates to a charging station for a consumer electronics device, and more particularly, to a charging station for one or more hand-held controllers for a video game console.

10     BACKGROUND

[0002]    Consumer electronics devices ("CED"), such as personal computers, video game consoles, cell phones, and other devices, often utilize accessory devices that operate in connection with the CED. Examples of accessory devices include wireless headsets, audio speakers, and handheld controllers. These accessory devices often operate on battery power, so that they can be

15     used without requiring a connection to a power supply. Frequent use of these battery-powered accessory devices drains the batteries and requires frequent replacement or recharging of the batteries.

[0003]    Frequent replacement of batteries can be expensive, and as a result many accessory devices utilize rechargeable batteries. The accessory device is connected to a charging station

20     periodically to recharge the batteries. The charging station and the accessory device have matching plugs or ports that fit together to make a connection. If the plug on the charging station or the accessory device is broken or damaged, the accessory device can no longer be connected to the charging station. These plugs can be small and/or fragile, as the accessory device itself is often a small, compact device. These small plugs can be easily bent or broken, rendering the charging

25     station inoperable. The user has to be careful to connect the plugs slowly, gently, and completely, in order to make a proper connection without damaging the parts.

-1-

1   **60708/N220**

[0004]    Thus, it is desirable to provide an improved charging station that allows for fast, easy, and reliable connection between the accessory device and the charging station.

5

SUMMARY

[0005]    The present invention relates to a charging station for a consumer electronics device, and more particularly, to a charging station for one or more hand-held controllers for a video game console. In one embodiment, a charging station for an accessory device having a power input port

10    includes a base with a recess having at least one electrical contact. The base further includes a power input for connection to a power supply, the power input being electrically coupled to the at least one electrical contact. The charging station also includes an external adapter with a connector configured to couple to the power input port of the accessory device, and with at least one electrical lead. The recess is dimensioned to receive the adapter, with the at least one electrical lead

15    contacting the at least one electrical contact when the adapter is received by the recess.

BRIEF DESCRIPTION OF THE DRAWINGS

[0006]    FIG. 1 is a perspective view of a charging station according to an exemplary embodiment of the invention;

20    [0007]    FIG. 2 is a perspective view of a charging station and two adapters according to an exemplary embodiment of the invention;

[0008]    FIG. 3 is a perspective view of a charging station with two adapters according to an exemplary embodiment of the invention;

[0009]    FIG. 4A is a top plan view of an adapter according to an exemplary embodiment of the

25    invention;

[0010]    FIG. 4B is a bottom plan view of an adapter according to an exemplary embodiment of the invention;

-2-

1    **60708/N220**

[0011]    FIG. 4C is a side plan view of an adapter according to an exemplary embodiment of the invention;

5    [0012]    FIG. 5 is a perspective view of a charging station with a video game controller according to an exemplary embodiment of the invention;

[0013]    FIG. 6 is a perspective view of a charging station with two video game controllers according to an exemplary embodiment of the invention;

[0014]    FIG. 7 is a block diagram of a charging station and an accessory device according to an
10    exemplary embodiment of the invention; and

[0015]    FIG. 8 is a circuit diagram of a charging station according to an exemplary embodiment of the invention.

DETAILED DESCRIPTION

15    [0016]    An exemplary embodiment of the present invention relates to a charging station for a consumer electronics device (CED), and more particularly, to a charging station for one or more hand-held controllers for a video game console. A charging station 10 according to an exemplary embodiment of the invention is shown in FIG. 1. The charging station 10 includes two docking bays 12, 14 for two accessory devices, which in one embodiment are hand-held controllers for a
20    video game console. The docking bays 12, 14 are dimensioned to accept adapters 16 (see FIG. 2). Electrical contacts 20 in the docking bays make contact with electrical leads 22 on the adapters (see FIG. 4B) to provide an electrical connection through which power can be transmitted. The adapters 16 are electrically coupled to the power input port on the hand-held controllers. In one embodiment, the adapters 16 drop-fit easily into the docking bays 12, 14, thus providing a fast and
25    easy connection of the hand-held controllers to the charging station 10.

[0017]    As shown in FIG. 1, the charging station 10 includes a base 24 with two docking bays 12, 14. The docking bays 12, 14 are each dimensioned to accept a hand-held controller 26 (see

-3-

1    60708/N220

FIGs. 5, 6). The two docking bays are separated by a partition 28 positioned between them. Each docking bay includes a recess 30 at the bottom of the docking bay. The recess 30 has four

5    electrical contacts 20 positioned in the recess. In other embodiments, the recess may include more than four or less than four electrical contacts. These contacts 20 are shown positioned in a linear arrangement in the recess 30, but they could be positioned in any suitable arrangement.

[0018]   The recesses 30 are dimensioned to receive an adapter 16 into the recess. As shown in FIG. 2, the adapters 16 can be dropped vertically into the docking bays 12, 14 and into the recesses

10   30. When the adapters are placed into the recesses 30, electrical leads 22 (see FIG. 4B) on the bottom side 38 of the adapters 16 contact the electrical contacts 20 in the recesses 30. The electrical leads 22 on the adapter thus make an electrical connection with the electrical contacts 20 in the recess. The electrical leads 22 on the adapter match the arrangement of the electrical contacts 20 such that each electrical lead 22 makes physical contact with an electrical contact 20

15   when the adapter is placed in the recess. In one embodiment, as will be described later, the electrical contacts 20 are spring loaded so as to make sufficient contacts with the electrical leads 22.

[0019]   In other embodiments, the adapters 16 and docking bays 12, 14 have matching shapes, such as, for example, a molded male and female matching shape, which is not limited to the recess

20   30 described above. The docking bays 12, 14 and adapters 16 can have any suitable shapes that allow the electrical contacts 20 of the docking bays to make contact with the electrical leads 22 of the adapters 16. Thus, many molded configurations, including ridges, grooves, and other shapes, can be used to enable the docking bays 12, 14 to receive the adapters 16. These examples are illustrative only, and not limiting.

25   [0020]   As shown in FIG. 3, in one embodiment, the adapters 16 and recesses 30 are shaped such that the adapter can only be placed into the recess in one orientation. In the embodiment shown, the adapter 16 includes at least one angled edge 32, and the recess 30 includes a matching

-4-

1    **60708/N220**

angled corner 34. This geometry ensures that the adapter 16 will be placed in the recess 30 in the proper orientation, so that the electrical contacts 20 meet the electrical leads 22. Other geometric

5    configurations or features could be used to accomplish this function, such as matching prongs and recesses, or other types of shaped edges. Additionally, this feature is optional, as the adapter could be made to fit into the recess in multiple orientations.

[0021]    As shown in FIGs. 4A-4C, the adapter 16 includes a body 36 with the angled edge 32. The electrical leads 22 are located on a bottom side 38 of the body 36. The top side 40 of the body

10    36 includes a connector 42 that is configured to connect to the power input port of the accessory device to be charged. In one embodiment, the connector 42 is a male mini-USB (universal serial bus) connector adapted to connect to a female mini-USB connector on a hand-held controller for a video game console, such as the PlayStation3®.

[0022]    In use, the connector 42 on the adapter 16 is connected to the power input port of the

15    accessory device to be charged, such as the hand-held controller 26 shown in FIGs. 5 and 6. The adapter 16 is a small and light-weight piece that connects snugly to the power input port of the hand-held controller 26. The adapter 16 can remain with the hand-held controller 26 at all times, even when the controller 26 is not being charged in the charging station 10. When the hand-held controller 26 is in use during operation of a video game, when the controller 26 is stored, and when

20    it is charging, the adapter 16 can remain connected to (and physically mounted on) the controller 26. The adapter 16 is small and light weight, so that it does not interfere with operation of the controller 26. When the controller needs to be recharged, connecting it to the charging station 10 is as easy as dropping it into the docking bay 12, 14. The adapter 16 slides easily into the recess 30, and the electrical leads 22 on the bottom of the adapter 16 make an electrical connection with the

25    electrical contacts 20 in the recess 30. The charging station 10 is connected to a power supply through its own power input. The charging station 10 then provides power to the controller 26 to recharge the controller's batteries. This recharging process is fast and easy, as the adapter 16

-5-

**A80**

1    **60708/N220**

allows the controller to be simply dropped into place, rather than carefully connected to a fragile port or connector.

5    **[0023]**    While the embodiment described above uses a vertical orientation, with the controller 26 and adapter 16 being dropped from above into the recess 30, other orientations may be used as well. In one embodiment, the adapter 16 is received horizontally into the docking bay, and the electrical contacts 20 in the docking bay and electrical leads 22 on the adapter are arranged vertically to make contact with each other when the adapter 16 is horizontally placed into the

10    docking bay. In one embodiment, the adapter 16 is placed into the docking bay by a push-fit, press-fit, or snap-fit, rather than simply a drop-fit. These fitting engagements are fast and easy to use, and also provide a reliable connection between the adapter and charging station. In another embodiment, the charging station includes prongs that hold the controller and adapter into place after they have been placed (vertically or horizontally) into the docking bay to obtain a complete

15    electrical connection.

**[0024]**    The charging station 10 can charge two controllers 26 simultaneously (or concurrently), or it can charge one at a time. The power input for the charging station 10 may be a power cord 44, as shown in FIG. 5, that connects to an alternating current (AC) power supply. In this case, the charging station 10 includes an AC/DC converter electrically coupled between the power input and

20    the electrical contacts 20, in order to provide direct current power to the contacts 20 and from there to the controllers 26. The AC/DC converter 46 may be internal to the base 24 or external. In another embodiment, the power input is a USB port that connects to the CED to obtain DC power from the CED. The charging station provides this DC power to the electrical contacts 20 and from there to the controllers 26. In other embodiments, DC power may be provided as input to the

25    charging station 10, where the DC power may be provided by an external AC/DC converter.

**[0025]**    The electrical contacts 20 may include a spring coupling the contacts to the base 24. The weight of the controller 26 pushes the adapter 16 down into the recess 30, pressing the

-6-

1    60708/N220

electrical leads 22 on the adapter 16 against the electrical contacts 20. The spring pushes back up
on the contacts 20, pushing them against the electrical leads 22 to ensure a complete electrical
5    connection.

[0026]    The charging station 10 may also include an indicator 48 that indicates a status of the
charging station. In one embodiment, the indicator 48 includes two LED assemblies 50, 52 (see
FIG. 1). The LED assemblies 50, 52 correspond with the first and second docking bays 12, 14,
respectively, so as to indicate the charging status of the hand-held controller 26 (or any other
10    suitable accessory device) being charged in the respective docking bay. Each of the LED
assemblies 50 and 52 includes at least two LEDs having different colors. By way of example, each
of the LED assemblies 50 and 52 in one embodiment includes a red LED and a green LED. While
the respective hand-held controller 26 is being charged, the red LED is emitted to indicate that the
hand-held controller 26 (i.e., the battery inside the hand-held controller 26) is currently being
15    charged. Further, when the respective hand-held controller 26 is finished charging, the green LED
is emitted to indicate that the charging has been completed. In other embodiments, each of the
LED assemblies 50, 52 may include different color LEDs and/or different number (e.g., three) of
LEDs to indicate respective charging status.

[0027]    In still other embodiments, each of the LED assemblies 50, 52 may include a single
20    LED, and may be referred to as LEDs 50, 52. The first LED 50 illuminates with a first color, for
example red, to indicate that the charging station 10 is currently charging an accessory device. The
second LED 52 illuminates with a second color, for example green, to indicate that the charging
station 10 is finished charging. The LEDs 50, 52 may be electrically coupled to a current detector
(see FIG. 7) which provides the signals to illuminate the LEDs. In one embodiment, the charging
25    station 10 stops providing power to the controller 26 when the controller's internal battery is
completely charged.

-7-

1    60708/N220

[0028]    A block diagram of the charging station 10 is shown in FIG. 7, showing some of the above-described components of the charging station in schematic form. As can be seen in FIG. 7,

5    the charging station (or charger base) 10 includes electrical contacts 20 that are adapted to be electrically coupled with the accessory device 26 via the adapter 16. This way, the charging station 10 is capable of supplying the power received from a power adapter or a power supply to the accessory device 26 (e.g., for charging).

[0029]    In one embodiment, the charger base includes the AC/DC converter 46 for converting

10    input AC power to DC power for charging the accessory device 26. In other embodiments, the charging station 10 may be provided with DC power via a mini-USB port, an external AC/DC converter or any other suitable DC power supply. The charging station 10 may include a USB host used to provide DC power via mini-USB port.

[0030]    In one embodiment, the charging station 10 includes a current detector 21 for detecting

15    the amount of current being provided by the power supply to the accessory device 26 through the contacts 20. If sufficient current (e.g., a predetermined amount of current) is detected by the current detector 21, the corresponding LED (e.g., a red LED) is emitted to indicate that the accessory device 26 is being charged. Then, when the charging has been completed, less current is detected because the battery in the accessory device is already substantially fully charged. In this

20    case, another LED (e.g., a green LED) is emitted to indicate that charging has been completed.

[0031]    A circuit diagram of the charging station 10 is shown in FIG. 8. As can be seen in FIG. 8, each of the LED assemblies includes two LEDs (green LED LED2 and red LED LED1, or green LED LED4 and red LED LED3). As can be seen in FIG. 8, the current detector 21 in one embodiment is implemented using a quad operational amplifier chip LM324. The current detector

25    21 controls light emission of LEDs LED1 and LED2 and/or the light emission of LEDs LED3 and LED4, depending on whether or not sufficient current for charging a respective accessory device is detected.

-8-

**A83**

**60708/N220**

[0032]    While the CED is described in the above embodiments as a video game console, and the accessory device is described as a hand-held controller for the video game console, the invention may be used for other CEDs and accessory devices, such as cell phones, wireless headsets, personal computers and related peripheral devices, and many other electronic devices. This list is meant to be illustrative only, and not limiting.

-9-

**A84**

60708/N220

WHAT IS CLAIMED IS:

1.      A charging station for an accessory device having a power input port, comprising:

a base comprising a recess having at least one electrical contact, the base further comprising a power input for connection to a power supply, the power input being electrically coupled to the at least one electrical contact;

an external adapter comprising a connector configured to couple to the power input port of the accessory device, the external adapter further comprising at least one electrical lead;

wherein the recess is dimensioned to receive the adapter, with the at least one electrical lead contacting the at least one electrical contact when the adapter is received by the recess.

2.      The charging station of claim 1, further comprising a current detector electrically coupled to the at least one electrical contact, and an indicator electrically coupled to the current detector to indicate a status of the charging station.

3.      The charging station of claim 2, wherein the indicator comprises an LED.

4.      The charging station of claim 1, wherein the external adapter comprises an angled edge and wherein the recess comprises an angled corner that matches the angled edge to orient the external adapter with respect to the recess.

5.      The charging station of claim 1, wherein the at least one electrical contact comprises four electrical contacts, and wherein the at least one electrical lead comprises four electrical leads.

6.      The charging station of claim 1, wherein the connector comprises a male mini-USB connector.

-10-

1    **60708/N220**

7.    The charging station of claim 1, wherein the power input comprises a power cord configured to couple to an AC power supply, and wherein the charging station further comprises an

5    AC/DC converter electrically coupled between the power input and the at least one electrical contact.

8.    The charging station of claim 1, wherein the power input comprises a USB port configured to couple to a consumer electronics device.

10

9.    The charging station of claim 1, wherein the at least one electrical contact further comprises a spring.

10.    The charging station of claim 1, further comprising a second recess and a second

15    electrical lead, and a partition positioned between the two recesses.

11.    Apparatus as shown and described herein.

12.    Method as shown and described herein.

20

25

-11-

1    **60708/N220**

ABSTRACT

The present invention relates to a charging station for a consumer electronics device, and more

5    particularly, to a charging station for one or more hand-held controllers for a video game console.

In one embodiment, a charging station for an accessory device having a power input port includes a

base with a recess having at least one electrical contact. The base further includes a power input

for connection to a power supply, the power input being electrically coupled to the at least one

electrical contact. The charging station also includes an external adapter with a connector

10    configured to couple to the power input port of the accessory device, and with at least one electrical

lead. The recess is dimensioned to receive the adapter, with the at least one electrical lead

contacting the at least one electrical contact when the adapter is received by the recess.

TP/tp

CLV PAS761061.1-*-10/24/07 1:39 PM

15

20

25

-12-

Attorney: Tiffany A. Parcher
Docket No.: 60708/N220
Inventor(s): Amir Navid
Title: CHARGING STATION
Sheet 1 of 8



*FIG.1*

**A88**

Attorney:  Tiffany A. Parcher
Docket No.:  60708/N220
Inventor(s):  Amir Navid
Title:  CHARGING STATION
Sheet 2 of 8



FIG. 2

Attorney: Tiffany A. Parcher
Docket No.: 60708/N220
Inventor(s): Amir Navid
Title: CHARGING STATION
Sheet 3 of 8



*FIG. 3*

Attorney:  Tiffany A. Parcher
Docket No.:  60708/N220
Inventor(s):  Amir Navid
Title:  CHARGING STATION
Sheet 4 of 8



*FIG.4A*

*FIG.4B*

*FIG.4C*

Attorney: Tiffany A. Parcher
Docket No.: 60708/N220
Inventor(s): Amir Navid
Title: CHARGING STATION
Sheet 5 of 8



*FIG.5*

Attorney: Tiffany A. Parcher
Docket No.: 60708/N220
Inventor(s): Amir Navid
Title: CHARGING STATION
Sheet 6 of 8



FIG.6

Attorney: Tiffany A. Parcher
Docket No.: 60708/N220
Inventor(s): Amir Navid
Title: CHARGING STATION
Sheet 7 of 8

FIG. 7



Attorney: Tiffany A. Parcher
Docket No.: 60708/N220
Inventor(s): Amir Navid
Title: CHARGING STATION
Sheet 8 of 8



FIG. 8

## Electronic Patent Application Fee Transmittal

| Application Number: | |
|---|---|
| Filing Date: | |
| Title of Invention: | CHARGING STATION |
| First Named Inventor/Applicant Name: | Amir Navid |
| Filer: | Tiffany A. Parcher/Christina Vann |
| Attorney Docket Number: | 60708/N220 |

Filed as Small Entity

### Provisional Filing Fees

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Basic Filing:** | | | | |
| Provisional Application filing fee | 2005 | 1 | 105 | 105 |
| **Pages:** | | | | |
| **Claims:** | | | | |
| **Miscellaneous-Filing:** | | | | |
| **Petition:** | | | | |
| **Patent-Appeals-and-Interference:** | | | | |
| Post-Allowance-and-Post-Issuance: | | | | |
| **Extension-of-Time:** | | | | |

| Description | Fee Code | Quantity | Amount | Sub-Total in USD($) |
|---|---|---|---|---|
| **Miscellaneous:** | | | | |
| | Total in USD ($) | | | 105 |

## Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 2365821 |
| **Application Number:** | 60982364 |
| **International Application Number:** | |
| **Confirmation Number:** | 9640 |
| **Title of Invention:** | CHARGING STATION |
| **First Named Inventor/Applicant Name:** | Amir Navid |
| **Customer Number:** | 23363 |
| **Filer:** | Tiffany A. Parcher/Christina Vann |
| **Filer Authorized By:** | Tiffany A. Parcher |
| **Attorney Docket Number:** | 60708/N220 |
| **Receipt Date:** | 24-OCT-2007 |
| **Filing Date:** | |
| **Time Stamp:** | 19:16:24 |
| **Application Type:** | Provisional |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment was successfully received in RAM | $105 |
| RAM confirmation Number | 3367 |
| Deposit Account | 031728 |
| The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows: Charge any Additional Fees required under 37 C.F.R. Section 1.16 and 1.17 | |

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes) /Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | Transmittal of New Application | Transmittal.pdf | 51930<br><br>ca992a86e446d40c2e34ffa218e4d26d cbaa7409 | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 2 | | Specification.pdf | 407285<br><br>7d22b1b1827dd8994a25e9d25e42dfd0 f0701b30 | yes | 12 |
| | **Multipart Description/PDF files in .zip description** | | | | |
| | **Document Description** | | **Start** | **End** | |
| | Specification | | 1 | 9 | |
| | Claims | | 10 | 11 | |
| | Abstract | | 12 | 12 | |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 3 | Drawings-only black and white line drawings | Drawings.pdf | 131888<br><br>2360422c579d72d6d2bce72c0aaaa99 526140fa9 | no | 8 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| 4 | Fee Worksheet (PTO-06) | fee-info.pdf | 8102<br><br>022317574d93dd762e503026bf1dcd06 e1e449a2 | no | 2 |
| **Warnings:** | | | | | |
| **Information:** | | | | | |
| | | **Total Files Size (in bytes):** | 599205 | | |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

New Applications Under 35 U.S.C. 111
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.

National Stage of an International Application under 35 U.S.C. 371
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

New International Application Filed with the USPTO as a Receiving Office
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.



US008143848B2

(12) **United States Patent**

Navid

(10) **Patent No.:** **US 8,143,848 B2**

(45) **Date of Patent:** **Mar. 27, 2012**

(54) **VIDEO GAME CONTROLLER CHARGING SYSTEM HAVING A DOCKING STRUCTURE**

(75) Inventor: **Amir Navid**, Sherman Oaks, CA (US)

(73) Assignee: **Nyko Technologies, Inc.**, Los Angeles, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 799 days.

(21) Appl. No.: **12/044,295**

(22) Filed: **Mar. 7, 2008**

(65) **Prior Publication Data**

US 2008/0150480 A1     Jun. 26, 2008

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 11/581,137, filed on Oct. 13, 2006, now abandoned.

(60) Provisional application No. 60/982,364, filed on Oct. 24, 2007.

(51) **Int. Cl.**
     ***H02J 7/00***     (2006.01)

(52) **U.S. Cl.** ..................................... **320/113**; 320/115

(58) **Field of Classification Search** ................... 320/113
     See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,547,399 A | 8/1996 | Naghi et al. | |
| 5,594,314 A * | 1/1997 | Hagiuda et al. | ............... 320/110 |
| 5,734,254 A * | 3/1998 | Stephens | ...................... 320/106 |
| 5,828,966 A | 10/1998 | Davis et al. | |
| 5,847,545 A | 12/1998 | Chen et al. | |
| 6,061,261 A | 5/2000 | Chen et al. | |

| | | | |
|---|---|---|---|
| 6,313,604 B1 * | 11/2001 | Chen | ............................. 320/114 |
| 6,321,340 B1 | 11/2001 | Shin et al. | |
| 6,362,987 B1 | 3/2002 | Yurek et al. | |
| 6,614,206 B1 | 9/2003 | Wong et al. | |
| 6,632,098 B1 | 10/2003 | Wong et al. | |
| 6,669,513 B2 | 12/2003 | Huang | |
| 6,790,062 B1 | 9/2004 | Liao | |
| 6,811,444 B2 | 11/2004 | Geyer | |
| 6,842,356 B2 * | 1/2005 | Hsu | ................................. 363/146 |
| 6,991,483 B1 | 1/2006 | Milan et al. | |
| 6,992,462 B1 | 1/2006 | Hussaini et al. | |
| 7,054,177 B2 | 5/2006 | Wu | |

(Continued)

OTHER PUBLICATIONS

International Search Report, Transmittal and Written Opinion dated Dec. 29, 2008, Application No. PCT/US 08/81004, Nyko Technologies, Inc.

(Continued)

*Primary Examiner* — Arun Williams

(74) *Attorney, Agent, or Firm* — Christie, Parker & Hale, LLP

(57) **ABSTRACT**

A video game controller charging system is provided. The video game controller charging system includes a base; at least one structure on the base for providing physical support to at least one video game controller while it is being charged; and at least one DC port on the base configured to couple to and provide DC power to a power input port of the at least one video game controller. The video game controller charging system may also include a current detector, a charging status indicator, at least one docking bay, and/or an AC-to-DC converter adapted to convert externally supplied power to the DC power provided to the power input port of at least one video game controller. The base of a charging station may include a recess having at least one electrical contact and a power input for connection to a power supply.

**27 Claims, 23 Drawing Sheets**



Exhibit   1
A. Navid
1-30-13
S. Clifford. CSR 10154

**US 8,143,848 B2**

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,140,922 B2 | 11/2006 | Luu et al. | |
| 2002/0115480 A1 | 8/2002 | Huang | |
| 2003/0216069 A1* | 11/2003 | Huang | 439/105 |
| 2004/0189250 A1* | 9/2004 | Nishida | 320/116 |
| 2004/0218411 A1 | 11/2004 | Luu et al. | |
| 2004/0259436 A1 | 12/2004 | Su | |
| 2005/0189914 A1 | 9/2005 | Esses | |
| 2006/0080476 A1 | 4/2006 | Wang et al. | |
| 2006/0202660 A1* | 9/2006 | Chang | 320/115 |
| 2007/0021209 A1 | 1/2007 | Hussaini et al. | |
| 2007/0091656 A1 | 4/2007 | Navid et al. | |
| 2007/0216352 A1 | 9/2007 | Shaddle | |

| | | | |
|---|---|---|---|
| 2007/0278999 A1* | 12/2007 | Hsia | 320/111 |
| 2008/0180060 A1* | 7/2008 | Odell et al. | 320/115 |
| 2009/0072784 A1* | 3/2009 | Erickson | 320/108 |

### OTHER PUBLICATIONS

International Search Report, International Application No. PCT/US 06/40118, Dated Nov. 28, 2007.

European Search Report for European Application No. 08843118.4 in the name of Nyko Technologies, Inc. European Search Report dated Oct. 22, 2010 and mailed Oct. 29, 2010 (6 pgs).

* cited by examiner



FIG. 1



FIG. 2



FIG. 3



FIG. 4



**FIG. 5**



FIG. 6



FIG. 7



**FIG. 8**



FIG. 9



FIG. 10

*FIG.11*



FIG. 12

FIG. 13

*FIG.14*





FIG.15



FIG.16



*FIG. 17*



FIG.18



FIG.19A

FIG.19B

FIG.19C



*FIG.20*

510

544

526



FIG. 21

510

544

526

526



FIG. 22



FIG.23A

FIG. 23B



US 8,143,848 B2

**1**

## VIDEO GAME CONTROLLER CHARGING SYSTEM HAVING A DOCKING STRUCTURE

### CROSS-REFERENCE TO RELATED APPLICATION(S)

This application is a continuation-in-part of pending application Ser. No. 11/581,137, filed on Oct. 13, 2006 now abandoned, the entire content of which is expressly incorporated herein by reference.

This application also claims priority to and the benefit of U.S. Provisional Application No. 60/982,364, filed Oct. 24, 2007, the entire content of which is also incorporated herein by reference.

### FIELD OF THE INVENTION

The present invention relates to charging systems for consumer electronics devices, and more particularly to charging systems for hand-held video game controllers.

### BACKGROUND

Hand-held and portable electronic devices have become increasingly widespread and are used daily by many consumers. Examples of such devices include cellular phones, pagers, CD and MP3 players, digital organizers, video game units, digital cameras, and many other electronic devices. Most of these hand-held and portable devices rely on battery power while operating and require periodic recharging at an alternating current (AC) outlet. Each device requires its own power adapter, one end of which fits into the AC outlet and the other end into the device. Thus, in order to recharge multiple devices, consumers have to carry, keep track of, and operate multiple power adapters.

Consumer electronics devices ("CED"), such as personal computers, video game consoles, cell phones, and other devices, often utilize accessory devices that operate in connection with the CED. Examples of accessory devices include wireless headsets, audio speakers, and handheld controllers. These accessory devices often operate on battery power, so that they can be used without requiring a connection to a power supply. Frequent use of these battery-powered accessory devices drains the batteries and requires frequent replacement or recharging of the batteries. Frequent replacement of batteries can be expensive, and as a result, many accessory devices utilize rechargeable batteries.

Of the accessory devices, wireless handheld controllers (or video game controllers) are often used by video game players together with the corresponding video game console. Many video games allow multiple players to play concurrently, thereby requiring multiple handheld controllers.

The accessory device is connected to a charging station periodically to recharge the batteries. The charging station and the accessory device have matching plugs or ports that fit together to make a connection. If the plug on the charging station or the accessory device is broken or damaged, the accessory device can no longer be connected to the charging station. These plugs can be small and/or fragile, as the accessory device itself is often a small, compact device. These small plugs can be easily bent or broken, rendering the charging station inoperable. The user has to be careful to connect the plugs slowly, gently, and completely, in order to make a proper connection without damaging the parts.

### SUMMARY OF THE INVENTION

In one exemplary embodiment, a video game controller charging system for charging at least one video game controller using externally supplied power includes: a base; at least one structure on the base for providing physical support to the at least one video game controller while the at least one video game controller is being charged; and at least one DC port on the base configured to couple to and provide DC power to a power input port of the at least one video game controller.

In one embodiment, the at least one DC port includes at least one male mini-USB connector.

In one embodiment, the video game controller charging system further includes a current detector electrically coupled to the at least one DC port and an indicator electrically coupled to the current detector. The indicator is configured to indicate a charging status of the video game controller charging system and may include at least one LED.

In one embodiment, the at least one structure on the base includes at least one docking bay configured to receive one of the video game controllers.

In one embodiment, the at least one structure on the base includes opposite surfaces configured to align one of the at least one video game controller such that the power input port of the video game controller couples to one of the at least one DC port. Also, the opposite surfaces may include spring-loaded locating buttons configured to align the video game controller.

In one embodiment, the at least one DC port comprises a plurality of DC ports, the at least one video game controller comprises a plurality of video game controllers, and the plurality of DC ports is configured to concurrently couple to and provide DC power to the plurality of video game controllers.

In one embodiment, the video game controller charging system further includes an AC-to-DC converter adapted to convert the externally supplied power to the DC power provided to the power input port of the at least one video game controller. In one embodiment, the AC-to-DC converter is in the base. In another embodiment, the AC-to-DC converter is external to the base.

In one embodiment, the AC-to-DC converter is adapted to convert an AC voltage in the range of 100 V to 240 V corresponding to the externally supplied power into a DC voltage corresponding to the DC power. The DC voltage may be DC 5 V.

In another exemplary embodiment, a charging system for at least one accessory device having a power input port includes: a base; at least one male mini-USB connector supported by the base and adapted to provide DC power to the at least one accessory device; at least one docking structure configured to receive and align the at least one accessory device to couple to the at least one male mini-USB connector; and a power input for connecting to a power supply, the power input electrically coupled to the at least one male mini-USB connector.

In one embodiment, the charging system further includes an AC-to-DC converter electrically coupled between the power input and the at least one male mini-USB connector.

In one embodiment, the charging system further includes an AC-to-DC converter external to the base and electrically coupled to the power input.

In one embodiment, the charging system further includes a current detector electrically coupled to the at least one male mini-USB connector and an indicator electrically coupled to the current detector, the indicator configured to indicate a charging status of the charging system. The indicator may include at least one LED.

In still another exemplary embodiment, a video game controller charging system for at least one video game controller

US 8,143,848 B2

3                                                              4

having a power input port includes: a base; at least one male mini-USB connector supported by the base and adapted to provide DC power to the power input port of the at least one video game controller; and at least one docking structure having opposite surfaces configured to receive and align the at least one video game controller to couple the power input port of the at least one video game controller to the at least one male mini-USB connector.

In one embodiment, the video game controller charging system further includes an AC-to-DC converter adapted to convert an AC power received from an AC power supply to the DC power provided to the power input port of the at least one video game controller.

In another exemplary embodiment of the invention, a charging system for charging at least one accessory device having a power input port includes a base with at least one recess having at least one electrical contact. The base further includes a power input for connection to a power supply, the power input being electrically coupled to the at least one electrical contact. The charging system also includes at least one external adapter including a connector configured to couple to the power input port of one of the accessory devices, the at least one external adapter also including at least one electrical lead. The at least one recess is dimensioned to receive the at least one external adapter, the at least one electrical lead contacting the at least one electrical contact when the external adapter is received by the recess.

Another embodiment of the present invention provides a power adapter capable of supplying power from an AC outlet to a variety of hand-held devices. In exemplary embodiments of the present invention, a power adapter for recharging electronic devices is provided. The power adapter may have a Universal Serial Bus (USB) port to which a device with a USB plug can be connected for recharging. The adapter may also have a FireWire port to which a device with a FireWire plug can be connected for recharging. FireWire is a proprietary name of Apple Computer for the IEEE 1394 interface. Both ports may be operated concurrently to recharge a USB device and a FireWire device at the same time. The adapter also has an alternating current (AC) plug which is fixed or movable such that the plug extends from the rear side of the adapter. The AC plug can be fixed to the adapter body, or be slid or moved somehow into the adapter when the adapter is not in use for easy storage. When the adapter is in use, the AC plug is plugged into an AC outlet. The adapter draws power from the outlet and supplies that power to the USB and FireWire devices to enable them to recharge.

According to the present invention, in one embodiment a power adapter is provided that includes a housing body having a first side and a plurality of second sides. A plug is located on the first side and is adapted to connect to an AC outlet for providing an AC power. A first DC port is located on one of the second sides and is adapted to provide a first DC power to a first external device. A second DC port is located on one of the second sides and is adapted to provide a second DC power to a second external device. An AC-to-DC converter is located in the housing body and is adapted to convert an AC power received through the plug to the first DC power and the second DC power.

In one embodiment, the first DC port and the second DC port are USB ports. In another embodiment, the first DC port and the second DC port are FireWire ports. In yet another embodiment, the first DC port is a USB port and the second DC port is a FireWire port.

In one embodiment, the first DC power and the second DC power have different voltages. In another embodiment, the first DC power supplies DC 5 V and the second DC power supplies DC 13 V.

In one embodiment, the power adapter also includes a plurality of DC ports, each DC port being located on one of the second sides and being adapted to provide a DC power to an external device, wherein each DC port is selected from the group consisting of USB port, FireWire port, PS/2 port, serial port, and parallel port.

In one embodiment, the AC-to-DC converter is adapted to convert an AC voltage of 120 V or 240 V corresponding to the AC power to DC voltages corresponding to the first DC power and the second DC power.

In another embodiment, the AC-to-DC converter is adapted to convert an AC voltage in the range of 100 V to 240 V corresponding to the AC power to DC voltages corresponding to the first DC power and the second DC power.

In another exemplary embodiment, a power adapter is provided that includes a housing body having a first side and a plurality of second sides. A plug is located on the first side and is adapted to connect to an AC outlet for providing an AC power. The power adapter includes a plurality of USB ports, whereas each USB port is located on one of the second sides and is adapted to provide a DC power to an external device. An AC-to-DC converter is located in the housing body and is adapted to convert an AC power received through the plug to the DC power.

In one embodiment, the power adapter also includes at least one DC port, each DC port being located on one of the second sides and adapted to provide a second DC power to an external device, wherein each DC port is selected from the group consisting of FireWire port, PS/2 port, serial port, and parallel port.

In one embodiment, the AC-to-DC converter is adapted to convert an AC voltage of 120 V or 240 V corresponding to the AC power to a DC voltage corresponding to the DC power.

In one embodiment, the AC-to-DC converter is adapted to convert an AC voltage in the range of 100 V to 240 V corresponding to the AC power to a DC voltage corresponding to the DC power.

In another exemplary embodiment, a power adapter is provided that includes a housing body having a first side and a plurality of second sides. A plug is located on the first side and is adapted to connect to an AC outlet for providing an AC power. The power adapter includes a plurality of FireWire ports, whereas each FireWire port is located on one of the second sides and is adapted to provide a DC power to an external device. An AC-to-DC converter is located in the housing body and is adapted to convert an AC power received through the plug to the DC power.

In one embodiment, the plug is fixed to the housing body. In another embodiment, the plug is movable between a first position for plugging into the AC outlet and a second position inside the housing body.

In another exemplary embodiment of the present invention, a power adapter having a plurality of USB ports of various sizes to accommodate devices with different types of USB plugs (e.g., USB plugs of type A or type B) is provided. The adapter also has a plurality of FireWire ports of various sizes to accommodate devices with different types of FireWire plugs (e.g., 4-pin or 6-pin FireWire plugs).

In yet another exemplary embodiment of the present invention, a power adapter having a plurality of ports of various types to accommodate many different electronic devices, is provided.

US 8,143,848 B2

5

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic front view diagram of a power adapter in an exemplary embodiment of the present invention.

FIG. 2 is a schematic front view diagram of a power adapter in another exemplary embodiment of the present invention.

FIG. 3 is a schematic front view diagram of a power adapter in yet another exemplary embodiment of the present invention.

FIG. 4 is a schematic front view diagram of a power adapter in another exemplary embodiment of the present invention.

FIG. 5 is a schematic side view diagram of the power adapter of FIG. 1 in a non-operating position.

FIG. 6 is a schematic side view diagram of the power adapter of FIG. 1 in an operating position.

FIG. 7 is a conceptual diagram of a side view of the adapter and the electronic device in an exemplary embodiment of the present invention.

FIG. 8 is a diagram showing the AC-to-DC converter in the adapter.

FIG. 9 is a schematic front view diagram of a power adapter in another exemplary embodiment of the present invention.

FIG. 10 is a schematic front view diagram of a power adapter in yet another exemplary embodiment of the present invention.

FIG. 11 is a perspective view of a video game controller charging system according to another exemplary embodiment of the present invention.

FIG. 12 is a top view of the video game controller charging system of FIG. 11.

FIG. 13 is a side view of the video game controller charging system of FIG. 11.

FIG. 14 is a perspective view of the video game controller charging system of FIG. 11 having video game controllers connected for charging.

FIG. 15 is a block diagram of the video game controller charging system of FIG. 11.

FIG. 16 is a perspective view of a charging station according to an exemplary embodiment of the invention.

FIG. 17 is a perspective view of a charging station and two adapters according to an exemplary embodiment of the invention.

FIG. 18 is a perspective view of a charging station with two adapters according to an exemplary embodiment of the invention.

FIG. 19A is a top plan view of an adapter according to an exemplary embodiment of the invention.

FIG. 19B is a bottom plan view of an adapter according to an exemplary embodiment of the invention.

FIG. 19C is a side plan view of an adapter according to an exemplary embodiment of the invention.

FIG. 20 is a perspective view of a charging station with a video game controller according to an exemplary embodiment of the invention.

FIG. 21 is a perspective view of a charging station with two video game controllers according to an exemplary embodiment of the invention.

FIG. 22 is a block diagram of a charging station and an accessory device according to an exemplary embodiment of the invention.

FIGS. 23A-B are a circuit diagram of a charging station according to an exemplary embodiment of the invention.

### DETAILED DESCRIPTION

In one embodiment, a video game controller charging system is provided. The video game controller charging system

6

includes a base, at least one structure on the base for providing physical support to at least one video game controller while it is being charged, and at least one DC port on the base configured to couple to and provide DC power to a power input port of the at least one video game controller. In some embodiments, the video game controller charging system may include a current detector, a charging status indicator, at least one docking bay, and/or an AC-to-DC converter adapted to convert externally supplied power to the DC power provided to the power input port of at least one video game controller. In other embodiments, the base of a charging system (or "charging station") may include a recess having at least one electrical contact and a power input for connection to a power supply, the power input being electrically coupled to the at least one electrical contact. The charging station also includes an external adapter with a connector configured to couple to a power input port of the accessory device, and with at least one electrical lead. The recess is dimensioned to receive the adapter, with the at least one electrical lead contacting the at least one electrical contact when the adapter is received by the recess.

In another embodiment, a power adapter includes a housing body having a plurality of sides. In addition, the power adapter includes a plug located on one side of the housing body and adapted to connect to an alternating current (AC) outlet. Furthermore, the power adapter includes first and second direct current (DC) ports, each located on a side of the housing body and each adapted to provide a DC power to an external device. Finally, the power adapter includes an AC-to-DC converter for converting the AC power received through the plug to the DC powers supplied to external devices.

A power adapter may include one or more USB ports to which devices with USB plugs can be connected for recharging. The adapter may also include one or more FireWire ports to which devices with FireWire plugs can be connected for recharging. Both ports may be operated concurrently. The adapter also has an AC plug that is fixed or is movable between a first position (e.g., operating position) and a second position (e.g., non-operating position). By way of example, the AC plug may extend from the rear side of the adapter. The AC plug can be fixed to the adapter housing body, or it can be retracted, folded, slid, or somehow moved into the adapter housing body for easy storage when the adapter is not in use. When the adapter is in use, the AC plug is plugged into an AC outlet. In one embodiment, the adapter draws AC power from the outlet, converts it to DC powers having +5 V and +13 V, respectively, and supplies the DC powers to the USB and FireWire devices, respectively, to enable them to recharge.

In each of the disclosed embodiments, the USB, FireWire, serial, parallel, and generally DC ports, may be either male or female. That is, the DC charging ports may be female and accept a plug, or may itself be a port plug for plugging into a port in an external device.

FIG. 1 is a schematic front view diagram of a power adapter 100 in an exemplary embodiment of the present invention. The power adapter 100 has a USB port 101 to which a device with a USB plug can be connected for recharging. The power adapter 100 also has a FireWire port 102 to which a device with a FireWire plug can be connected for recharging. The power adapter 100 includes an AC-to-DC power converter for providing +5 V and +13 V, respectively. The power adapter 100 may take an input of 100 V to 240 V (w/frequencies of 50 Hz or 60 Hz) AC power and/or any other standard AC outlet voltage to enable the power adapter 100 to be used in a number of different countries throughout the world.

In the United States, AC voltage is standardized at 120 V, but in practice voltages range from 105 V to 130 V. In other

US 8,143,848 B2

7          8

parts of the world, voltages range from 100 V to 240 V. The frequencies vary across the world as well. In the U.S., 60 Hz is the standard. However, in other parts of the world, AC voltage is supplied at 50 Hz or 60 Hz. The AC-to-DC power converters in the power adapter may be adapted to convert AC voltages from a particular standard to a DC voltage required of the DC ports in the power adapter.

The USB port 101 is capable of delivering DC power having +5 V to a connected USB device. The FireWire port 101 is capable of delivering DC power having +13 V to a connected FireWire device. Ports 101, 102 may be operated concurrently to recharge a USB device and a FireWire device at the same time. While FIG. 1 illustrates that ports 101, 102 are located at the front surface of the power adapter 100, the ports may be located at any suitable location on the front, rear, side, top, or bottom surfaces or sides of the adapter 100.

FIG. 2 is a schematic front view diagram of a power adapter 110 in another exemplary embodiment of the present invention. The power adapter 110 has two FireWire ports 102 to which a device with a FireWire plug can be connected for recharging. The FireWire ports 102 may be of a different type and may accept 4-pin or 6-pin FireWire connections. Each FireWire port 102 is capable of delivering DC power having +13 V to a connected FireWire device. Ports 102 may be operated concurrently to recharge FireWire devices at the same time.

FIG. 3 is a schematic front view diagram of a power adapter 120 in yet another exemplary embodiment of the present invention. The power adapter 120 has two USB ports 101 to which a device with a USB plug can be connected for recharging. The USB ports 101 may be of a different type and may accept type A or type B connections. Each USB port 101 is capable of delivering DC power having +5 V to a connected USB device. Ports 101 may be operated concurrently to recharge USB devices at the same time.

FIG. 4 is a schematic front view diagram of a power adapter 130 in another exemplary embodiment of the present invention. Power adapter 130 has a USB port 161 and a FireWire port 162 that are connected to lines 163. The lines extend the ports so that USB and FireWire plugs may be inserted into the extended ports without having to reach the power adapter 130 plugged into an AC outlet. Although a USB and FireWire port are shown in FIG. 4, this embodiment includes all possible combinations of ports, the combination being formed from USB, FireWire, serial, parallel ports, and other DC charging ports, in various combinations.

FIG. 5 is a schematic side view diagram of the power adapter 100 of FIG. 1 in its non-operating position. The power adapters 110 and 120 of FIGS. 2 and 3 have substantially the same structure in one embodiment. As shown in FIG. 5, the power adapter 100 may have an AC plug 103 that is movable such that it extends from the rear side of the adapter 100. In the non-operating position, when the adapter 100 is not in use, the AC plug 103 is slid, moved, or otherwise positioned into the adapter 100 so that the plug 103 does not extend out from the adapter 100. This non-operating position allows for easy storage of the adapter 100. In other embodiments, the plug may be fixed to the adapter housing body and is not movable.

FIG. 6 is a schematic side view diagram of the power adapter 100 of FIG. 1 in its operating position. As shown in FIG. 6, when the power adapter 100 is in use, the AC plug 103 is slid, moved, or otherwise positioned outside of the housing of the adapter 100, so that the plug 103 extends out from the adapter 100 in its operating position. In this position the AC plug 103 may be plugged into an AC outlet so that the adapter 100 can draw AC power from the outlet, convert it to DC

powers having +5V and +13V, respectively, and supply the DC powers to hand-held and portable electronic devices.

While the AC plug 103 of the power adapter 100 illustrated in FIGS. 5 and 6 appears as a pair of parallel flat bars that are commonly used in the United States and some other countries, for international use, the AC plug may have a shape of a pair of cylindrical bars used in many Asian and European countries, and/or any other suitable shape. Furthermore, a single power adapter may include a number of different types of AC plugs for use in many different countries having different AC plug types/AC power voltages.

FIG. 7 is a conceptual diagram of a side view of an adapter 100 and an electronic device 105 in an exemplary embodiment of the present invention. The adapter 100 is plugged into an AC outlet 106. A device 105 is connected to the adapter 100 by a cable 104. The cable 104 plugs into the adapter 100 through a plug 101 or 102, shown in FIG. 1. The adapter 100 draws power from the AC outlet 106 and delivers the power to the device 105 through the cable 104.

FIG. 8 is a diagram showing the AC-to-DC converter in the adapter 100. The AC-to-DC converter 112 is located in the housing body of the adapter 100. The AC-to-DC converter 112 receives an AC power from the AC plug 103 via an AC outlet 106 and provides DC power to a plurality of DC ports 111. The AC-to-DC converter 112 may be composed of multiple AC-to-DC converters in order to provide different DC power voltages to the DC ports 111. For example, in FIG. 1, the AC-to-DC converter would receive AC power from the AC plug 103 and provide DC 5 V to one DC port (e.g., USB port 101) and DC 13 V to another DC port (e.g., FireWire port 102).

FIG. 9 is a schematic front view diagram of a power adapter 200 in another exemplary embodiment of the present invention. The adapter 200 has a plurality of USB ports 201 to which a plurality of devices with USB plugs can be connected for recharging. The USB ports 201 may be of various sizes to accommodate devices having different types of USB plugs (e.g., USB plugs of type A or type B). The adapter 200 also has a plurality of FireWire ports 202 to which a plurality of devices with FireWire plugs can be connected for recharging. The FireWire ports 202 may likewise be of various sizes to accommodate devices having different types of FireWire plugs (e.g., 6-pin or 4-pin FireWire plugs). The ports 201 and 202 may be located at any suitable location on the front, rear, side, top, or bottom surfaces or sides of the adapter 200.

FIG. 10 is a schematic front view diagram of a power adapter 300 in yet another exemplary embodiment of the present invention. The adapter 300 has a plurality of ports 301a, 301b, 301c, 301d, 301e, 301f, 301g having different cross-sectional shapes to which a plurality of devices can be connected for recharging. The ports 301 may be any of a wide variety of ports used by popular electronic devices, such as USB, FireWire, PS/2, serial ports, parallel ports, and others. The ports 301a-301g may be located at any suitable location, on the front, rear, side, top, or bottom surfaces or sides of the adapter 300. The ports of the power adapter 300 may have cross-sections that are different from the cross-sections of the ports 301a-301g that are shown for illustrative purposes only.

Similar to the power adapter 100 of FIG. 1, the power adapters 200 and 300 of FIGS. 9 and 10 each have one or more AC plugs for plugging to corresponding AC outlets to receive AC power therefrom. The AC plugs may have different shapes to be compatible with AC outlets used in various different countries of the world.

Further, similar to the power adapter 100, the power adapters 200 and 300 of FIGS. 9 and 10 may have capabilities to convert a range of different AC voltages that are used through-

US 8,143,848 B2

9

out the world. By way of example, the power adapters 200 and 300 may be able to convert from AC power having a voltage range of 100 V to 240V (and at frequencies 50 Hz or 60 Hz) to DC power having +5 V and +13 V and/or any other desirable voltages.

FIGS. 11, 12, and 13 are perspective, top, and side views, respectively, of a video game controller charging system 400 according to another exemplary embodiment of the present invention. FIG. 14 is a perspective view of the video game controller charging system 400 having video game controllers 420 connected for charging. In one embodiment, the charging system 400 converts AC power from an AC power supply to DC power and supplying the DC power having a desired DC voltage to a connected CED accessory device, such as one of the video game controllers 420. In such an embodiment, the video game controller charging system 400 includes an AC-to-DC converter for converting AC power to DC power. In other embodiments, the video game controller charging system 400 may receive DC power from an external power source. In such cases, the external DC power may be provided by an external AC-to-DC converter that receives power from an AC outlet, and converts the received AC power to DC power.

The video game controller charging system 400 includes a base 402 and one or more docking bays 404, wherein each docking bay 404 is configured to receive a video game controller 420. The charging system 400 also includes one or more partitions 406 separating the docking bays 404. The charging system 400 further includes a DC port 408 within each of the docking bays 404 that is configured to electrically couple to one of the video game controllers 420 and deliver DC power to the coupled video game controller 420.

The DC ports 408 of the video game controller charging system 400 are configured to connect to a power input port of the video game controller 420 to be charged. In the present embodiment, the DC ports 408 are male mini-USB (universal serial bus) connectors adapted to connect to a female mini-USB connector on a video game controller for a video game console, such as the PlayStation3®. Alternatively, the DC ports 408 may be any electrical connectors suitable for coupling to a video game controller for another video game console, or for any other consumer electronics device to be charged, such as an MP3 player or accessory device.

In the present embodiment of the video game controller charging system 400, the partitions 406 include locators 410 for aligning the video game controller to the DC port 408. There are locators 410 on each of the two surfaces of the partitions 406, as well as the two surfaces of the base 402, which face the DC ports 408. There may be two locators 410 on each surface described, i.e., four locators 410 adjacent each video game controller 420. Each pair of opposite surfaces, a portion of the base 402, a corresponding docking bay 404, and/or the locators 410 may comprise a structure for providing physical support to one of the video game controllers 420 during charging. While the locators 410 in the illustrated embodiment of FIG. 11 are button-shaped, the shape of the locators 410 is not limited thereto. Also, the locators 410 may be spring-loaded in order to facilitate aligning and maintaining a required position of the video game controller 420 for coupling to the corresponding DC port 408. In other embodiments, the locators 410 may not be spring-loaded and the video game controller 420 may be aligned by the locators 410 through any other suitable method or mechanism, such as a pressure fit.

In use, the DC ports 408 are connected to power input ports of the video game controllers 420 to be charged, as shown in FIG. 14. When one or more video game controllers 420 need

10

to be recharged, connecting the video game controllers 420 to the charging system 400 is as easy as inserting each of the video game controllers 420 into one of the docking bays 404. As described above, the locators 410 aid in aligning the video game controller 420 into the docking bay 404 such that the power input port of the video game controller 420 slides down onto and connects to the DC port 408. The charging system 400 is connected to a power supply through its own power input (either AC power which is converted to DC power using an internal AC-to-DC converter or externally provided DC power). The charging system 400 then provides power to the video game controller 420 to recharge the batteries of the video game controller 420.

While the embodiment described above uses a vertical orientation, with each of the video game controllers 420 being dropped from above into the docking bays 404, other orientations may be used as well. In one alternative embodiment, for example, the video game controllers 420 may be received horizontally into the docking bays 404, and electrically coupled to DC ports 408 having a horizontal orientation instead of the vertical orientation shown in FIGS. 11-14.

The present embodiment of the video game controller charging system 400 can charge up to four video game controllers 420 concurrently, or it can charge one at a time. Alternative embodiments of the charging system 400, however, may be configured to charge more than four video game controllers 420 concurrently. The power supply for the charging system 400 may be a power cord 416 that has a plug for connecting to an AC power supply or a DC power supply. In one embodiment, the charging system 400 also includes an AC-to-DC converter 440 (see FIG. 15) electrically coupled between the power cord 416 and the DC ports 408 for converting AC power to DC power having +5 V or any DC voltage suitable for delivery to the video game controller 420. The AC-to-DC converter 440 may be in the base 402 or external to the base 402. The power cord 416 may be removably connected to the base 402, or may be fixedly coupled to the base 402. In an alternative embodiment, the power input may be a USB port that connects to a CED (e.g., a video game console) to obtain DC power from the CED. The charging system 400 provides this DC power to the DC ports 408 for delivery to the video game controllers 420. In other embodiments, DC power may be provided as input to the charging system 400, where the DC power may be provided by an external AC-to-DC converter. In such embodiments, the power input may be DC power converted from AC power from a wall outlet and converted to DC power using the external AC-to-DC converter.

The video game controller charging system 400 may also include an indicator panel 450 that indicates a status of the charging system 400. In the present embodiment, the indicator panel 450 includes four LED assemblies 452. Each of the four LED assemblies 452 corresponds with one of the four DC ports 408, so as to indicate the charging status of the video game controller 420 being charged at the respective DC port 408. Each of the LED assemblies 452 includes at least two LEDs having different colors. For example, each of the LED assemblies 452 in the present embodiment includes a red LED and a green LED. While the respective video game controller 420 is being charged, the red LED is emitted to indicate that the video game controller 420, or more specifically, the battery inside the video game controller 420, is currently being charged. When the respective video game controller 420 is finished charging, the green LED is emitted to indicate that the charging has been completed. In another embodiment, the green LED may be emitted to indicate that the video game controller is being charged, while the red LED

US 8,143,848 B2

11

is emitted to indicate that the charging has been completed. In alternative embodiments, each of the LED assemblies **452** may include different colors of LEDs and/or different numbers of LEDs (e.g., three LEDs) to indicate respective charging status.

In another alternative embodiment, each of the LED assemblies **452** may include a single LED and may illuminate with a first color (e.g., red) to indicate that the charging system **400** is currently charging a video game controller **420**. Another LED assembly **452** may illuminate with a second color (e.g., green) to indicate that the charging system **400** has completed charging. The LED assemblies may be electrically coupled to a current detector **460** (see FIG. 15) which provides the signals to illuminate the LEDs. In one embodiment, the charging system **400** may stop providing power to the video game controller **420** when the video game controller's internal battery is completely charged.

FIG. 15 is a block diagram showing some of the above-described components of the video game controller charging system **400** in schematic form. As can be seen in FIG. 15, the charging system **400** includes DC ports **408**, each of which is configured to be electrically coupled with a video game controller **420**. Through the DC ports **408**, the charging system **400** is capable of supplying the power received from a power adapter or a power supply to the video game controllers **420** for charging.

In one embodiment, the base **402** includes an AC-to-DC converter **440** for converting input AC power to DC power for charging the video game controller **420**. In other embodiments, the charging system **400** may be provided with an external AC/DC converter, DC power via a mini-USB port, or any other suitable DC power supply. The charging system **400** may include a USB host used to provide DC power via a mini-USB port.

In one embodiment, the video game controller charging system **400** includes one or more current detectors **460** for detecting the amount of current being provided by the power supply to the video game controllers **420** through the DC ports **408**. If sufficient current, i.e. a predetermined amount of current, is detected by one of the current detectors **460**, the corresponding LED (e.g., a red LED) is emitted to indicate that the video game controller **420** in the corresponding docking bay **404** is being charged. Then, when the charging has been completed, less current is detected because the battery in the accessory device is already substantially fully charged. In this case, another LED (e.g., a green LED) is emitted to indicate that charging has been completed.

Another exemplary embodiment of the invention, shown in FIGS. **16-23**, relates to a charging station for a consumer electronics device (CED), and more particularly, to a charging station for one or more hand-held controllers for a video game console. A charging station **510** according to an exemplary embodiment of the invention is shown in FIG. 16. The charging station **510** includes two docking bays **512, 514** for two accessory devices, which in one embodiment are hand-held controllers for a video game console. The docking bays **512, 514** are dimensioned to accept adapters **516** (see FIG. 17). Electrical contacts **520** in the docking bays **512, 514** make contact with electrical leads **522** on the adapters **516** (see FIG. 19B) to provide an electrical connection through which power can be transmitted. The adapters **516** are electrically coupled to the power input port on the hand-held controllers. In one embodiment, the adapters **516** drop-fit easily into the docking bays **512, 514**, thus providing a fast and easy connection of the hand-held controllers to the charging station **510**.

12

As shown in FIG. 16, the charging station **510** includes a base **524** with two docking bays **512, 514**. The docking bays **512, 514** are each dimensioned to accept a hand-held controller **526** (see FIGS. **20, 21**). The two docking bays **512, 514** are separated by a partition **528** positioned between them. Each of the docking bays **512, 514** includes a recess **530** at the bottom of the docking bay. The recess **530** has four electrical contacts **520** positioned in the recess **530**. In other embodiments, the recess may include more than four or less than four electrical contacts. These contacts **520** are shown positioned in a linear arrangement in the recess **530**, but they could be positioned in any suitable arrangement.

The recesses **530** are dimensioned to receive an adapter **516** into the docking bays **512, 514**. As shown in FIG. 17, the adapters **516** can be dropped vertically into the docking bays **512, 514** and into the recesses **530**. When the adapters **516** are placed into the recesses **530**, electrical leads **522** (see FIG. 19B) on the bottom side **538** of the adapters **516** contact the electrical contacts **520** in the recesses **530**. The electrical leads **522** on the adapter **516** thus make an electrical connection with the electrical contacts **520** in the recess **530**. The electrical leads **522** on the adapter **516** match the arrangement of the electrical contacts **520** such that each electrical lead **522** makes physical contact with an electrical contact **520** when the adapter **516** is placed in the recess **530**. In one embodiment, as will be described later, the electrical contacts **520** are spring loaded so as to make sufficient contacts with the electrical leads **522**.

In other embodiments, the adapters **516** and the docking bays **512, 514** have matching shapes, such as, for example, a molded male and female matching shape, which is not limited to the recess **530** described above. The docking bays **512, 514** and the adapters **516** can have any suitable shapes that allow the electrical contacts **520** of the docking bays **512, 514** to make contact with the electrical leads **522** of the adapters **516**. Thus, many molded configurations, including ridges, grooves, and other shapes, can be used to enable the docking bays **512, 514** to receive the adapters **516**. These examples are illustrative only, and not limiting.

As shown in FIG. 18, in one embodiment, the adapters **516** and recesses **530** are shaped such that the adapter **516** can only be placed into the recess **530** in one orientation. In the embodiment shown, the adapter **516** includes at least one angled edge **532**, and the recess **530** includes a matching angled corner **534**. This geometry ensures that the adapter **516** will be placed in the recess **530** in the proper orientation, so that the electrical contacts **520** meet the electrical leads **522**. Other geometric configurations or features could be used to accomplish this function, such as matching prongs and recesses, or other types of shaped edges. Additionally, this feature is optional, as the adapter **516** could be made to fit into the recess **530** in multiple orientations.

As shown in FIGS. **19A-19C**, the adapter **516** includes a body **536** with the angled edge **532**. The electrical leads **522** are located on a bottom side **538** of the body **536**. The top side **540** of the body **536** includes a connector **542** that is configured to connect to the power input port of the accessory device to be charged. In one embodiment, the connector **542** is a male mini-USB (universal serial bus) connector adapted to connect to a female mini-USB connector on a hand-held controller for a video game console, such as the PlayStation3®.

In use, the connector **542** on the adapter **516** is connected to the power input port of the accessory device to be charged, such as the hand-held controller **526** shown in FIGS. **20** and **21**. The adapter **516** is a small and light-weight piece that connects snugly to the power input port of the hand-held

US 8,143,848 B2

13

controller **526**. The adapter **516** can remain with the hand-held controller **526** at all times, even when the controller **526** is not being charged in the charging station **510**. When the hand-held controller **526** is in use during operation of a video game, when the controller **526** is stored, and when it is charging, the adapter **516** can remain connected to (and physically mounted on) the controller **526**. The adapter **516** is small and light weight, so that it does not interfere with operation of the controller **526**. When the controller **526** needs to be recharged, connecting it to the charging station **510** is as easy as dropping it into one of the docking bays **512**, **514**. The adapter **516** slides easily into the recess **530**, and the electrical leads **522** on the bottom of the adapter **516** make an electrical connection with the electrical contacts **520** in the recess **530**. The charging station **510** is connected to a power supply through its own power input. The charging station **510** then provides power to the controller **526** to recharge the controller's batteries. This recharging process is fast and easy, as the adapter **516** allows the controller **526** to be simply dropped into place, rather than carefully connected to a fragile port or connector.

While the embodiment described above uses a vertical orientation, with the controller **526** and adapter **516** being dropped from above into the recess **530**, other orientations may be used as well. In one embodiment, the adapter **516** is received horizontally into one of the docking bays **512**, **514**, and the electrical contacts **520** in the docking bay and electrical leads **522** on the adapter **516** are arranged vertically to make contact with each other when the adapter **516** is horizontally placed into the docking bay. In one embodiment, the adapter **516** is placed into the docking bay by a push-fit, press-fit, or snap-fit, rather than simply a drop-fit. These fitting engagements are fast and easy to use, and also provide a reliable connection between the adapter **516** and charging station. In another embodiment, the charging station includes prongs that hold the controller and adapter into place after they have been placed (vertically or horizontally) into the docking bay to obtain a complete electrical connection.

The charging station **510** can charge two controllers **526** simultaneously (or concurrently), or it can charge one at a time. The power input for the charging station **510** may be a power cord **544**, as shown in FIG. **20**, that connects to an alternating current (AC) power supply. In this case, the charging station **510** includes an AC/DC converter electrically coupled between the power input and the electrical contacts **520**, in order to provide direct current power to the contacts **520** and from there to the controllers **526**. The AC/DC converter **546** may be internal to the base **524** or external. In another embodiment, the power input is a USB port that connects to the CED to obtain DC power from the CED. The charging station provides this DC power to the electrical contacts **520** and from there to the controllers **526**. In other embodiments, DC power may be provided as input to the charging station **510**, where the DC power may be provided by an external AC/DC converter.

The electrical contacts **520** may include a spring coupling the contacts **520** to the base **524**. The weight of the controller **526** pushes the adapter **516** down into the recess **530**, pressing the electrical leads **522** on the adapter **516** against the electrical contacts **520**. The spring pushes back up on the contacts **520**, pushing them against the electrical leads **522** to ensure a complete electrical connection.

The charging station **510** may also include an indicator **548** that indicates a status of the charging station **510**. In one embodiment, the indicator **548** includes two LED assemblies **550**, **552** (see FIG. **16**). The LED assemblies **550**, **552** correspond with the first and second docking bays **512**, **514**,

14

respectively, so as to indicate the charging status of the hand-held controller **526** (or any other suitable accessory device) being charged in the respective docking bay. Each of the LED assemblies **550** and **552** includes at least two LEDs having different colors. By way of example, each of the LED assemblies **550** and **552** in one embodiment includes a red LED and a green LED. While the respective hand-held controller **526** is being charged, the red LED is emitted to indicate that the hand-held controller **526** (i.e., the battery inside the hand-held controller **526**) is currently being charged. Further, when the respective hand-held controller **526** is finished charging, the green LED is emitted to indicate that the charging has been completed. In other embodiments, each of the LED assemblies **550**, **552** may include different color LEDs and/or different number (e.g., three) of LEDs to indicate respective charging status.

In still other embodiments, each of the LED assemblies **550**, **552** may include a single LED, and may be referred to as LEDs **550**, **552**. The first LED **550** illuminates with a first color, for example red, to indicate that the charging station **510** is currently charging an accessory device. The second LED **552** illuminates with a second color, for example green, to indicate that the charging station **510** is finished charging. The LEDs **550**, **552** may be electrically coupled to a current detector **521** (see FIG. **22**) which provides the signals to illuminate the LEDs. In one embodiment, the charging station **510** stops providing power to the controller **526** when the controller's internal battery is completely charged.

A block diagram of the charging station **510** is shown in FIG. **22**, showing some of the above-described components of the charging station in schematic form. As can be seen in FIG. **22**, the charging station (or charger base) **510** includes electrical contacts **520** that are adapted to be electrically coupled with the accessory device **526** via the adapter **516**. This way, the charging station **510** is capable of supplying the power received from a power adapter or a power supply to the accessory device **526** (e.g., for charging).

In one embodiment, the charger base includes the AC/DC converter **546** for converting input AC power to DC power for charging the accessory device **526**. In other embodiments, the charging station **510** may be provided with DC power via a mini-USB port, an external AC/DC converter, or any other suitable DC power supply. The charging station **510** may include a USB host used to provide DC power via mini-USB port.

In one embodiment, the charging station **510** includes a current detector **521** for detecting the amount of current being provided by the power supply to the accessory device **526** through the contacts **520**. If sufficient current (e.g., a predetermined amount of current) is detected by the current detector **521**, the corresponding LED (e.g., a red LED) is emitted to indicate that the accessory device **526** is being charged. Then, when the charging has been completed, less current is detected because the battery in the accessory device is already substantially fully charged. In this case, another LED (e.g., a green LED) is emitted to indicate that charging has been completed.

A circuit diagram of the charging station **510** is shown in FIGS. **23A** and **23B**. As can be seen in FIGS. **23A** and **23B**, each of the LED assemblies includes two LEDs (green LED LED2 and red LED LED1, or green LED LED4 and red LED LED3). As can also be seen in FIGS. **23A** and **23B**, the current detector **521** in one embodiment is implemented using a quad operational amplifier chip LM324. The current detector **521** controls light emission of LEDs LED1 and LED2 and/or the

**A132**

US 8,143,848 B2

15

16

light emission of LEDs LED**3** and LED**4**, depending on whether or not sufficient current for charging a respective accessory device is detected.

While the CED is described in the above embodiments as a video game console, and the accessory device is described as a video game controller for the video game console, the invention may be used for other CEDs and accessory devices, such as cell phones, wireless headsets, personal computers and related peripheral devices, and many other electronic devices. This list is meant to be illustrative only, and not limiting.

Also, while some of the embodiments are primarily described as a charging system for charging video game controllers, the present invention is not limited thereto. The charging system in various embodiments may be used or be modified to be used for charging any suitable hand-held electronics devices or accessories, such as, for example, hand-held video games, or hand-held audio or multimedia players such as MP3 players, without departing from the spirit or scope of the present invention.

It will be appreciated by those with ordinary skill in the art that the invention can be embodied in other specific forms without departing from the spirit or essential character thereof. The embodiments described above should be considered to be illustrative and not restrictive. The scope of the present invention is defined by the appended claims and their equivalents.

What is claimed is:

**1.** A video game controller charging system for charging a plurality of video game controllers using externally supplied power, the video game controller charging system comprising:

a base;

at least one structure on the base for providing physical support to the plurality of video game controllers while the plurality of video game controllers are being charged; and

a plurality of DC ports on the base, each of the DC ports configured to couple to and provide DC power to a power input port of a respective one of the plurality of video game controllers,

wherein the at least one structure on the base comprises a plurality of docking bays open in a first direction and configured to receive respective ones of the plurality of video game controllers from the first direction, and

wherein the at least one structure on the base further comprises a plurality of pairs of opposite surfaces, each pair of surfaces defining a respective docking bay of the plurality of docking bays each of the DC ports being on the base between a respective one of the pairs of surfaces.

**2.** The video game controller charging system of claim **1**, wherein the plurality of DC ports comprises a plurality of male mini-USB connectors.

**3.** The video game controller charging system of claim **1**, further comprising:

a current detector electrically coupled to the plurality of DC ports; and

an indicator electrically coupled to the current detector, the indicator configured to indicate a charging status of the video game controller charging system.

**4.** The video game controller charging system of claim **3**, wherein the indicator comprises at least one LED.

**5.** The video game controller charging system of claim **1**, wherein the pairs of opposite surfaces are configured to align respective ones of the plurality of video game controllers such

that the power input ports of the respective ones of the plurality of video game controllers couple to respective ones of the plurality of DC ports.

**6.** The video game controller charging system of claim **5**, wherein the pairs of opposite surfaces comprise spring-loaded locating buttons configured to align the respective ones of the plurality of video game controllers.

**7.** The video game controller charging system of claim **1**, wherein the plurality of DC ports is configured to concurrently couple to and provide the DC power to the plurality of video game controllers.

**8.** The video game controller charging system of claim **1**, further comprising an AC-to-DC converter adapted to convert the externally supplied power to the DC power provided to the power input ports of the respective video game controllers.

**9.** The video game controller charging system of claim **8**, wherein the AC-to-DC converter is in the base.

**10.** The video game controller charging system of claim **8**, wherein the AC-to-DC converter is external to the base.

**11.** The video game controller charging system of claim **8**, wherein the AC-to-DC converter is adapted to convert an AC voltage in the range of 100 V to 240 V corresponding to the externally supplied power into a DC voltage corresponding to the DC power.

**12.** The video game controller charging system of claim **11**, wherein the DC voltage is :DC **5** V.

**13.** A charging system for charging a plurality of video game controllers, each having a power input port, the charging system comprising:

a base;

a plurality of male mini-USB connectors supported by the base and each adapted to provide DC power to a respective one of the plurality of video game controllers;

at least one docking structure defining a plurality of docking bays open in a first direction and configured to receive from the first direction and align respective ones of the plurality of video game controllers to couple to respective ones of the plurality of male mini-USB connectors; and

a power input for connecting to a power supply, the power input electrically coupled to the plurality of male mini-USB connectors,

wherein the at least one docking structure comprises a plurality of pairs of substantially parallel opposite planar surfaces, each pair of surfaces defining a respective docking bay of the plurality of docking bays, each of the docking bays being open on opposite sides between the respective pair of surfaces.

**14.** The charging system of claim **13**, wherein the charging system further comprises an AC-to-DC converter electrically coupled between the power input and the plurality of male mini-USB connectors.

**15.** The charging system of claim **13**, wherein the charging system further comprises an AC-to-DC converter external to the base and electrically coupled to the power input.

**16.** The charging system of claim **13**, further comprising:

a current detector electrically coupled to the plurality of male mini-USB connectors; and

an indicator electrically coupled to the current detector, the indicator configured to indicate a charging status of the charging system.

**17.** The charging system of claim **16**, wherein the indicator comprises at least one LED.

**18.** A charging system for charging at least one video game controller having a power input port, the charging system comprising:

US 8,143,848 B2

17

a base comprising at least one recess having at least one electrical contact, the base further comprising a power input for connection to a power supply, the power input being electrically coupled to the at least one electrical contact; and

at least one external adapter comprising a connector configured to couple to the power input port of the at least one video game controller, the at least one external adapter further comprising at least one electrical lead;

wherein the at least one external adapter is removably attachable on the at least one video game controller and configured to remain attached on the at least one video game controller when the at least one video game controller is in use during operation of a video game, and

wherein the base further comprises at least one structure defining at least one docking bay open in a first direction and configured to receive from the first direction the at least one video game controller having the at least one external adapter attached thereon such that the at least one electrical lead contacts the at least one electrical contact, the at least one structure comprising at least one pair of substantially parallel opposite planar surfaces defining the at least one docking bay, the at least one docking bay being open on opposite sides between the at least one pair of surfaces.

**19.** The charging system of claim **18**, further comprising:

a current detector electrically coupled to the at least one electrical contact of the at least one recess; and

an indicator electrically coupled to the current detector, the indicator adapted to indicate a status of the charging system.

**20.** The charging system of claim **19**, wherein the indicator comprises at least one LED.

**21.** The charging system of claim **18**, wherein:

the at least one external adapter further comprises an angled edge; and

the at least one recess comprises an angled corner dimensioned to match the angled edge of the at least one external adapter and adapted to orient the at least one external adapter with respect to the at least one recess.

18

**22.** The charging system of claim **18**, wherein:

the at least one electrical contact of the at least one recess comprises four electrical contacts; and

the at least one electrical lead of the at least one external adapter comprises four electrical leads.

**23.** The charging system of claim **18**, wherein the connector of the at least one external adapter comprises a male mini-USB connector.

**24.** The charging system of claim **18**, further comprising an AC/DC converter electrically coupled between the power input of the base and the at least one electrical contact of the at least one recess.

**25.** A video game controller charging system for charging a video game controller having a power input port, the video game controller charging system comprising:

a base comprising a plurality of electrical contacts, the base further comprising a power input for connection to a power supply, the power input being electrically coupled to the plurality of electrical contacts; and

an adapter comprising a connector configured to couple to the power input port of the video game controller, the adapter further comprising a plurality of electrical leads,

wherein the adapter is removably attachable on the video game controller and configured to remain attached on the video game controller when the video game controller is in use during operation of a video game, and

wherein the base further comprises a docking structure configured to receive the video game controller having the adapter attached thereon such that the plurality of electrical leads of the adapter contact the plurality of electrical contacts of the base.

**26.** The video game controller charging system of claim **25**, wherein the plurality of electrical contacts comprises at least one spring biasing the plurality of electrical contacts toward the plurality of electrical leads.

**27.** The video game controller charging system of claim **25**, wherein the connector comprises a male mini-USB connector.

\* \* \* \* \*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 12th day of February, 2014, I caused this Non-Confidential Brief of Appellant to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Steven M. Hanle
SHEPPARD, MULLIN, RICHTER
  & HAMPTON LLP
650 Town Center Drive, 4th Floor
Costa Mesa, California 92626
(714) 513-5100
shanle@sheppardmullin.com

*Counsel for Appellees*

Daniel N. Yannuzzi
Graham M. Buccigross
Matthew M. Mueller
SHEPPARD, MULLIN, RICHTER
  & HAMPTON LLP
12275 El Camino Real, Suite 200
San Diego, California 92130
(858) 720-8900
dyannuzzi@sheppardmullin.com
gbuccigross@sheppardmullin.com
mmueller@sheppardmullin.com

*Counsel for Appellees*

/s/ Art Hasan
Art Hasan
*Attorney for Plaintiff-Appellant,*
*NYKO Technologies, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*11,516*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[      ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[      ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: <u>February 12, 2014</u>          <u>/s/ Art Hasan                              </u>
                                         Art Hasan
                                         *Attorney for Plaintiff-Appellant,*
                                         *NYKO Technologies, Inc.*